NONCONFIDENTIAL

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **AMERICAN HONEY PRODUCERS ASSOCIATION AND SIOUX HONEY ASSOCIATION,** | |
|       **Plaintiffs,** | |
| **v.** | |
| **THE UNITED STATES,** | **Before: Mark A. Barnett, Chief Judge** |
|       **Defendant,** | **Court No. 22-00195** |
| **and** | |
| **ALLIED NATURAL PRODUCT AND AMBROSIA NATURAL PRODUCTS (INDIA) PVT. LTD,** | |
|       **Defendant-Intervenors.** | |

**PLAINTIFFS' RULE 56.2 MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

R. ALAN LUBERDA
MELISSA M. BREWER
JOSHUA R. MOREY
MATTHEW G. PEREIRA
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to the American Honey Producers
Association and the Sioux Honey Association

December 16, 2022

NONCONFIDENTIAL

## Table of Contents

Page

ADMINISTRATIVE DETERMINATION UNDER REVIEW ....................................................1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ...................................................1

STANDARD OF REVIEW .........................................................................................................5

STATEMENT OF FACTS ..........................................................................................................6

ARGUMENT .............................................................................................................................11

I.      THE DEPARTMENT'S RELIANCE ON RESPONDENTS' ALLEGEDLY AUDITED FINANCIAL STATEMENTS AND FAILURE TO APPLY ADVERSE FACTS AVAILABLE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE .........................................................................11

      A.      Legal Standard for Gap Filling ...............................................................11

      B.      The Department's Factual Findings That the Respondents Did Not Withhold Information or Impede the Department's Investigation Are Not Supported by Substantial Evidence .........................................12

            1.      Ambrosia Withheld Its Fiscal Year 2020-2021 Audited Financial Statements and Impeded the Investigation................................12

            2.      Allied Withheld Its Fiscal Year 2020-2021 Audited Financial Statements and Impeded the Investigation................................17

            3.      Respondents' Submission of Audited Financial Statements in Response to Questionnaires in Lieu of Verification Denied Plaintiffs an Opportunity to Rebut, Clarify, or Correct Them .........................................................................19

      C.      The Department's Explanations that Respondents' Acted to the Best of Their Ability Are Wrong ..................................................21

            1.      The Department's Claim That It Did Not Specify That Allied and Ambrosia Submit Audit Reports with Their Financial Statements Is Not Supported by Substantial Evidence.........................................................................21

NONCONFIDENTIAL

**Table of Contents**
**(continued)**

Page

2.   The Department's Determination That the Financial Statements for Each Company Indicate They Are Audited by an Independent Third Party Is Not Supported by Substantial Evidence ........................................................23

3.   The Department's Determination That the Respondents' Financial Statements Are Reliable and Not Missing Integral Parts Is Not Supported by Substantial Evidence.........................................25

D.   Audited Financial Statements, Including the Auditor's Report, Are Core Information in Antidumping Duty Investigations...........................................29

E.   The Department's Reliance on Respondents' Financial Statements Are Not in Accordance with Law .........................................................30

II.   THE DEPARTMENT'S USE OF THE RESPONDENTS' ACQUISITION COSTS AS A PROXY FOR THE COP OF RAW HONEY IS UNLAWFUL .................................................................................32

A.   Factual Background on Raw Honey Costs .........................................................32

B.   The Department's Reliance on Acquisition Costs in This Case Is Contrary to Agency Practice.........................................................35

1.   The Department's Established Practice Is to Rely on Beekeeper and Middleman Costs When There Are Representative, Reliable, and Useable Costs Available .............................35

2.   Where Useable Beekeeper and Middleman Supplier Costs Are Not Available, The Department Must Fill the Gap with Appropriate Information, Including Government Published Cost Information .........................................................38

3.   The Department's Explanation for Rejecting NHBI Data Is Inadequate .........................................................39

C.   The Department's Determination That Acquisition Costs Are Reliable and a "Reasonable Proxy" for Supplier Costs Is Not Supported by Substantial Evidence .........................................................41

1.   For the Same Reasons That the Supplier Costs Cannot Be Used to Calculate COP, They Are Not a Reliable Benchmark .........................................................42

NONCONFIDENTIAL

**Table of Contents**
(continued)

                                                      **Page**

2.    The Beekeeper and Middleman Supplier Costs Are Also Not Verifiable .............................................................43

3.    The Department Failed to Analyze Numerous Reliable Cost Benchmarks Demonstrating the Respondents' Acquisition Costs Were Not a Reasonable Proxy for Beekeeper COP .........................45

III.    CONCLUSION.....................................................................................48

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Deacero S.A.P.I. de C.V. v. United States,
   996 F.3d 1283 (Fed. Cir. 2021)..............................................................................23

Goodluck India Ltd. v. United States,
   11 F.4th 1335 (Fed. Cir. 2021) ...............................................................................20

Husteel Co. v. United States,
   491 F. Supp. 2d 1283 (Ct. Int'l Trade 2007) ...........................................................6

Huvis Corp. v. United States,
   525 F. Supp. 2d 1370 (2007),
   aff'd upon remand, 570 F.3d 1347 (Fed. Cir. 2009)................................................6

Itochu Bldg. Prods. v. United States,
   163 F. Supp. 3d 1330 (Ct. Int'l Trade 2006) .................................................. 47-48

Motor Vehicle Ass'n v. State Farm Mut.,
   463 U.S. 29 (1983)..............................................................................................6, 43

Mukand, Ltd. v. United States,
   767 F.3d 1300 (Fed. Cir. 2014)..............................................................................11

Nippon Steel Corp. v. United States,
   337 F.3d 1373 (Fed. Cir. 2003)...........................................................5-6, 11, 23, 28

Suramerica de Aleaciones Laminadas. C.A. v. United States,
   44 F.3d 978 (Fed. Cir. 1994).....................................................................................5

Suzano S.A. v. United States,
   589 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ................................................. 45, 47-48

**Statutes and Regulations**

19 U.S.C. § 1516(b)(1)(B)(i) ...........................................................................................5

19 U.S.C. § 1677(28) ......................................................................................................36

19 U.S.C. § 1677b(b)(3) .............................................................................................36, 38

19 U.S.C. § 1677b(f)(1)(A)...................................................................................30, 31, 32

iv

NONCONFIDENTIAL

19 U.S.C. § 1677e(a) .................................................................................2, 4, 12, 38, 41

19 U.S.C. § 1677e(a)(1) and (2) ...................................................................................11

19 U.S.C. § 1677e(a)(2)(D) ............................................................................. 43-44, 45

19 U.S.C. § 1677e(b) ...............................................................................3, 4, 5, 40, 41

19 U.S.C. § 1677e(b)(1) ................................................................................................11

19 U.S.C. § 1677m(d) .................................................................................................22

19 U.S.C. § 1677m(i) ............................................................................................. 43-44

19 U.S.C. § 1677m(d) .................................................................................................22

19 C.F.R. § 351.301(c)(1)(v) ................................................................................ 19-20

## Legislative

Statement of Administrative Action,
  Uruguay Round Agreements Act,  H.R. Doc. No. 316. Vol. 1,
  103d Cong. 2d Sess. 656 (1994) .........................................................................36

## Administrative Determinations

Certain Iron Mechanical Transfer Drive Components From the People's Republic
  of China: Final Affirmative Determination of Sales at Less Than Fair Value,
  81 Fed. Reg. 75,032 (Dep't Commerce Oct. 28, 2016) and accompanying
  Issues and Decision Memorandum ...................................................................26, 27

Certain Preserved Mushrooms From Indonesia:
  Final Results of Antidumping Duty Administrative Review,
  66 Fed. Reg. 36,754 (Dep't Commerce July 13, 2001) and accompanying
  Issues and Decision Memorandum .........................................................................37

Certain Preserved Mushrooms From the Netherlands:
  Preliminary Affirmative Determination of Sales at Less Than Fair Value,
  Postponement of Final Determination, and Extension of Provisional Measures,
  87 Fed. Reg. 66,265 (Dep't Commerce Nov. 3, 2022) and accompanying
  Issues and Decision Memorandum .........................................................................26

NONCONFIDENTIAL

Final Determination of Sales at Less Than Fair Value:
   Canned Pineapple Fruit From Thailand, 60 Fed. Reg. 29,553
   (Dep't Commerce June 5, 1995) ..................................................................................37

Final Results of Antidumping Duty Administrative Review:
   Tapered Roller Bearings and Parts Thereof From the People's Republic of
   China, 56 Fed. Reg. 67,590 (Dec. 31, 1991) ..........................................................32

Issues and Decision Memorandum for the Final Affirmative Determination
   in the Less-Than-Fair-Value Investigation of Raw Honey from India
   (Dep't Commerce Apr. 7, 2022) ("IDM") (PR 346) ......................................... passim

Notice of Final Determination of Sales at Less Than Fair Value;
   Honey From Argentina, 66 Fed. Reg. 50,611 (Dep't Commerce Oct. 4, 2001)
   and accompanying Issues and Decision Memorandum (Sept. 24, 2001)
   ("Honey from Argentina OI IDM") ..................................................................36-37, 39, 40-41

Notice of Final Determination of Sales at Less Than Fair Value:
   Narrow Woven Ribbons with Woven Selvedge from Taiwan,
   75 Fed. Reg. 41,804 (Dep't Commerce July 19, 2010) and accompanying
   Issues and Decision Memorandum ...................................................................... 37-38

Notice of Final Determination of Sales at Less Than Fair Value:
   Steel Concrete Reinforcing Bars From Belarus, 66 Fed. Reg. 33,528
   (Dep't Commerce June 22, 2001) and accompanying Issues and Decision
   Memorandum .......................................................................................................... 26-27

Notice of Final Determinations of Sales at Less Than Fair Value:
   Certain Durum Wheat and Hard Red Spring Wheat from Canada,
   68 Fed. Reg. 52,741 (Dep't Commerce Sept. 5, 2003) and accompanying
   Issues and Decision Memorandum .........................................................................39

Notice of Final Results of Antidumping Duty Administrative Review:
   Individually Quick Frozen Red Raspberries From Chile, 70 Fed. Reg. 6,618
   (Dep't Commerce Feb. 8, 2005) and accompanying Issues and Decision
   Memorandum ...........................................................................................................37

Notice of Preliminary Determination of Sales at Less Than Fair Value:
   Greenhouse Tomatoes From Canada, 66 Fed. Reg. 51,010
   (Dep't Commerce Oct. 5, 2001), unchanged in final, 67 Fed. Reg. 8781
   (Dep't Commerce Feb. 26, 2002) (final determ.) and accompanying Decision
   Memorandum ...........................................................................................................37

Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of
   Vietnam: Initiation of Less-Than-Fair-Value Investigations,
   86 Fed. Reg. 26,897 (Dep't Commerce May 18, 2021) (PR 54) ..............................6

Raw Honey From India:
    Final Affirmative Determination of Sales at Less Than Fair Value and Final
    Negative Determination of Critical Circumstances, 87 Fed. Reg. 22,188
    (Apr. 14, 2022) ("Final Determination") (PR 356) ........................................................ *passim*

Raw Honey from India:
    Preliminary Affirmative Determination of Sales at Less Than Fair Value,
    Preliminary Negative Determination of Critical Circumstances, Postponement
    of Final Determination, and Extension of Provisional Measures,
    86 Fed. Reg. 66,528 (Dep't Commerce Nov. 23, 2021)
    ("Preliminary Determination") (PR 273) and accompanying Decision
    Memorandum for the Preliminary Determination in the Less-Than-Fair-Value
    Investigation of Raw Honey from India ("Prelim. Decision Memo") (PR 259) ............. *passim*

Stainless Steel Bar From India:
    Final Results of Antidumping Duty Administrative Review; 2018-2019,
    85 Fed. Reg. 74,985 (Dep't Commerce Nov. 24, 2020) and accompanying
    Issues and Decision Memorandum ..................................................................................... 37-38

Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the
    People's Republic of China; Final Results of 1996-1997 Antidumping
    Administrative Review and New Shipper Review and Determination Not to
    Revoke Order in Part, 63 Fed. Reg. 63,842 (Nov. 17, 1998), aff'd,
    Timken Co. v. United States, 201 F. Supp. 2d 1316 (Ct. Int'l Trade 2002) ............................ 32

Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the
    People's Republic of China; Final Results of 1997-1998 Antidumping Duty
    Administrative Review and Final Results of New Shipper Review,
    64 Fed. Reg. 61,837 (Dep't Commerce Nov. 15, 1999), aff'd,
    Luoyang Bearing Factory v. United States, 240 F. Supp. 2d 1268
    (Ct. Int'l Trade 2002) ......................................................................................................... 31-32

Wooden Bedroom Furniture from the People's Republic of China:
    Final Results of the 2004-2005 Semi-Annual New Shipper Reviews,
    71 Fed. Reg. 70,739 (Dec. 6, 2006) .................................................................................. 26-27

## PLAINTIFFS' BRIEF IN SUPPORT OF THE MOTION FOR JUDGEMENT ON THE AGENCY RECORD

On behalf of the American Honey Producers Association and the Sioux Honey Association ("Plaintiffs"), we submit this Memorandum of Law in support of Plaintiffs' Motion for Judgement Upon the Agency Record.  Plaintiffs urge this Court to determine that certain aspects of the U.S. Department of Commerce's (the "Department" or "Commerce") final determination of sales at less-than-fair-value ("LTFV") are not supported by substantial evidence and are not otherwise in accordance with law and to remand the agency's determination for further proceedings.

### ADMINISTRATIVE DETERMINATION UNDER REVIEW

Plaintiffs challenge certain aspects of the Department's affirmative determination in the LTFV investigation of raw honey from India.  See Raw Honey From India: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 87 Fed. Reg. 22,188 (Apr. 14, 2022) ("Final Determination") (PR 356)[1] and the accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Raw Honey from India (Dep't Commerce Apr. 7, 2022) ("IDM") (PR 346).

### ISSUES PRESENTED AND SUMMARY OF ARGUMENT

The Department's Final Determination is not supported by substantial evidence and is not otherwise in accordance with law because the Department improperly:

---

[1]    Documents in the administrative record are cited using the descriptions provided in the Index to the Administrative Record, filed with this Court on September 24, 2022 (ECF No. 16). Documents are cited by their confidential record number ("CR __") and/or their public record number ("PR__"), as appropriate.

NONCONFIDENTIAL

1. Failed to rely on adverse facts available ("AFA") in calculating a dumping margin for Allied Natural Product ("Allied") and Ambrosia Natural Products ("Ambrosia") (collectively "Respondents");

2. Relied on the Respondents' acquisition costs for raw honey to calculate the cost of production of the subject merchandise.

First, the Department's factual findings that Ambrosia and Allied did not "withhold" information or "impede" the agency's investigation under 19 U.S.C. § 1677e(a) are not supported by substantial evidence. The Department instructed each respondent to submit the fiscal year 2020-2021 audited financial statements, including the accompanying notes and auditor's report, for the themselves and their affiliates on several occasions, with each respondent ultimately promising to submit copies of such financial statements when they became available. Each respondent, however, withheld the audited financial statements until they responded to a questionnaire issued by the Department in lieu of verification, [

]. Neither respondent's so-called "audited" financial statement, however, included the auditor's report. Ambrosia even attempted to submit a new version of the financial statements, which it claimed included the missing auditor's report, in response to Plaintiffs' case brief, but the Department rejected the financial statements as untimely filed new factual information.

Additionally, the Department does not permit interested parties to submit information to rebut, clarify, or correct information contained in a response to questionnaire in lieu of verification. As a result, because the respondents submitted the financial statements in response to the Department's questionnaire in lieu of verification, Plaintiffs had no opportunity to submit information to rebut, clarify, or correct the financial statements. Given that Respondents informed the Department that they would submit copies of the financial statements when they

NONCONFIDENTIAL

were available, the financial statements are dated [                    ] the date respondents submitted

them, the copies of the financial statements submitted by respondents did not contain the

auditor's report, and Plaintiffs were deprived of an opportunity to submit information to rebut,

clarify, or correct the financial statements, the Department's factual findings that Ambrosia and

Allied did not "withhold" information or "impede" the Department's investigation are not

supported by substantial evidence.

Second, the Department's factual findings that respondents cooperated by acting to the

best of their ability under 19 U.S.C. § 1677e(b) is also not supported by substantial evidence.

The Department found that because the agency's questionnaire in lieu of verification did not

"explicitly specify" that financial statements include an auditor's report, respondents' failure to

include the auditors' reports is not evidence of a lack of cooperation.   Contrary to the

Department's determination, the record is clear that the definition of an "audited financial

statement" includes the "footnotes and auditor's opinion."  Moreover, the record demonstrates

that both respondents were aware of this definition, and [

]. Therefore, the Department's explanation that the

Respondents cooperated to the best of their ability is contrary to the record.

The Department's determinations that the auditor's reports are not an "integral" part of

the financial statements and the financial statements were reliable is also not supported by the

record and is contrary to the agency's practice.  The Department's longstanding practice is to

require respondents to submit an auditor's report along with their financial statements because

the report is the only information that confirms the financial statements are in accordance

generally accepted accounting principles ("GAAP"), and the statute requires that a respondent's

books and records are GAAP compliant in order for the agency to rely on those books and

records.   Additionally, Indian law requires that an auditor's report be attached to financial statements.  Because the respondents did not submit the auditor's reports, the Department's determination that the financial statements are reliable and useable is not supported by substantial evidence.

Finally, audited financial statements (including an auditor's report) are a "core" component of the dumping calculation.  The financial statements are the foundational documents upon which all sales and cost information must be reconciled and verified.  The Respondents' failure to submit copies of the complete audited financial statements, including the auditor's reports, should have resulted in the application of total adverse facts available.

Third, the Department's use of respondents' acquisition costs as a "proxy" for the cost of producing raw honey is not in accordance with law.  Where the respondent is not the producer of the merchandise under consideration, the Department's practice is to rely on the supplier's costs of the major input – in this case raw honey.  Here, the Department acknowledged this practice but determined that it was unable to collect a representative sample of costs from the respondents' beekeeper and middleman suppliers.  In past cases where the Department has been unable to rely on suppliers' costs, the Department has relied on public, government published data to fill the gap in the record under 19 U.S.C. § 1677e(a) as non-adverse facts available.  The Department unlawfully rejected such information here stating that it could not rely on such data because the beekeeper and middleman suppliers did not fail to cooperate to the best of their ability under 19 U.S.C. § 1677e(b).  Contrary to the Department's explanation, however, regardless of the level of cooperation of the beekeeper/middleman suppliers, the costs were unrepresentative and unusable as the Department correctly determined.  Therefore, the

NONCONFIDENTIAL

Department's rejection of public, government published data on the cost of producing raw honey in India, is based on the wrong standard (i.e., under 19 U.S.C. § 1677e(b)).

The Department's use of acquisition costs is also not supported by substantial evidence. Having made the factual finding that beekeeper/middleman supplier costs were not representative, the Department then relied on the sample beekeeper and middleman supplier costs to determine that respondents' acquisition costs were a "reasonable proxy" for the suppliers' costs. These findings are contradictory and undermine the Department's finding that the acquisition costs were a "reasonable proxy" for the suppliers' costs. The record also demonstrates that the submitted beekeeper/middleman supplier costs were unverifiable *and* the Department made no attempt to verify them. Lastly, the Department failed to address several other benchmarks (i.e., detracting evidence) that showed the acquisition costs were not a "reasonable proxy" for the cost of producing raw honey. As a result, the Department's determination is not supported by substantial evidence.

## STANDARD OF REVIEW

This Court must hold unlawful any aspect of the Department's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence exists, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"

Nippon Steel Corp. v. United States. 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Atl. Sugar. Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

The standard also requires the Department to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Ass'n v. State Farm Mut., 463 U.S. 29, 43 (1983); see also Husteel Co. v. United States, 491 F. Supp. 2d 1283, 1291-93 (Ct. Int'l Trade 2007) (finding the agency's determination unsupported by substantial evidence because the agency "did not provide a reasoned explanation supported by a stated connection between the facts found and the choices made . . . .") (citation omitted)).

In addition, the Court will find the Department's action to be not in accordance with law when that decision is contrary to statute, regulation, precedent, or procedures. Huvis Corp. v. United States, 525 F. Supp. 2d 1370, 1374 (2007), aff'd upon remand, 570 F.3d 1347 (Fed. Cir. 2009).

## **STATEMENT OF FACTS**

On May 11, 2021, the Department initiated the antidumping investigation of raw honey from India based on petitions filed by Plaintiffs. See Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 86 Fed. Reg. 26,897 (Dep't Commerce May 18, 2021) (PR 54).

On June 4, 2021, the Department selected Allied and Ambrosia as the mandatory respondents. See Memo From USDOC To DAS/EC Pertaining to Interested Parties Respondent Selection Memo (June 4, 2021) (CR 38) (PR 62).

On June 8, 2021, the Department issued initial antidumping questionnaires to the Respondents. See Letter From USDOC to Trade Pacific Pertaining to Allied Natural Product

NONCONFIDENTIAL

Questionnaire (June 8, 2021) (PR 63) ("Allied's Initial Questionnaire"); Letter From USDOC to Ambrosia Natural Products Pertaining to Ambrosia Natural Products Questionnaire (June 8, 2021) (PR 65) ("Ambrosia's Initial Questionnaire") (collectively "Initial Questionnaires").

In those questionnaires, the Department required that each respondent submit audited 2019/2020 and 2020/2021 financial statements in response to Section A. Ambrosia's Initial Questionnaire at A-10, Q. 6.b (PR 65); Allied's Initial Questionnaire at A-10 Q. 6.b (PR 63). Neither respondent submitted copies of the 2020/2021 audited financial statements in response to the Initial Questionnaires or in response to several supplemental questionnaires issued by the Department, but both respondents informed the Department they would submit copies of the financial statements when they were available.[2] See sections I.B.1 – I.B.2.

On November 17, 2021, the Department issued its Preliminary Determination and calculated dumping margins for Ambrosia of 6.72 percent and for Allied of 6.24 percent. See Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 86 Fed. Reg. 66,528 (Dep't Commerce Nov. 23, 2021) (hereinafter "Preliminary Determination") (PR 273), and accompanying Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Raw Honey from India (hereinafter "Prelim. Decision Memo") (PR 259).

Despite neither company submitting any audited financial statements for the fiscal year covering the period of investigation (i.e., Apr. 1, 2020 to Mar. 31, 2021), the Department relied

---

[2]     Additional factual background is provided in the argument section.

on the cost and sales information submitted by each respondent to calculate the dumping margins without reliance on adverse facts available.

In addition, with respect to the Department's calculation of each respondent's cost of production ("COP"), the Department relied on the acquisition cost of raw honey by the exporter from the middlemen or honey producers as a surrogate for the COP of the purchased raw honey. Memo from USDOC to Office Dir/OA Pertaining to Allied Prelim Cost Memo at 1-2 (CR 216) (PR 261); Memo from USDOC to Office Dir/OA Pertaining to Ambrosia Prelim. Cost Memo at 1-2 (CR 234) (PR 269).

The Department also announced its intention to conduct verification "through alternative means in lieu of an on-site verification" as a result of "travel restrictions in response to the global COVID-19 pandemic." Preliminary Determination, 86 Fed. Reg. at 66,529 (PR 273).

On January 6, 2022, the Department issued questionnaires to each respondent in lieu of on-site verification. See Letter from USDOC to Ambrosia Natural Products Pertaining to Ambrosia in Lieu Of Verification Qnaire (Jan. 6, 2022) (CR 247) (PR 291) ("Letter Issuing Ambrosia QILOV"); Letter From USDOC to  Trade Pacific Pertaining to Allied in Lieu of Verification Qnaire (Jan. 6, 2022) (CR 248) (PR 292) ("Letter Issuing Allied QILOV").

On January 18, 2018, respondents' each submitted what they claimed to be fiscal year 2020-2021 complete audited financial statements in response to the Department's questionnaire in lieu of verification. See Verification from Ambrosia Natural Products India Pvt. Ltd. to Sec of Commerce Pertaining to Ambrosia Verification QR at VD-10 (a) (CR 249-61) (PR 296) ("Ambrosia QILOV"); Verification from Trade Pacific PLLC to Sec of Commerce Pertaining to Allied Verification QR at SVE-1 (CR 267-78) (PR 297) ("Allied QILOV").   This new

information was filed after the record was closed, which prevented the Department and Plaintiffs from conducting further inquiry.

Following Respondents' submission of responses to the questionnaire in lieu of verification, Plaintiffs submitted a case brief challenging certain aspects of the Department's Preliminary Determination.  In particular, Plaintiffs argued the Department should rely on total adverse facts available ("AFA") with respect to both Respondents because record evidence demonstrated that the so-called "audited" financial statements submitted by each respondent were not in fact the complete, official, audited financial statements they were portrayed to be. Letter From Kelley Drye & Warren LLP To Sec of Commerce Pertaining to Petitioners Re-Submission of Case Brief To Remove Bracketing at 5-24 (CR 294) (PR 327-28) ("Pets. Case Brief"). [3]  Further, without complete, audited financial statements, the Department could not reconcile and verify the cost and sales information submitted by each respondent to the Respondents' books and records.  Id. at 20-24 (CR 294) (PR 327-28).  This was further evidenced by discrepancies between the reported cost and sales information and the data in the "audited" financial statements, which undermined the reliability of the reported cost and sales information, the submitted financial statements or both.  Id. at 19-20 (CR 294) (PR 327-28). Given that the Department had instructed the respondents to submit the complete audited financial statements on several occasions, Plaintiffs argued the respondents had failed to cooperate by not acting to the best of their ability in submitting such information.  Id. at 20-24 (CR 294) (PR 327-28).

---

[3]   The Department instructed Plaintiffs to resubmit their case brief and treat as public information certain information that Respondents' had previously treated as proprietary. See Memo from USDOC to File Pertaining to Interested Parties Bracketing of Brief and Establishes Deadlines (CR 292) (PR 323).

NONCONFIDENTIAL

Plaintiffs also argued that if the Department did not rely on total AFA in calculating a dumping margin for the Respondents it should not rely on the acquisition cost of purchased raw honey in calculating COP.  Id. at 25-45 (CR 294) (PR 327-28).  Specifically, the Department's longstanding practice is to rely on supplier costs, but because the supplier costs the Department received during the investigation were found by the Department to be unrepresentative, and were also unverifiable and unreliable, the Department was required to fill the gap in the record with other cost information.  See id. (CR 294) (PR 327-28).  Moreover, the record contained multiple benchmarks that demonstrated that the acquisition costs on the record were not a reasonable proxy for supplier costs.  See id. at 48-52 (CR 294) (PR 327-28).  As a result, Plaintiffs urged the Department to instead rely on information published by the Government of India regarding the cost of producing raw honey in India.  Id. at 47-59 (CR 294) (PR 327-28).

In its Final Determination, the Department determined the Respondents did not withhold information from the record, did not fail to provide information by established deadlines that significantly impeded the proceeding, and did not provide information that cannot be verified.  IDM at 31-32 (PR 346).  The Department therefore found no basis to conclude that the Respondents failed to cooperate to the best of their abilities and that the documents submitted were usable for margin calculation purposes.  Id. at 32 (PR 346).  In addition, the Department continued to rely on Respondents' acquisition costs as a surrogate for the COP of the purchased raw honey.  See id. at 38-43 (PR 346).  The Department specifically held that application of "AFA is not warranted for Allied or Ambrosia's beekeeper-suppliers' and middlemen/beekeeper-supplier, as these interested parties have submitted complete and usable cost responses."  Id. at 43 (PR 346).  Plaintiffs, however, did not urge the Department to rely on AFA, but instead urged

NONCONFIDENTIAL

the Department to calculate COP based information published by the Government of India as a superior gap filling surrogate to Respondents' unrepresentative and unverified acquisition costs.

This appeal followed.

## ARGUMENT

**I.   THE DEPARTMENT'S RELIANCE ON RESPONDENTS' ALLEGEDLY AUDITED FINANCIAL STATEMENTS AND FAILURE TO APPLY ADVERSE FACTS AVAILABLE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

### A.   Legal Standard for Gap Filling

The statute requires Commerce to resort to facts available if necessary information is not on the record or an interested party: (1) withholds information that has been requested by Commerce; (2) fails to provide such information by the deadlines established, or in the form and manner requested;  (3) significantly impedes a proceeding; or (4) provides information that cannot be verified.  See 19 U.S.C. § 1677e(a)(1) and (2).

Further, if Commerce determines "that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  Id. § 1677e(b)(1).  A party's compliance with the "best of its ability" standard is determined by assessing whether the party has done "the maximum it is able to do" in responding to a request for information.  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  This includes providing complete, accurate, and timely responses to Commerce's requests for information.  See id.  Moreover, total, as opposed to partial, AFA is appropriate when the missing information is "core" to Commerce's analysis "and leaves little room for the substitution of partial facts without undue difficulty."  Mukand, Ltd. v. United States, 767 F.3d 1300, 1308 (Fed. Cir. 2014).

**B.**     **The Department's Factual Findings That the Respondents Did Not Withhold Information or Impede the Department's Investigation Are Not Supported by Substantial Evidence**

In rejecting Plaintiffs' argument that the Department should assign each respondent an antidumping rate based on total AFA for the failure to provide complete and accurate financial statements, the Department found that the Respondents' "did not withhold information from the record, did not fail to provide information by established deadlines that significantly impeded the proceeding, and did not provide information that cannot be verified." IDM at 31-32 (PR 346). The Department's factual findings regarding the statutory factors under 19 U.S.C. § 1677e(a) are not supported by substantial evidence as record evidence shows that Ambrosia and Allied failed to provide complete and accurate financial statements for Fiscal Year 2020-2021.

**1.**     **Ambrosia Withheld Its Fiscal Year 2020-2021 Audited Financial Statements and Impeded the Investigation**

The Department's Initial Questionnaire instructed the Respondents to submit copies of their audited financial statements, including an auditor's report, as follows:

> Please provide the following financial documents for the two most recently completed fiscal years . . . audited, consolidated and unconsolidated financial statements (including any footnotes **and auditor's opinion**);

Ambrosia's Initial Questionnaire at A-10 (PR 65) (emphasis added). The relevant fiscal years were 2019-2020 and 2020-2021.

In its response to Section A of the Department's initial questionnaire, Ambrosia explained that it was a "processor of raw honey," "was not in the business of beekeeping," and was also submitting its questionnaire response on behalf of two affiliates – Ambrosia Enterprise ("AE") and Sunlite India Agro Producer Co. Ltd. ("Sunlite"), which are "traders of raw honey" that they procure from beekeepers. Response from Ambrosia Natural Products India Pvt. Ltd. to

NONCONFIDENTIAL

Sec of Commerce Pertaining to Ambrosia Sec A QR at A-1 (CR 48-55) (PR 92-98) ("Ambrosia AQR").

Ambrosia submitted audited financial statements for fiscal years 2018-2019 and 2019-2020 for itself, Sunlite, and AE, stated that the fiscal year 2020-2021 audited financial statements were "not yet ready," and informed the Department it would submit copies when they are "ready." Ambrosia AQR at A-19 (CR 48-55) (PR 92-98).   The missing financial statements covered the entire period of investigation.

On August 23, 2021, in a supplemental questionnaire, the Department instructed Ambrosia to provide copies of Ambrosia's, Sunlite's, and AE's "2020-2021 financial statements" and to the extent "these financial statements are not yet available, provide year end unaudited financial statements or the year end accounting trial balance."   Ambrosia 9/16/21 SABCQR at 1, S1-4 – S1-5 (CR 124-30) (PR 173-76).  Ambrosia responded that "{t}he audit of FY 2020-2021 is in process," and submitted copies of each company's trial balance.  Id. at S1-4 – S1-5 (CR 124-30) (PR 173-76).

On September 10, 2021, the Department again attempted to collect copies of Ambrosia's, Sunlite's and AE's FY 2020-2021 audited financial statements.   Response from Ambrosia Natural Products India Pvt. Ltd. to Sec of Commerce Pertaining to Ambrosia Suppl Sec D Qr at S-1 (CR 135-38) (PR 186) ("Ambrosia 9/24/21 SDQR").   Moreover, to the extent Ambrosia claimed these financial statements were not yet available, the Department also instructed Ambrosia to provide the date when they would be available.   Id. (CR 135-38) (PR 186). Ambrosia responded that the audited financial statement for fiscal year 2020-2021 was still in process, and that it expected the audit for Ambrosia, AE, and Sunlite would be finalized around October 30, 2021.  Id. (CR 135-38) (PR 186).

NONCONFIDENTIAL

On October 14, 2021, the Department made its fourth request for Ambrosia to submit copies the FY 2020-2021 audited financial statements for Ambrosia, Sunlite, and AE. Ambrosia 10/28/21 2SDQR at SD2-1 (CR 168-69) (PR 224).  Ambrosia again responded that the financial statements were not yet available and that it now anticipated they "would be finalized around 20th November 2021," which was shortly after the deadline for the Department's preliminary determination. Id. (CR 168-69) (PR 224).  Ambrosia also promised the Department that "{o}nce the Audited Financials are ready," it would submit them. Id. (CR 168-69) (PR 224).  Despite November 20, 2021 passing, however, Ambrosia did not submit copies of the audited financial statements for itself or its affiliates.

It was not until mid-January 2022, in response to the Department's questionnaire in-lieu of verification, that Ambrosia finally submitted copies of what it claimed were the audited financial statements for the three relevant entities for FY 2020-2021.  Ambrosia's 1/18/2022 QILOV at Exhibits VD-10(a), VD-10(b), VD-10(c) (CR 249-61) (PR 296).

As Plaintiffs discussed in their administrative case brief, the record indicated, that Ambrosia's so-called "audited financial statements," were incomplete and were missing significant indicia of reliability normally contained on Indian financial statements, including in the earlier period financial statements placed on the record by Ambrosia.  See Pets. Case Br. at 10-17 (CR 294) (PR 327-28).  For Ambrosia, the most significant deficiencies in the 2020-2021 financial statement highlighted by Plaintiffs to Commerce include:

- The fiscal year 2020-2021 financial statement for Ambrosia was not accompanied by a legally required independent auditor's report (QILOV at Exhibit VD-10 (a) (CR 249-61) (PR 296))

- Annexures A and B and the Report on Internal Financial Controls appended to the auditor's report were also missing (id.);

NONCONFIDENTIAL

- There was not an auditor's signature on any page of the financial statement (Ambrosia QILOV at Exhibit VD-10 (a) (CR 249-61) (PR 296)) [

  ] (Ambrosia AQR at Exhs. A-9(a)-(b) (CR 48-55) (PR 92-98));

- There was not an auditor's stamp on any page of the document (Ambrosia QILOV at Exhibit VD-10 (a) (CR 249-61) (PR 296)), [

  ] (Ambrosia AQR at Exhs. A-9(a)-(b) (CR 48-55) (PR 92-98));

- There were a significant number of the pages on the 2020-2021 statement containing the signature of only one of the two directors designated for signature, while the rest contained the signature of both of the directors designated for signature (Ambrosia QILOV at Exhibit VD-10 (a) (CR 249-61) (PR 296);

- There were various other missing forms and information required by India law including Form No. AOC-1, Form No. MGT-9, the list of directors, the Balance Sheet Abstract and General Business profile, as well as certain documents for consolidated affiliates Satyam Enclave and Kandera (see Pets. Case Br. at 12-14 (CR 294) (PR 327-28)).

The financial statements for Ambrosia's affiliate, AE, were also missing the legally required auditor's report (which was specifically referenced in the financial statement itself) as well as the Section 44AB Statement of Particulars, the Detail stock Annexure, the Annexure to Computation of Book Profit, Annexure III, and the auditor's signature and company stamp on Annexure page of various other forms and information. See Pets. Case Br. at 15-17 (CR 294) (PR 327-28). Thus, the financial statements for 2020-2021 provided by Ambrosia and AE were incomplete and were missing the normal indicia of reliability (forms, signatures, stamps, auditor's report) that financial accounting rules (Indian GAAP) require for such documents to be deemed reliable. Accordingly, Plaintiffs urged the Department not to rely on the Ambrosia's financial statements, as they were incomplete and unreliable. Id. at 20-24 (CR 294) (PR 327-28).

In response to the submission of Plaintiffs' case brief to the Department, Ambrosia attempted to file another version of its financial statements on February 8, 2022, this time

NONCONFIDENTIAL

including an auditor's report and certain appendices.  <u>See</u> Letter from Kelley Drye & Warren LLP to Sec of Commerce Pertaining to Petitioners Petits Cmts re Ambrosia's Untimely NFI (CR 291) (PR 321) ("Pets. Letter re Ambrosia Untimely NFI").  The newly filed financial statements were dated [

                                            ].  <u>Id.</u> at 4 (CR 291) (PR 321).    The Department, however, ultimately rejected Ambrosia's February 8, 2022, submission because it contained untimely and unsolicited new factual information ("NFI") and the record was closed. <u>See</u> Letter from USDOC to Ambrosia Natural Products India Pertaining to Ambrosia Rejection of New Factual Info (Feb 8, 2022) (PR 322) ("DOC Letter to Ambrosia Rejecting Untimely NFI").[4]

   At a minimum, this untimely attempt to submit a new "audited" financial statement confirmed that the earlier version of 2020-2021 financial statement ultimately relied upon by the Department was incomplete.  It also unequivocally demonstrates that the Department's finding that Ambrosia did not "withhold" information is unsupported by substantial evidence.   On October 28, 2021, Ambrosia promised the Department that "{o}nce the Audited Financials are ready," it would submit them.  Ambrosia 10/28/21 2SDQR at SD2-1 (CR 168-69) (PR 224).  The financial statements Ambrosia submitted in January 2022 were dated [

---

[4]    The Department also instructed all interested parties to destroy Ambrosia's untimely submitted financial statements and directed interested parties to refrain from "referencing the rejected information in future submissions."  <u>See</u> DOC Letter to Ambrosia Rejecting Untimely NFI at 1-2 (PR 322).  As a result, Plaintiffs do not have a copy of the proprietary version of Ambrosia's February 8, 2022 submission, are unable to further reference it in this brief, and cannot provide a copy of it to the Court.  Ambrosia has not appealed the Department's decision to exclude this document from the record.

]. See Pets. Letter re Ambrosia Untimely NFI at 4 (CR 291) (PR 321). As a result, the record evidence demonstrates the Department's finding that Ambrosia did not "impede" the investigation is not supported by substantial evidence.

### 2.   Allied Withheld Its Fiscal Year 2020-2021 Audited Financial Statements and Impeded the Investigation

Allied similarly withheld Fiscal Year 2020-2021 financial information. When instructed to submit copies of audited financial statements, including auditor's opinions (Allied Initial Questionnaire at A-10 (PR 63)), Allied responded that "{t}he audited financial statements for the FY 2020-2021 are not yet available, and will be provided when they are completed." Response from Trade Pacific PLLC to Sec of Commerce Pertaining to Allied Sec A QR at A-22 (CR 44-47) (PR 89-90) ("Allied AQR"); see also Response from Trade Pacific PLLC to Sec of Commerce Pertaining to Allied Sec B-D QR at B-6, C-5, D-17 ("Allied BCDQR") (CR 63-72) (PR 114-15) (noting that while its 2019-2020 financial statements were audited, the 2020-2021 statements were still unaudited, and would "be provided once" the audit "is complete").

On September 9, 2021, in response to the Department's request for Allied's audited financial statements, Allied stated that it was "in the process of finalizing its audited financial statements for FY 2020-2021" and instead submitted a copy of its trial balance. Response from Trade Pacific PLLC to Sec of Commerce Pertaining to Allied Sec A-C Suppl QR at S1-5 (CR 95-102) (PR 156) ("Allied 9/9/21 SABC QR").

On September 28, 2021, in response to the Department's subsequent request for its audited 2020-2021 financial statements, Allied responded that its audited financial statements were still not complete, and that it expected they would be completed by November 7, 2021.

Response from Trade Pacific PLLC to Sec of Commerce Pertaining to Allied Sec D Suppl QR at SuppD-12 (CR 142-45) (PR 191) ("Allied 9/28/21 SDQR").

On November 5, 2021, in response to yet another request for the company's audited 2020-2021 financial statements, Allied responded that the financial statements still were not ready, and that Allied now expected them to be completed by November 25, 2021. See Response from Trade Pacific PLLC To Sec of Commerce Pertaining To Allied 2nd Suppl Sec A-C QR at SuppABC2-1 (CR 194-209) (PR 246) ("Allied 11/5/21 SABCQR").

On January 18, 2022, in response to the Department's QILOV, Allied submitted copies of what it claimed were its fiscal year 2020-2021 "audited" financial statements. See Allied QILOV at Exhibit SVE-11 (CR 267-78) (PR 297). Importantly, however, the auditor's report for these so-called "audited" financial statements was missing. See id. (CR 267-78) (PR 297). That the auditor's report existed is demonstrated by language in the balance sheet and income statements that instruct the reader to [

] {a}s per *audit report* of even date annexed." Id. (CR 267-78) (PR 297) (emphasis added). The financial statement pages submitted also were missing the usual indicia of reliability found in financial statements. [

], for example, Allied's submitted 2020-2021 financial statements only had the auditor's signature block, stamp, and signature on the balance sheet and profit and loss statement. See Allied QILOV at Exhibit SVE-11 (CR 267-78) (PR 297); Allied AQR at (CR 44-47) (PR 89-90); Allied 11/5/21 SABCQR at SuppABC2-1, Exhibits S3-1(a) – S3-1(b) (CR 194-209) (PR 246). For the remaining pages, the auditor's signature was replaced with a small squiggly line on the auditor's stamp. See Allied QILOV at Exhibit SVE-11 (CR 267-78) (PR 297). The inconsistent signatures raise questions about the reliability of the submitted documents. Additionally, there

NONCONFIDENTIAL

were discrepancies among the reported cost figures reported as [

] discovered at verification.  <u>See</u> Pets. Case Brief at 19-20 (CR 294) (PR

327-28).  Such discrepancies, [                              ] undermine the reliability of the submitted

financial statements, the reported costs or both.

      Thus, Allied's submitted fiscal year 2020-2021 audited financial statement, on their face,

and as compared to the financial statements submitted from prior years in certain respects,

demonstrates that Allied "withheld" information from the financial statements that should have

been provided, contrary to the Department's finding that no such information was withheld.  <u>See</u>

Allied QILOV at Exhibit SVE-11 (indicating the financial statements have [

] {a}s per audit report") (CR 267-78) (PR 297).

Allied had indicated its financial statements would be available for submission by November 25,

2021, and the financial statements were [                              ], but waited to submit the

allegedly audited financial statements.  Thus, the Department's finding that Allied did not

"impede" the investigation is also unsupported.

    **3.**     **<u>Respondents' Submission of Audited Financial Statements in Response to Questionnaires in Lieu of Verification Denied Plaintiffs an Opportunity to Rebut, Clarify, or Correct Them</u>**

      The Department's regulations provide interested parties with an opportunity to submit

information to rebut, clarify, or correct information contained in questionnaire responses.  <u>See</u> 19

C.F.R. § 351.301(c)(1)(v) (providing interested parties with 14 days to submit information to

rebut, clarify, or correct information contained in an initial questionnaire response and 10 days to

submit information to rebut, clarify, or correct information contained in a supplemental

questionnaire response).  Because Respondents' submitted their so-called audited financial

statements in response to the Department's questionnaires in lieu of verification, Plaintiffs were specifically denied this opportunity. The Department's questionnaire in lieu of verification provided that:

> Normally, after an on-site verification, interested parties do not have an opportunity to submit factual information rebutting information collected by Commerce at verification. Accordingly, Commerce will not accept factual information from other interested parties to rebut your response to this request, but interested parties may address the information submitted in response to this request in case and rebuttal briefs.

See, e.g., Letter Issuing Allied QILOV at 2 (CR 248) (PR 292).

One basis for the Department's practice to not accept information to rebut, clarify, or correct information submitted during verification is that the Department generally does not to accept new information from a respondent at verification – including information previously requested and not provided by the respondent. While Commerce has the discretion to seek corrective information at verification, that "discretion has limits." Goodluck India Ltd. v. United States, 11 F.4th 1335, 1342 (Fed. Cir. 2021) (citing Goodluck India Ltd. v. United States, 393 F. Supp. 3d 1352, 1358 (Ct. Int'l Trade 2019); Borlem S.A.-Empreedimentos Industriais v. United States, 913 F.2d 933, 937 (Fed. Cir. 1990)). "Commerce's typical practice is to accept corrective information at verification only for 'minor corrections to information already on the record.'" Goodluck, 11 F.4th at 1342 (citing 19 C.F.R. §§ 351.301, 351.302(d)(1)(i); 19 U.S.C. § 1673d(e)). Here, both respondents provided missing information previously requested as a part of a written verification substitute procedure (the QILOV) after the record had closed. Record evidence ([                                                    ]) demonstrates that the information was available to the respondents before the record closed. Under the circumstances, the acceptance of the financial statements cannot be said to be a minor correction. That the statements provided

were incomplete and missing normal indicia of reliability makes the Department's acceptance of those documents all the more problematic.

Had the Respondents provided their financial statements when they were initially available, prior to verification in response to the initial and deficiency requests for information while the record was open, as each respondent committed to do, Plaintiffs would have had the opportunity to submit factual information and analysis to rebut, clarify, or correct information contained in the financial statements. This undermined the Department's ability to reach a reasoned conclusion. The Department's finding that Respondents did not impede the investigation is therefore not supported by substantial evidence.

### C.     The Department's Explanations that Respondents' Acted to the Best of Their Ability Are Wrong

#### 1.     The Department's Claim That It Did Not Specify That Allied and Ambrosia Submit Audit Reports with Their Financial Statements Is Not Supported by Substantial Evidence

The Department states that Respondents did not fail to cooperate to the best of its ability by failing to provide auditor's reports because the agency's verification questionnaire "did not explicitly specify that the accompanying audit report be provided." IDM at 32 (PR 346). This is not an accurate or complete portrayal of the record.

There is no dispute that the Department specifically required the Respondents to submit the audit report accompanying its audited financial statements by defining the audited financial statements requested as including the "footnotes and auditor's opinion." Initial Questionnaires at A-10 (explaining that "audited" financial statements include "**footnotes and auditor's opinion**") (PR 63, 65) (emphasis added). Allied and Ambrosia both responded directly to this question expressly stating that they would provide the requested information when it became available.

Allied AQR at A-22 (CR 44-47) (PR 89-90); Ambrosia AQR at A-19 (CR 48-55) (PR 92-98). Thus, the requirement to provide the auditor's report with the financial statement was clearly communicated, and both respondents indicated that they would do so when available.[5]   There was no reason to repeat a term already defined in the original questionnaire.

Nor is there any legitimate question that Respondents were aware that complete audited financial statements necessarily include an auditor's report.   The fiscal year 2018-2019 and 2019-2020 audited financial statements Ambrosia submitted for itself and its two affiliates [

]. See Ambrosia AQR at Exhs. A-9(a) to A-9(f), (CR 48-55) (PR 92-98).   Indeed, Ambrosia's untimely attempt to submit a new financial statement on February 4, 2021 with an auditor's report demonstrated that Ambrosia was well aware of the requirement. See Letter from Ambrosia Natural Products India Pvt. Ltd. to Sec of Commerce Pertaining to Ambrosia (Rejected) Auditors Signed Financial Statements (CR 285-89)[6] (PR 311-15) ("Ambrosia's Rejected Untimely Financial Statements").

Similarly, the balance sheet and income statements of Allied's submitted financial statements make clear an audit report accompanies the official (but not submitted) version of Allied's financial statements – making it an integral part of the financial statement.   Allied

---

[5]   While the Department's IDM does not specifically reference 19 U.S.C. § 1677m(d), the explanation that the agency "did not explicitly specify that the accompanying audit report be provided" seems to at least be an implicit reference to this section of the statute.   IDM at 32 (PR 346).   The requirement that a complete audited financial statement includes an auditor's report, however, was clearly communicated to both respondents in the initial questionnaire, and thus, the Department would have had no reason under 19 U.S.C. § 1677m(d) to repeat the instruction to include the auditor's report with the financial statement provided in the QILOV.

[6]   Interested parties were required to destroy the proprietary version of this file. The public version is available through the Department's ACCESS website.

NONCONFIDENTIAL

QILOV at Exhibit SVE-11 (referencing [

] {a}s per audit report") (CR 267-78) (PR 297).

That the Department's subsequent attempts to collect the Respondents' audited financial statements did not repeat that the definition of a complete financial statement includes an auditor's report did not lessen their reporting requirements. "An adverse inference is appropriate not only when an interested party fails to respond, but also where 'it is reasonable for Commerce to expect that more forthcoming responses should have been made.'" Deacero S.A.P.I. de C.V. v. United States, 996 F.3d 1283, 1298 (Fed. Cir. 2021) (quoting Nippon Steel Corp. v. United States, 337 F.3d 1373, 1383 (Fed. Cir. 2003)). Certainly, the Department should have reasonably expected the respondents to apply the same definition of an audited financial report as found in the initial questionnaire. The Department's explanation that Respondents cooperated to the best of their ability despite failing to provide complete audited financial statements, which include an auditor's report, is therefore not supported by substantial evidence.

### 2. The Department's Determination That the Financial Statements for Each Company Indicate They Are Audited by an Independent Third Party Is Not Supported by Substantial Evidence

Despite these problems, the Department found that Respondents' fiscal year 2020-2021 financial statements are reliable because "the submitted financial statements for each company indicate that they are audited by an independent third party, as evidenced by directors' and auditor's signatures and stamps that are present on the income statements." IDM at 32 (PR 346). As a result, the Department concluded "that the financial statements for both companies serve as a reliable basis for Commerce to use to ensure the reported cost and sales information is complete and accurate." Id. (PR 346). The record does not support the Department's

determination because the Department does not answer how an "audited" financial statement without the auditor's report can be considered complete and reliable.

Contrary to the Department's explanation, not a single page of Ambrosia's "Audited Financial Statement-2020-2021" on the record bears an auditor's signature or an auditor's stamp. See Ambrosia QILOV at Exh. VD-10(a) (CR 249-61) (PR 296). This includes the income statement. See id. (CR 249-61) (PR 296). Thus, the Department's determination with regards to Ambrosia's 2020-2021 financial statement is factually incorrect. Further, a company director's signature provides no objective basis to determine that financial statements are "audited by an independent third party." See IDM at 32 (PR 346). Accordingly, the Department's finding that Ambrosia's financial statements are reliable, complete, and accurate is not supported by substantial evidence.

Additionally, after Plaintiffs highlighted the significant deficiencies in Ambrosia's financial statement, Ambrosia attempted to file "audited financial statements, an auditor's opinion, and certain appendices," which the Department rejected as untimely new factual information. See DOC Letter to Ambrosia Rejecting Untimely NFI (PR 322). In the letter accompanying that submission, Ambrosia admits that "Exhibit VD-10(a)" i.e., the version Ambrosia had previously submitted, "is an Auditor unsigned version of the Audited Financial Statements." Ambrosia's Rejected Untimely Financial Statements at 2 (PR 311-15). Ambrosia would not have attempted to submit what it purported to be audited financial statements in the middle of briefing if the Department already had such audited financial statements on the record.

Allied's financial statements are also missing an auditor's report. See Allied QILOV at SVE-11 (CR 267-78) (PR 297). Allied informed the Department it would submit its 2020-2021 audited financial statements (including any footnotes and the auditor's report), and the balance

sheet and the income statement specifically reference the existence of such a report.   Allied QILOV at Exhibit SVE-11 (CR 267-78) (PR 297).   Additionally, only the first two pages of Allied's 2020-2021 financial statements have an auditor's signature (with the remaining pages containing only a squiggly line where the auditor's signature should be).   See id. (CR 267-78) (PR 297).   More importantly, however, it is the auditor's report, not an auditor's signature, that comments on the accuracy and reliability of the figures presented by the company in the financial statement, and that was missing from the record.   The fact that an auditor reviewed the data alone is insufficient.   What matters is that an auditor concluded the financial statements are a true and accurate representation of the books and records and are GAAP compliant – and that information would be in the missing auditor's report.

Accordingly, the Department's determination that the Respondents' financial statements indicate that they are audited as accurate is not supported by substantial evidence on the record.

### 3.   The Department's Determination That the Respondents' Financial Statements Are Reliable and Not Missing Integral Parts Is Not Supported by Substantial Evidence

Despite the absence of auditor's reports, the Department found that the Respondents' financial statements are reliable, complete, and accurate, because the documents "alleged by the petitioners to be missing are not an integral part of the financial statements," and that "the missing data are not critical for Commerce's use for this investigation."   IDM at 32-33 (PR 346). This is contradicted by the Department's own practice, Indian law, and the record.

The Department has consistently determined that the auditor's report is an integral part of the financial statements, is required to determine the reliability of financial statements, and has rejected financial statements that do not have an auditor's report.   See Certain Preserved Mushrooms From the Netherlands: Preliminary Affirmative Determination of Sales at Less Than

Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 87 Fed. Reg. 66,265 (Dep't Commerce Nov. 3, 2022) and accompanying Issues and Decision Memorandum at 7-8 (preliminarily finding that a respondent impeded an investigation and failed to cooperate by not acting to the best of its ability "{b}y withholding information critical to this proceeding, mainly the auditor's report of Okechamp's 2021 financial statements, and not placing them on the record"); Certain Iron Mechanical Transfer Drive Components From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 75,032 (Dep't Commerce Oct. 28, 2016) and accompanying Issues and Decision Memorandum at 45 ("CMTDC from China") (finding that the Department's "decision not to rely on Thai Iron's financial statements . . . is consistent with the aforementioned cases that lacked the auditor's statement, or certain sections of the auditor's statement, for certain financial statements indicating those were incomplete financial statements" and that the agency "cannot rely on the Thai Iron financial statements without an auditor's statement" because "{a}n auditor's statement provides an opinion regarding the reliability of a company's financial statements."); Wooden Bedroom Furniture from the People's Republic of China: Final Results of the 2004-2005 Semi-Annual New Shipper Reviews, 71 Fed. Reg. 70,739 (Dec. 6, 2006), and accompanying Issues and Decision Memorandum at 6 ("It is the Department's practice to disregard incomplete financial statements as a basis for calculating surrogate financial ratios where '. . . the statement is missing key sections, such as sections of the auditor's report, that are vital to our analysis and calculations.'"); Notice of Final Determination of Sales at Less Than Fair Value: Steel Concrete Reinforcing Bars From Belarus, 66 Fed. Reg. 33,528 (Dep't Commerce June 22, 2001) and accompanying Issues and Decision Memorandum at Comment 2

("{W}e are concerned that the statement is missing key sections, such as sections of the auditor's report, that are vital to our analysis and calculations").

Given the Department's long-held practice of finding that financial statements that are missing an auditor's report are unreliable, that auditor's reports are a key, integral part of financial statements, and that auditor's reports are vital to the Department's analysis and calculations, it is contrary to the Department's consistent practice and unlawful for the Department to claim here that the auditor's reports are not an integral part of financial statements.  The entire purpose of an auditor's report, as the Department itself notes, is to "provide{} an opinion regarding the reliability of a company's financial statements."  CMTDC from China at 45.  The Department is missing that opinion in this case.

The Department also cites to Ambrosia's unsupported claim as to the contents of the India's Companies Act of 2013 to support its determination that Ambrosia's financial statements are reliable, audited, and complete:

> according to Ambrosia, under the Indian Companies Act of 2013 Section 2(40), financial statements are only required to include: a balance sheet as at the end of the financial year; a profit and loss account; cash flow statement for the financial year; and any explanatory notes annexed to, or forming part of, any document referenced in the applicable sub-clauses. Therefore, the documents alleged by the petitioners to be missing are not an integral part of the financial statements.

IDM at 33 (PR 346).  There are at least three problems with this explanation.

First, the Department accepted Ambrosia's interpretation of the India Companies Act of 2013, which was not submitted to the record.  As a result, the Department's determination is not supported by the record.

Second, if Ambrosia had placed the Indian Companies Act of 2013 on the record for the Department to review, the agency would have seen that section 134(2) of that law requires that "{t}he auditors' report shall be attached to every financial statement."  India Companies Act of 2013 § 134(2), available at https://www.mca.gov.in/Ministry/pdf/CompaniesAct2013.pdf. Ambrosia cited to the law in its rebuttal brief after the record was closed, preventing Plaintiffs from commenting or rebutting the claim.  Thus, the Department's explanation is not supported by record evidence.

Third, even by Ambrosia's explanation of the Indian Companies Act of 2013 Section 2(40), Indian financial statements must include "any explanatory notes annexed to, or forming part of, any document referenced in the applicable sub-clauses."  IDM at 33 (PR 346).  The explanatory notes and documents accompanying Ambrosia's and Allied's financial statements reference independent auditor's reports. See Ambrosia QILOV at Exh. VD-10(a) (CR 249-261) (PR 296); Allied QILOV at Exh. SVE-11 (CR 267-278) (PR 297).  AE's financial statement also states that the audit report, which should have been attached, is "an integral part of the balance sheet" and is required by the Income Tax Act of 1961.  Ambrosia QILOV at Exh. VD-10(c) (CR 249-261) (PR 296).  The Department does not address any of this evidence that 'fairly detracts from the substantiality of the evidence'" upon which it relied.  Nippon Steel Corp., 337 F.3d at 1379.

Because neither respondent submitted an auditor's report for its financial statements, the Department has consistently found auditor's reports to be an integral part of the financial statements, the record demonstrates that Indian law requires auditor's reports to be attached to financial statements, and evidence indicates that and auditor's report exists for the financial

NONCONFIDENTIAL

statements at issue, the Department's determination that the Respondents' financial statements are reliable and complete is not supported by substantial evidence.

### D. Audited Financial Statements, Including the Auditor's Report, Are Core Information in Antidumping Duty Investigations

Audited financial statements for the period of investigation are "core" information in antidumping investigations. Without Ambrosia's and Allied's fiscal year 2020-2021 audited financial statements, the Department has no means to verify the accuracy, reliability, and completeness of U.S. sales, third-country sales, and cost data or to reconcile the reported costs and sales to the books and records of the respondent.

As part of the Department's investigation process, Sections B (normal value), C (U.S. sales), and D (cost) questionnaires required the Respondents to provide a series of reconciliation worksheets to show that the relevant data reported in the company's audited financial statements reconcile with the submitted U.S. sales, home market sales, and cost files data (the data used to calculate the dumping margins). See Allied BCDQR at B-6, C-5, D-27 (CR 63-72) (PR 114-15); Response from Ambrosia Natural Products India Pvt. Ltd. to Sec of Commerce Pertaining To Ambrosia Sec B-C QR at B-7 and pdf pg. 155 (CR 57-62) (PR 112-13) ("Ambrosia BCQR"); Response from Ambrosia Natural Products India Pvt. Ltd. to Sec of Commerce Pertaining to Ambrosia Sec D QR at D-27 (CR 73-75) (PR 116) ("Ambrosia DQR"). The first step of the reconciliation required Respondents to demonstrate that the fiscal year 2020/2021 audited financial statements (which fully covered the period of investigation ("POI"), April 1, 2020 to March 31, 2021) reconciled with the company's accounting books and records (e.g., FY 2020/21 trial balance, general ledger, journals, etc.). See Allied BCDQR at B-6, C-5, D-27; Ambrosia

NONCONFIDENTIAL

BCQR at B-7 and pdf pg. 155; DQR at D-27.  Therefore, having complete audited financial statements are foundational to all aspects of the antidumping calculation.

Moreover, the statute requires a respondent's books and records to GAAP compliant in order for the Department to rely on those books and records.  19 U.S.C. § 1677b(f)(1)(A). Without the only evidence that could have demonstrated respondents' books and records were GAAP compliant, the Department has no way of determining whether this statutory requirement has been met.

Because the Respondents withheld the auditor's reports and submitted the 2020/2021 financial statements late in the investigation impeding their  careful examination, the record is lacking evidence that the financial data reported in the provided documents were complete, fairly stated (in all material aspects), compliant with Indian GAAP, or credible.  See Allied QILOV at SVE-11 (CR 267-78) (PR 297); Ambrosia QILOV at VD-10 (a) (CR 249-61) (PR 296).  Without the assurance of the auditor's report, the Department has no means to confirm that the submitted U.S. sales, home market sales, and cost files are complete, reliable, and accurate and reconcilable to the respondents books and records.  The auditor's report and company's audited financial statements are the only documents that can verify the accuracy of the submitted U.S. sales, normal value sales, and costs data files.   Given the "core" nature of this information, only total (not partial) AFA is appropriate.

E.    **The Department's Reliance on Respondents' Financial Statements Are Not in Accordance with Law**

The Department calculates costs in antidumping investigations "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country,

NONCONFIDENTIAL

where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). The Department's finding that the Respondents' financial statements are "usable for margin calculation purposes in the final determination of this investigation" is not in accordance with law because the record does not demonstrate that the Respondents' financial statements are compliant with Indian GAAP.

As detailed above in sections I.B.1 and I.B.2, the copies of Respondents' allegedly audited fiscal year 2020-2021 submitted in the underlying investigation did not include auditor's reports. The Department relies on auditor's reports to determine if financial statements are kept in accordance with GAAP. Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of 1997-1998 Antidumping Duty Administrative Review and Final Results of New Shipper Review, 64 Fed. Reg. 61,837, 61,842 (Dep't Commerce Nov. 15, 1999) (explaining that "because, according to the Auditor's Reports, the methodology used in recording and reporting the financial condition of these two companies appears, in certain instances, to be inconsistent with the methodology (i.e., Indian GAAP)" the Department could not rely on the noted financial statement), aff'd, Luoyang Bearing Factory v. United States, 240 F. Supp. 2d 1268, 1305 (Ct. Int'l Trade 2002); see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of 1996-1997 Antidumping Administrative Review and New Shipper Review and Determination Not to Revoke Order in Part, 63 Fed. Reg. 63,842, 63,851 (Nov. 17, 1998) ("we have excluded the data for Asian and NEI in calculating surrogate overhead, SG&A and profit ratios primarily because, according to the Auditor's Reports, the methodology used in recording and reporting the financial condition of these two companies appears, in certain instances, to be inconsistent with the methodology (i.e., Indian GAAP)"), aff'd, Timken Co. v. United States,

NONCONFIDENTIAL

201 F. Supp. 2d 1316, 1345-47 (Ct. Int'l Trade 2002); <u>Final Results of Antidumping Duty</u> <u>Administrative Review: Tapered Roller Bearings and Parts Thereof From the People's Republic</u> <u>of China</u>, 56 Fed. Reg. 67,590, 67,594 (Dec. 31, 1991) ("we believe that Asian is not an appropriate surrogate primarily because the Auditor's Report notes that the financial statements are not presented in accordance with the generally accepted accounting principles ("GAAP") of India.").

Because the Respondents have withheld their auditor's reports from the record of this investigation, the Department has no basis to determine whether the Respondents' books and records are kept in accordance with Indian GAAP.  Because the statute requires that a respondent's books and records be in accordance with GAAP to be used in antidumping proceedings, the Department's <u>Final Determination</u> is not in accordance with law.  <u>See</u> 19 U.S.C. § 1677b(f)(1)(A).

## II.    **THE DEPARTMENT'S USE OF THE RESPONDENTS' ACQUISITION COSTS AS A PROXY FOR THE COP OF RAW HONEY IS UNLAWFUL**

### A.    **Factual Background on Raw Honey Costs**

Neither Allied nor Ambrosia engaged in the production of raw honey during the period of investigation.  Instead, both mandatory respondents' purchased raw honey from beekeeper suppliers or middleman suppliers and then engaged in minor processing steps before re-selling the honey to customers in India and the United States.  <u>See</u>, <u>e.g.</u>, Allied's AQR at A-1 - A-2 (CR 44-47) (PR 89-90); Ambrosia's AQR at A-1 - A-2 (CR 48-55) (PR 92-98).

On July 12, 2021, the Department instructed each Respondent to "rely{} on its own actual material cost and processing costs" and to "report material costs based on their own purchases of honey."  Memo from USDOC to File Pertaining to Allied and Ambrosia Grants

-32-

Partial Ext. For Sec B Through D Qnaire (PR 87); see also Memo from USDOC to File Pertaining to Ambrosia Sec D Response Clarification (PR 100). The Department also noted that it was considering whether to collect "the supplier's costs, and if so, how best to accomplish such data collection." Id. (PR 87). As a result, in their responses to the Department's initial Section D questionnaire, each respondent submitted their acquisition costs of raw honey. Allied BCDQR at D-3 (CR 63-72) (PR 114-15); Response from Ambrosia Natural Products India Pvt. Ltd. to Sec of Commerce Pertaining to Ambrosia Sec D QR at D-3 (CR 73) (PR 116) ("Ambrosia DQR").

On July 22, 2021, the Department requested comments from interested parties in the antidumping investigations on raw honey from Argentina, Brazil, India, and Ukraine, on the appropriate raw honey cost of production reporting methodology. See Letter from USDOC to Interested Parties Pertaining to Interested Parties Interested Party Request – Cost of Production Reporting (PR 101). Plaintiffs submitted comments urging the Department to collect cost information from Respondents' beekeepers and middlemen suppliers as the producers of the merchandise under consideration. See Letter from Kelley Drye & Warren LLP to Sec of Commerce Pertaining to Petitioners Cmts on Cost Reporting Methodology (PR 111). Following the receipt of comments, the Department issued cost questionnaires and supplemental questionnaires to beekeepers and middlemen suppliers of both Respondents.

In the Preliminary Determination, the Department found that "due to the large number of beekeeper suppliers" it was not possible for the Department to obtain "a representative COP for the raw honey purchased by Allied and Ambrosia." Prelim. Decision Memo at 16 (PR 259) (emphasis added). The Department determined to instead "rely on the respondents' acquisition costs" as a proxy for the actual COP of the honey purchased. Id. (PR 259). The Department

NONCONFIDENTIAL

next determined "whether reliance on Allied's and Ambrosia's acquisition costs as a proxy for the actual COP of the raw honey purchased was reasonable." Id. (PR 259).  It did so by comparing those acquisition costs to the beekeeper and supplier costs, despite having just determined that the beekeeper and supplier costs were unrepresentative and could not be relied upon for calculating a margin.  The Department preliminarily found that "the acquisition prices paid by the respondents were higher than the actual COP incurred by its raw honey suppliers" and, accordingly, that it was "reasonable" to use acquisition costs plus the cost of Respondents' additional minor processing "as a reasonable proxy" for the beekeeper costs.  Id. (PR 259).  It is not true that the record had evidence that the acquisition costs were higher than the beekeeper costs of that honey; the record only contained evidence that some of the acquisition costs were higher than the "limited" sampling of beekeeper costs that the Department determined was unrepresentative.  The Department nonetheless preliminarily determined this was adequate to find the costs reasonable.

 In its case brief, Plaintiffs argued that reliance on acquisition costs was inappropriate because the beekeeper and supplier costs were not a reasonable benchmark for demonstrating the acquisition costs were appropriate given the Department's finding that they were unrepresentative and unusable for determining dumping margins. Pets. Case Br. at 25-47 (CR 294) (PR 327).  Plaintiffs also identified several benchmarks, including information on the cost of production of raw honey published by the National Horticultural Board of India ("NHBI"), a Government of India organization, that demonstrated acquisition costs were not a "reasonable proxy" for supplier raw honey costs.  See id. at 47-52 (CR 294) (PR  327).

 In the Final Determination, the Department continued to find that the beekeepers were the producers of the subject merchandise and, as a result, the agency "normally would determine the

COP of the honey purchases using the actual COP of the beekeepers and middlemen suppliers." IDM at 23 (PR 346). However, the Department found that "due to the sheer volume of beekeepers in India, a statistically valid random sample was not possible," and the Department could not use beekeeper and middlemen supplier costs for calculating the COP of raw honey. Id. at 25 (PR 346). Despite finding that it could not collect a statistically valid sample of such information, the Department determined that in this case, "the exporter-respondents' acquisition cost represents the best information on the record for determining the honey COP and complies with the Act," because the beekeeper/supplier costs that the agency did collect provided "no reason to believe that Allied and Ambrosia's beekeepers sold raw honey below their COP." Id. at 23, 27 (PR 346).

The Department also rejected information on the cost of production of raw honey published by the NHBI, explaining that it had "no grounds . . . to resort to using the NHBI data from the GOI as a surrogate for the cost of producing raw honey" because Respondents' beekeeper and middlemen suppliers cooperated to the best of their ability. IDM at 22 (PR 346). In doing so, the Department ignored (1) its own findings that those costs were unrepresentative and statistically invalid and (2) the benchmarks Plaintiffs had identified demonstrating that acquisition costs were not a "reasonable proxy" for supplier costs. Id. (PR 346).

### B. The Department's Reliance on Acquisition Costs in This Case Is Contrary to Agency Practice

#### 1. The Department's Established Practice Is to Rely on Beekeeper and Middleman Costs When There Are Representative, Reliable, and Useable Costs Available

Plaintiffs and the Department agree that in calculating the cost of production under 19 U.S.C. § 1677b(b)(3), the statute at 19 U.S.C. § 1677(28) clarifies that the reported costs include

the costs of both the producer and exporter where those parties are not the same. <u>See</u> <u>IDM</u> at 23 (PR 346) (noting that the Statement of Administration explains that the purposes of 19 U.S.C. § 1677(28) "is to clarify that where different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm in calculating cost of production and constructed value" and "{t}he intent of this section is to ensure that Commerce has the authority to capture all costs in situations where various companies are engaged in the production and sale" of merchandised under consideration) (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. 103-316, vol. 1 (1994) at 835).

As a result, the starting point for the Department's cost of production ("COP") calculation is the actual COP of the merchandise, not the price of acquiring the merchandise by a reseller that may or may not also perform minor further processing. The Department has established a practice of determining whether to use acquisition costs or supplier costs based on: (1) whether the mandatory respondent acquires in- or out-of-scope merchandise and, relatedly, (2) whether the respondent is the manufacturer of the MUI. For example, in the original investigation of honey from Argentina, the Department rejected reliance on acquisition costs because the respondents were purchasing in-scope honey from their suppliers, further processing the honey, and then selling it. <u>See</u> <u>Notice of Final Determination of Sales at Less Than Fair Value; Honey From Argentina</u>, 66 Fed. Reg. 50,611 (Dep't Commerce Oct. 4, 2001), and accompanying Issues and Decision Memorandum (Sept. 24, 2001) ("<u>Honey from Argentina OI IDM</u>") at Comment 2 ("We do not believe that acquisition prices are appropriate to our COP analysis. . . In this case, we have found that the 'cost of producing' honey in Argentina includes the sum of the beekeepers' COP, plus an amount for the exporters' selling, general, and administrative expenses."). Similarly, in <u>Tomatoes from Canada</u>, the Department collected COP

information from the tomato growers, who supplied the respondents subject to the investigation.
See Notice of Preliminary Determination of Sales at Less Than Fair Value: Greenhouse
Tomatoes From Canada, 66 Fed. Reg. 51,010 (Dep't Commerce Oct. 5, 2001) (because the
"respondents did not produce the subject merchandise" the Department "select{ed} producers
which supplied the five respondents in order to gather COP information for" its investigation),
unchanged in final, 67 Fed. Reg. 8781 (Dep't Commerce Feb. 26, 2002) (final determ.) and
accompanying Decision Memorandum (Feb. 22, 2002).[7]

The Department has applied a similar methodology in other non-agricultural cases as
well.  Specifically, in Stainless Steel Bar from India, the Department determined the respondent,
"which processed the merchandise before export to the United States, is not the producer of the
subject merchandise" because the minimal processing performed by the respondent had a limited
impact on the most important CONNUM characteristics in that case.  Stainless Steel Bar From
India: Final Results of Antidumping Duty Administrative Review; 2018-2019, 85 Fed. Reg.
74,985 (Dep't Commerce Nov. 24, 2020), and accompanying Issues and Decision Memorandum
at 23 (Comment 1) (citations omitted); see also Notice of Final Determination of Sales at Less
Than Fair Value: Narrow Woven Ribbons with Woven Selvedge from Taiwan, 75 Fed. Reg.

---

[7]    In contrast to the noted cases, the Department has typically relied on acquisition costs where
the respondent purchased merchandise not under consideration and processed the merchandise
into merchandise under investigation.  See e.g., Notice of Final Results of Antidumping Duty
Administrative Review: Individually Quick Frozen Red Raspberries From Chile, 70 Fed. Reg.
6,618 (Dep't Commerce Feb. 8, 2005), and accompanying Issues and Decision Memorandum at
Comment 1 (where the respondent purchased out-of-scope fresh raspberry inputs); Certain
Preserved Mushrooms From Indonesia: Final Results of Antidumping Duty Administrative
Review, 66 Fed. Reg. 36,754 (Dep't Commerce July 13, 2001), and accompanying Issues and
Decision Memorandum (where the respondent purchased out-of-scope fresh mushrooms); Final
Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit From Thailand, 60 Fed.
Reg. 29,553 (Dep't Commerce June 5, 1995) (where the respondent purchased out-of-scope
fresh pineapples).

NONCONFIDENTIAL

41,804 (Dep't Commerce July 19, 2010), and accompanying Issues and Decision Memorandum at 48-49 (Comment 20) ("In determining whether the greige ribbon suppliers or Shienq Huong is the producer of the NWR in question, we looked to the extent to which the greige ribbon was further manufactured by Shienq Huong.  In doing so, we analyzed whether raw materials were added, and whether processing was performed that changed the physical nature and characteristics of the product.").

### 2. Where Useable Beekeeper and Middleman Supplier Costs Are Not Available, The Department Must Fill the Gap with Appropriate Information, Including Government Published Cost Information

Where the Department cannot rely upon the supplier costs, it must resort to facts available as instructed by the statute.  Specifically, where "necessary information is not available on the record" or "an interested part or any other person . . . provides such information but the information cannot be verified," the Department "shall . . . use the facts otherwise available in reaching the applicable determination."  19 U.S.C. § 1677e(a).  Having found that the beekeeper costs were statistically invalid and unusable for purposes of calculating the cost of production under 19 U.S.C. § 1677b(b)(3), the Department faced such a gap filling need.

In prior cases involving honey where the Department could not rely upon supplier costs, the Department has used market-wide representative public information on such costs as reported in government publications.[8]  In the Honey from Argentina Investigation, the Department relied on the 1999 *Gestion Apicola* cost studies of beekeeper costs in Argentina as neutral facts available to calculate the COP for Argentine honey producers because the honey producers did not provide the Department with the requested honey cost of production information.  Honey

---

[8]   Where such public information is unavailable the Department has also relied on the acquisition cost when left without any other choice.

from Argentina OI IDM at Comment 2 ("in this case, the honey producers did not provide the Department with the requested honey cost of production information" and, as a result, as "non-adverse facts available" the Department relied on the noted cost studies).

In Wheat from Canada, the Department also used cost information published from governmental sources as neutral facts available where farmers not have adequate cost information and documentation. The Department relied on "provincial crop planning guides" to determine seed costs and labor costs, among others. See Notice of Final Determinations of Sales at Less Than Fair Value: Certain Durum Wheat and Hard Red Spring Wheat from Canada, 68 Fed. Reg. 52,741 (Dep't Commerce Sept. 5, 2003) and accompanying Issues and Decision Memorandum at Comments 11 and 12.

The record here contained similar publicly-available, market-wide, cost information for raw honey published by the NHBI, an Indian Government agency, and the Department unlawfully departed from its prior practice without adequate explanation in relying on Respondents' acquisition costs instead of the NHBI data. See section II.B.2. Moreover, as discussed in more detail in section II.C., the Department's determination that Respondents' acquisition costs were a "reasonable proxy" for Respondents' beekeeper and middleman supplier costs is not supported by substantial evidence.

### 3.   The Department's Explanation for Rejecting NHBI Data Is Inadequate

The Department has relied on public information to fill gaps in the record regarding cost of production in prior cases, including prior cases involving honey. Pets. Case Br. at 55-58 (CR 294) (PR 327). The Department never evaluated whether the NHBI costs were representative of Indian market costs of production for raw honey. Instead, the Department's explanation for

rejecting the NHBI data was it found the beekeeper costs to be adequate because (1) "Allied and Ambrosia's selected beekeepers fully cooperated and responded to the best of their abilities using the records available to them," (2) "the selected middlemen and beekeeper costs are reliable," and the Department (3) "has no grounds . . . to resort to using the NHBI data from the GOI as a surrogate for the cost of producing raw honey."  IDM at 22 (PR 346).  The record evidence does not support these findings.

The level of cooperation of the selected middlemen under 19 U.S.C. § 1677e(b) is not at issue; what is at issue is whether the information that was collected was adequate for the use to which it was put given the Department's finding that the information was unrepresentative broadly of domestic beekeepers and unusable for purposes of determining the costs of Indian beekeepers.  See IDM at 25 (PR 346).  Because the cost data submitted by Respondents' suppliers was found to be unrepresentative or unusable, there is a gap in the record that must be filled – whether that data is being used to calculate the margins or as a benchmark for the gap filler.  This finding that the costs are not representative or usable is both the grounds to reject them as a benchmark and to resort to using NHBI data from the GOI as the surrogate cost of producing honey.  The NHBI cost data does not suffer from the same deficiency identified by the Department of being unrepresentative of Indian producer costs.  It is broad market data published by a Government source, that is on the record and can be relied upon as a non-adverse, neutral facts available source consistent with agency precedent.  Honey from Argentina OI IDM at Comment 2.  For this reason alone, the Court should remand the agency's determination as the Department clearly misapplied the standard for reliance on public information to fill the gap in the record under 19 U.S.C. § 1677e(a) by analyzing whether the suppliers cooperated – the standard under 19 U.S.C. § 1677e(b).

Moreover, as discussed in the next section, the Department's determination that acquisition costs are a "reasonable proxy" for the Respondents' suppliers' costs is not supported by substantial evidence. As a result, the Court should remand the agency's determination to reconsider the appropriate non-adverse source to fill the gap in the record regarding the beekeepers' and middlemen suppliers' costs.

C. **The Department's Determination That Acquisition Costs Are Reliable and a "Reasonable Proxy" for Supplier Costs Is Not Supported by Substantial Evidence**

While the Department determined it could not use beekeeper and middleman supplier costs to calculate a COP of raw honey, in a contradictory fashion, the agency determined the same information is an appropriate benchmark. The Department concluded that the beekeeper and middlemen costs are "reliable" because Allied and Ambrosia's selected beekeepers fully cooperated and responded to the best of their abilities using the records available to them." IDM at 22 (PR 346). The Department also stated that "petitioners argue that AFA should be applied to Allied and Ambrosia because the cost data submitted by their beekeeper-suppliers are undocumented, unverifiable, and incomplete, and the data are, therefore, unreliable." Id. at 38 (PR 346). The Department's analysis both misstates Plaintiffs' argument and is conclusory.

The beekeepers' and middleman suppliers' alleged best efforts at cooperation does not by itself render the information they submitted representative, reliable, or useable as a benchmark. The Department's determination that the submitted information is reliable and useable is not supported by substantial evidence as it directly conflicts with its finding that such information was unrepresentative. Because the Department's determination that acquisition costs are a "reasonable proxy" for beekeeper and middleman supplier costs of producing raw honey directly depends on the use of the submitted "unrepresentative" supplier cost information serving as a

benchmark, the Department's determination that acquisition costs are a "reasonable proxy" is not supported by substantial evidence.

### 1. For the Same Reasons That the Supplier Costs Cannot Be Used to Calculate COP, They Are Not a Reliable Benchmark

The "limited" beekeeper supplier COP data the Department used to assess the reasonableness of the acquisition costs as a "proxy" for actual costs is unreliable as a benchmark for the same reasons the Department did not use it to calculate costs in this investigation. In selecting "limited" beekeeper suppliers, the Department focused on the largest honey suppliers to each of the exporter-respondents (as they were more likely to have the ability to provide the data), and then, from those suppliers, the Department selected the suppliers with the lowest sales prices to Allied and Ambrosia. IDM at 26 (PR 346). The Department reasoned that these were the suppliers with the highest risk to be selling raw honey to the Respondents at below their COP. Id. at 26 (PR 346). The "limited" sample, however, remains unrepresentative as the Department expressly found. Id. at 25 (PR 346).

The Department received data from a very small number of suppliers, so the cost data is not representative of the average cost of production of all suppliers, as the Department expressly found in rejecting these costs for use in the margin calculation. IDM at 25 (PR 346). Similarly, comparing the costs to the prices of the lowest-price sellers says nothing about the average difference in price and cost across all suppliers. The lowest-priced sales could consist solely of subprime or low-quality product, which the middlemen or Respondents' then blend with higher priced product. The Department cannot know this, however, because as it notes, the beekeeper suppliers do not maintain the type of records necessary to calculate product-specific COPs. See IDM at 27 (PR 346). Further, higher-priced sales are just as likely to be sold below the cost of

production as low-priced sales, as higher-priced sales are more likely to come from more sophisticated operations with higher costs. The Department's reasoning and conclusions must be internally consistent to be reasonable. Here, the Department has not articulated a rational connection between the facts found and the choice made. See Motor Vehicle Ass'n v. State Farm Mut.. 463 U.S. 29, 43 (1983). If the Department cannot determine the cost of producing raw honey because representative sampling is impossible and the "largest" quantity suppliers do not provide representative coverage, relying on an even smaller, "limited" selection of beekeepers' data is even more problematic. Accordingly, the "limited" beekeeper supplier data cannot be used as an appropriate benchmark to determine if the Respondents' acquisition costs are reasonable, because, as the Department has already determined, they are not representative. IDM at 25 (PR 346). This is especially true in light of record evidence indicating [

]. See Section II.C..3.

### 2. The Beekeeper and Middleman Supplier Costs Are Also Not Verifiable

The statute requires the Department to verify information it relies upon in reaching a determination, and also instructs the Department to rely on facts available where information cannot be verified. See 19 U.S.C. § 1677m(i); 19 U.S.C. § 1677e(a)(2)(D). The middlemen and beekeeper supplier information is not verifiable on its face, and the Department made no attempt to verify this information. See generally Ambrosia QILOV (CR 249-61) (PR 296); Allied QILOV (CR 267-78) (PR 297). Thus, the Department's determination that the information is "reliable" and "useable" as a benchmark is unlawful.

The middlemen and beekeepers that the Department collected data from are largely comprised of families and small farms, and they are not required to maintain the types of detailed

accounting records that are necessary to calculate product-specific COPs. IDM at 27 (PR 346). Further, these middlemen and beekeepers are small farmers that are not required by Indian law to maintain books and records, prepare financial statements, or file tax returns. IDM at 38 (PR 346). This forced the Department to rely on unverifiable information, including assumptions and estimates to allocate costs between the beekeepers' various farming operations, instead of actual, verifiable information. IDM at 27 (PR 346). Indeed, most of the supplier beekeepers' reported data is unverifiable.

In their initial responses, no supporting documentation was provided at all for any of the cost exhibits. See, e.g., Response from Ambrosia Natural Products India Pvt. Ltd. to Sec of Commerce Pertaining to Ambrosia Sec D QR- Supplier Cost at Exhs. M1-2, M1-5, M1-6, M1-10, M1-11, B1-4, B1-5, B1-6, B1-7, B1-8, B1-9, B2-1, B2-3, B2-5, B2-6, B2-6(b), B2-7, B2-8, B2-9, B2-10, B2-11, B2-12 (CR 106-10) (PR 162) ("9/14/21 Ambrosia Supplier DQR"); Response from Trade Pacific PLLC to Sec of Commerce Pertaining to Allied Sec D QR (Beekeeper) at Exhs. B1-1, B1-3, B1-5, B1-7, B1-8, B1-9, B1-10, B1-11(CR 114-17) (PR 164-65) ("9/14/2021 Allied Beekeeper 1st DQR"); Response from Trade Pacific PLLC to Sec of Commerce Pertaining to Allied Sec D QR (Beekeeper 2) at Exhs. B2-1, B2-3, B2-5, B2-7, B2-8, B2-9, B2-10, B2-11 (CR 111-13) (PR 163) ("9/14/2021 Allied Beekeeper 2nd DQR"). None of this reported information is verifiable, as required by the Department's regulations. See 19 U.S.C. § 1677e(a)(2)(d).

Information provided in supplemental questionnaires was equally unverifiable. In fact, many of the beekeeper suppliers' "records" provided in this proceeding were simply handwritten on a notepad. See, e.g, [        ] 10/27/21 SDQR Exhs. B2S1-7 (a), Exhibit B2S1-8 (c) (CR 165-66) (PR 221); [        ] 11/02/21 SDQR Exhs. Exhibit B2S2-9 (CR 190-91) (PR 243); [

**NONCONFIDENTIAL**

] 10/27/21 SDQR at Exhs. B1S1-3(b), B1S1-4(b), B1S1-5(a), B1S1-6(b) (CR 162-64) (PR 220); [                    ] 11/02/21 SDQR at Exhs. B1S2-2, B1S2-4 (CR 188-89) (PR 242); Allied 10/28/21 SDQR at Exh. S2-3(b), S2-4(a), S2-5, S2-6, S2-7(b), S2-8(a), S2-9(a), S2-9(b) (CR 179-83) (PR 231-32).

Given that the beekeeper and middleman supplier cost information is not verifiable, and that the Department did not in fact verify it, the Department's use of this information as a benchmark is not supported by substantial evidence and is contrary to the statute.

**3.    The Department Failed to Analyze Numerous Reliable Cost Benchmarks Demonstrating the Respondents' Acquisition Costs Were Not a Reasonable Proxy for Beekeeper COP**

The Department's <u>Final Determination</u> is not supported by substantial evidence because the Department failed to consider data placed on the record by Plaintiffs, including NHBI data, that demonstrates the Respondents' acquisition costs are below the average COP of raw honey in India. The Department's failure to address this detracting evidence makes its determination not supported by substantial evidence. <u>See</u>, <u>e.g.</u>, <u>Suzano S.A. v. United States</u>, 589 F. Supp. 3d 1225, 1237 (Ct. Int'l Trade 2022) ("Commerce is obligated to discuss 'issues material to {its} determination,' and must 'must take into account whatever in the record fairly detracts from' its conclusion.") (citations omitted).

[



]:

NONCONFIDENTIAL

|  | Avg. Price (Rs./Kg.) | Avg. Acq. Cost (Rs./Kg.) | Avg. Tot. Cost (Rs./Kg.)[9] |  |
|---|---|---|---|---|
| Allied | [          ] | [          ] | [          ] | {Allied BPI} |
| Ambrosia | [          ] | [          ] | [          ] | {Ambrosia BPI} |

See, e.g., Allied 10/28/21 Supp. QR at Exhibit SD2-5 (CR 176-78) (PR 230); Ambrosia 10/28/21 Supp. QR at Revised Exhibit S3-7 (a) (CR 168-69) (PR 224); Ambrosia 9/24/21 Supp. DQR at Exhibit S2-5 (CR 135-38) (PR 186).

The Respondents' reported acquisition costs in this investigation are also [          ] below the cost of production provided by the NHBI, which establish a cost of production range of **Rs. 188-208 per kg. of raw honey**.  See Letter from Kelley Drye & Warren LLP to Sec of Commerce Pertaining to Petitioners Cmts Re Allied's Supplier Sec D Qr at Attachment 4 (CR 147) (PR 193) ("Pets. 9/29 Comments on Allied Supplier D QRs").  Eleven other reliable sources on the record of this proceeding on raw honey costs in India also demonstrate that the Department's use of Respondent's acquisition costs in this investigation are not reasonable:

---

[9] Total costs were calculated by deducting packing costs that were included in TOTCOM.

| Raw Honey Values | | |
|---|---|---|
| Source | Rs/Kg | Citation[10] |
| **India** | | |
| Hindi News (April 2020) | 150 | p.11, Exh. 2, Att. A |
| Centre for Science and Environment (2014 Price, inflated)* | 195.08 | p.13, Exh. 2, Att. B |
| Ministry of Micro, Small & Medium Enterprises * | 200 | p.28, Exh. 8A-8B |
| Khadi and Villages Commission | 450 | p.29, Exh. 8A |
| Import Prices into India* | 299.48 | p.30, Exh. 8C |
| Economic Advisory Council Analysis* | 180 | p.34, Exh. 8D |
| MHPC 2019-2020 Annual Report* | 299 | p.36, Exh. 9 |
| Chairman Debroy Cost of Production 2020 | 110 | p. 32-34, Exh. 8D |
| * Average of Indian Sources of Unadulterated Honey | 234.88 | p.39 |
| www.agrifarming.in | 136.36 | Attachment 2[11] |
| www.agriculturegoods.com | 101.96 | Attachment 3[12] |
| | | |
| **Non-India** | | |
| POI Imports (Comparable Economies) | 191.28 | p.38, Exh. 10 |
| POI World Imports | 294 | p.41, Exh. 11 |
| | | |
| * Sources for pricing in India known to exclude admixture of sugar syrup | | |

Despite Plaintiffs raising these benchmarks in their case brief, the Department did not analyze them in its final issues and decisions memorandum. Pets. Case Br. at 47-52 (CR 326-27) (PR 327-28). The agency is legally required to address all major arguments raised by the parties. See, e.g., Suzano S.A. v. United States, 589 F. Supp. 3d 1225, 1233 (Ct. Int'l Trade 2022) ("Although Commerce is not required to address all the evidence submitted, the court has previously held that Commerce must address any arguments made by the parties that are material to Commerce's determination. Itochu Bldg. Prods. v. United States, 163 F. Supp. 3d 1330, 1337

---

[10]   Citations are to Petitioners' Particular Market Situation Allegation unless otherwise noted. See Letter from Kelley Drye & Warren Re: Raw Honey from India -- Petitioners' Particular Market Situation Allegation (Sept. 13, 2021) ("Pets. PMSA") (CR 120-22) (PR 167-69).

[11]   Pets. 9/29 Comments on Allied Supplier D QRs (CR 147) (PR 193).

[12]   Pets. 9/29 Comments on Allied Supplier D QRs QRs (CR 147) (PR 193).

(Ct. Int'l Trade 2006).  An argument is material if it is a 'focal point' of a party's argument or if a final determination cannot be 'sufficiently reviewed without specific discussion of the issue.'") (citing Asociacion Colombiana de Exportadores de Flores v. United States, 704 F. Supp. 1068 (Ct. Int'l Trade 1988)).   The agency's failure to address this detracting evidence makes its determination unsupported by substantial evidence and otherwise not in accordance with law.

III.   **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully urge this Court to determine that the Department's Final Determination is not supported by substantial evidence and is otherwise not in accordance with law.  Plaintiffs urge this Court to remand the Final Determination to the Department with instructions to correct the errors set forth above.

Respectfully submitted,

/s/Joshua R. Morey
R. ALAN LUBERDA
MELISSA M. BREWER
JOSHUA R. MOREY
MATTHEW G. PEREIRA
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Plaintiffs

Dated:  December 16, 2022

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's Order dated October 7, 2022 (ECF No. 19), setting the word limitation to the Rule 56.2 Motion for Judgment on the Agency Record and accompanying Memorandum in Support of Plaintiffs the American Honey Producers Association and the Sioux Honey Association's ("Plaintiffs") to 14,000 words, counsel for Plaintiffs certifies that the attached Memorandum in Support of Rule 56.2 Motion for Judgment On the Agency Record contains 13,955 words, including footnotes.  The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

<u>/s/ Joshua R. Morey</u>
R. ALAN LUBERDA
MELISSA M. BREWER
JOSHUA R. MOREY
MATTHEW G. PEREIRA
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400
aluberda@kelleydrye.com
mbrewer@kelleydrye.com
jmorey@kelleydrye.com
mpereira@kelleydrye.com

Counsel to Plaintiffs

Dated:  December 16, 2022