## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | | |
|---|---|---|
| AMERICAN HONEY PRODUCERS ASSOCIATION AND SIOUX HONEY ASSOCIATION, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Court No. 22-00195 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALLIED NATURAL PRODUCT AND AMBROSIA NATURAL PRODUCTS (INDIA) PVT. LTD., | ) ) ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGGIE T. BLADES, JR.
Assistant Director

OF COUNSEL:
Jared M. Cynamon
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.
Telephone:  (202) 482-0131

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 305-7571

Fax: (202) 514-8264
Email: kara.m.westercamp@usdoj.gov

Dated: March 17, 2023                    *Attorneys for Defendant United States*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT PURSUANT TO RULE 56.2 ................................................. 2

    I.    Administrative Decision Under Review ................................. 2

    II.   Statement Of The Issues ............................................... 2

STATEMENT OF FACTS ................................................................. 2

    I.    Initiation Of Investigation And Respondent Selection .......................... 2

    II.   Commerce's Questionnaires And Responses ......................................... 3

        A.   Mandatory Respondents' Responses Relating To Financial Statements ..... 3

        B.   Responses Relating To The Raw Honey Cost Of Production Reporting Methodology ......................................... 5

    III.  Preliminary Determination ......................................... 6

    IV.  In-Lieu-Of-Verification Questionnaires And Administrative Case Briefs ............ 7

    V.   Final Determination ......................................... 8

SUMMARY OF THE ARGUMENT ......................................... 11

ARGUMENT ......................................... 12

    I.    Legal Standards ......................................... 12

        A.   Standard Of Review ......................................... 12

        B.   Application Of Facts Available With An Adverse Inference .................. 13

    II.   Commerce's Determination To Use Allied's And Ambrosia's Acquisition Costs For The Cost Of Production, Without Applying Facts Available With An Adverse Inference, Is Supported By Substantial Evidence And In Accordance With Law ................................................................. 15

        A.   Legal Framework ......................................... 15

i

B.    Commerce's Past Practice In The Honey From Argentina Investigation Informed Its Determination Here 16

C.    Substantial Evidence Supports Commerce's Reliance On Acquisition Costs In Calculating The Cost Of Production 18

D.    AHPA's Arguments Do Not Undermine Commerce's Determination 22

III.    Commerce Properly Determined That The Use Of Facts Available With An Adverse Inference Was Not Warranted With Respect To The Allied And Ambrosia Financial Statements 29

A.    Substantial Evidence Supports Commerce's Determination That Allied And Ambrosia Provided Necessary Information And Acted To The Best Of Their Ability ......................................................................................30

B.    AHPA's Arguments Do Not Undermine Commerce's Determination..... 32

    1.    The Respondents Did Not Withhold Information Or Impede The Investigation ................................................................................32

    2.    The Respondents Acted To The Best Of Their Ability And No Core Information Is Missing From The FY 2020-2021 Financial Statements ...................................................................................36

CONCLUSION ...........................................................................................................43

## **TABLE OF AUTHORITIES**

**CASES**                                                      **PAGE(S)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    675 F. Supp. 2d 1287 (Ct. Int'l Trade 2009) ................................................. 27

*Allegheny Ludlum Corp. v. United States*,
    112 F Supp. 2d 1141 (Ct. Int'l Trade 2000) ................................................. 28

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984)...................................................................... 12

*BlueScope Steel Ltd. v. United States*,
    548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ............................................... 14

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)........................................................................................ 12

*Consol. Fibers, Inc. v. United States*,
    535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) ............................................... 13

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)........................................................................................ 12

*Deacero S.A.P.I. De C.V. v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021)...................................................................... 33

*Diamond Sawblades Mfrs. Coal. v. United States*,
    986 F.3d 1351 (Fed. Cir. 2021)...................................................................... 36

*Dongtai Peak Honey Indus. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015)...................................................................... 13

*Gerber Food (Yunnan) Co. v. United States*,
    491 F. Supp. 2d 1326 (Ct. Int'l Trade 2007) ............................................... 38

*Gerber Food (Yunnan) Co., Ltd. v. United States*,
    387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) ............................................... 13

*Gov't of Argentina v. United States*,
    542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ............................................... 29

*Hyundai Steel Co. v. United States*,
    279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) ............................................... 34

*Icdas Celik Enerji Tersane Ve Ulasim Sanayi, A.S. v. United States*,
   429 F. Supp. 3d 1353 (Ct. Int'l Trade 2020) ................................................. 23

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992) ........................................................................................ 12

*Itochu Bldg. Prods. v. United States*,
   163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ................................................. 28

*Jindal Poly Films v. United States*,
   365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ........................................... 14, 32

*Maverick Tube Corp. v. United States*,
   857 F.3d 1353 (Fed. Cir. 2017) ................................................................. 33, 34

*Mid Continent Steel & Wire, Inc. v. United States*,
   203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) ................................................. 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................... 23, 24

*Ningbo Dafa Chem. Fiber Co. v. United States*,
   580 F.3d 1247 (Fed. Cir. 2009) ................................................................. 26, 27

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003) ............................................................... passim

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ...................................................................... 12

*NTN Bearing Corp. v. United States*,
   74 F.3d 1204 (Fed. Cir. 1995) ........................................................................ 40

*Nucor Corp. v. United States*,
   612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ................................................. 12

*PAM S.p.A. v. United States*,
   463 F.3d 1345 (Fed. Cir. 2006) ................................................................. 13, 37

*Papierfabrik August Koehler SE v. United States*,
   843 F.3d 1373 (Fed. Cir. 2016) ......................................................... 14, 33, 43

*SKF USA Inc v. United States*,
   630 F.3d 1365 (Fed. Cir. 2011) ...................................................................... 16

*SKF USA, Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001)..................................................... 23

*Sunpreme Inc. v. United States,*
    946 F.3d 1300 (Fed. Cir. 2020)................................................ 29, 30

*Tianjin Mach. Imp. & Exp. Corp. v. United States,*
    353 F. Supp. 2d 1294 (2004) ..................................................... 35

*United States Steel Corp. v. United States,*
    348 F. Supp. 3d 1248 (Ct. Int'l Trade 2018) ......................... 12, 13

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009).................................................................. 12

*Tianjin Mach. Imp. & Exp. Corp. v. United States,*
    353 F. Supp. 2d 1294 (2004) ..................................................... 35

*USEC Inc. v. United States,*
    498 F. Supp. 2d 1337 (Ct. Int'l Trade 2007) ............................. 40

## STATUTES

19 U.S.C. §1677.................................................................... passim

19 U.S.C. § 1516a(b)(1)(B) ....................................................... 12

## REGULATIONS

19 C.F.R. § 351.303(g)(1).................................................... 21, 36

## OTHER AUTHORITIES

*Wheat from Canada,*
    58 Fed. Reg. 52,741 (Dep't of Commerce Sept. 5, 2003) (final LTFV determ.),. .......... 24

*Tapered Roller Bearings and Parts Thereof from the People's Republic of China,*
    64 Fed. Reg. 61,837 (Dep't Commerce Nov. 15, 1999) (final admin. review)............... 41

*Steel Concrete Reinforcing Bars from Belarus,*
    66 Fed. Reg. 33,528 (Dep't of Commerce June 22, 2001) (final LTFV determ.), .......... 39

*Honey from Argentina,*
    66 Fed. Reg. 50,611 (Dep't of Commerce Oct. 4, 2001) (final LTFV determ.)............... 17

*Honey from Argentina*,
    69 Fed. Reg. 30,283 (Dep't of Commerce May 27, 2004) (final admin. review). .......... 18

*Honey from Argentina*,
    69 Fed. Reg. 62,624 (Dep't of Commerce Jan. 6, 2004) (prelim. admin. review) .......... 17

*Wooden Bedroom Furniture from the People's Republic of China*,
    71 Fed. Reg. 70,739 (Dep't of Commerce Dec. 6, 2006) (final NSR) ........................... 39

*Honey from Argentina*,
    71 Fed. Reg. 78,397 (Dep't of Commerce Dec. 29, 2006) (prelim. admin. review. .. 17, 39

*Honey from Argentina*,
    72 Fed. Reg. 25,245 (Dep't of Commerce May 4, 2007) (final admin. review), ............. 18

*Honey from Argentina*,
    73 Fed. Reg. 79,802 (Dep't of Commerce Dec. 30, 2008) (prelim. admin. review); ....... 17

*Honey from Argentina*,
    76 Fed. Reg. 2,655(Dep't of Commerce Jan. 14, 2011) (prelim. admin. review. .......... 17

*Honey from Argentina*,
    77 Fed. Reg. 77,029 (Dep't of Commerce Dec. 31, 2012) (revocation order). ............... 17

*Certain Iron Mechanical Transfer Drive Components from the People's Republic of China*,
    81 Fed. Reg. 75,032 (Dep't of Commerce Oct. 28, 2016) (final LTFV determ.),............ 39

*Raw Honey from India*,
    86 Fed. Reg. 66,528 (Dep't of Commerce Nov. 23, 2021) (prelim. LTFV determ.) ......... 6

*Raw Honey from Argentina*,
    87 Fed. Reg. 22,179 (Dep't of Commerce Apr. 14, 2022) (final LTFV determ.) ...........17

*Raw Honey from India*,
     87 Fed. Reg. 22,188 (Dep't of Commerce Apr. 14, 2022) (final LTFV determ.) ............. 2

*Certain Preserved Mushrooms from the Netherlands*,
    87 Fed. Reg. 66,265 (Dep't of Commerce Nov. 3, 2022) (prelim. LTFV determ.), ........ 39

1994 U.S.C.C.A.N. 4040 ...........................................................................................15

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | | |
|---|---|---|
| AMERICAN HONEY PRODUCERS ASSOCIATION AND SIOUX HONEY ASSOCIATION, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Court No. 22-00195 |
| | ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| ALLIED NATURAL PRODUCT AND AMBROSIA NATURAL PRODUCTS (INDIA) PVT. LTD., | ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the Rule 56.2 motion for judgment on the agency record filed by plaintiffs American Honey Producers Association and Sioux Honey Association (collectively, AHPA or plaintiffs), AHPA Br., ECF No. 21, challenging certain aspects of the final determination of the U.S. Department of Commerce (Commerce) in the less-than-fair-value investigation covering raw honey from India. As we demonstrate below, Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.  Accordingly, we respectfully request that the Court deny plaintiffs' motion and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Decision Under Review

The administrative determination under review is the final determination of the less-than-fair-value investigation covering raw honey from India.  *See Raw Honey from India*, 87 Fed. Reg. 22,188 (Dep't of Commerce Apr. 14, 2022) (final LTFV determ.) (P.R. 356),[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 346).  The period of investigation is April 1, 2020, through March 31, 2021.

### II.   Statement Of The Issues

1.   Whether Commerce's use of the acquisition cost of the mandatory respondents, Allied Natural Product (Allied) and Ambrosia Natural Products (India) Private Limited[2] (Ambrosia), as a proxy for the beekeepers' cost of production is supported by substantial evidence and in accordance with law.

2.   Whether substantial evidence supports Commerce's determination not to apply facts available with an adverse inference to the mandatory respondents, because they acted to the best of their ability in responding to Commerce's requests for information relating to their financial statements.

## STATEMENT OF FACTS

### I.   Initiation Of Investigation And Respondent Selection

Following a request from the petitioners, AHPA, in May 2021, Commerce initiated the antidumping investigation covering raw honey from India.  *See Raw Honey from Arg., Braz.,*

---

[1]  Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the less-than-fair-value investigation.

[2]  Ambrosia comprises Ambrosia Natural Products (India) Private Limited (AN), Ambrosia Enterprise (AE, and Sunlite India Agro Producer Co. Ltd. (Sunlite).  *See* IDM at 1.

*India, Ukr., and Viet*, 86 Fed. Reg, 26,897 (Dep't of Commerce May 18, 2021) (P.R. 54).  Due to

the large number of potential respondents, Commerce selected Allied and Ambrosia for

individual examination because they accounted for the largest volume of entries of the subject

merchandise into the United States during the period of investigation.  *See* Respondent Selection

Memo. (June 4, 2021) (C.R. 38, P.R. 62).

## II.   Commerce's Questionnaires And Responses

### A.   Mandatory Respondents' Responses Relating To Financial Statements

Commerce subsequently issued antidumping questionnaires to Allied and Ambrosia, in

which Commerce requested that they provide financial documents for the two most recently

completed fiscal years (FY), 2019-2020 and 2020-2021.  *See* Allied Initial Questionnaire at A-10

(June 8, 2021) (P.R. 63); Ambrosia Initial Questionnaire at A-10 (June 8, 2021) (P.R. 65).

Allied and Ambrosia timely responded and included audited financial statements for FYs

2018-2019 and 2019-2020, but not FY 2020-2021.  *See* Allied Section A Questionnaire Resp. at

A-22 and Exh. A-9(a)-(b) (July 13, 2021) (C.R. 44-47, P.R. 89-90); Ambrosia Section A

Questionnaire Resp. at A-19 and Exh. A-9(a)-(f) (July 14, 2021) (C.R. 48-55, P.R. 92-98).

However, both informed Commerce that audited financial statements for FY 2020-2021 were not

yet available but would be provided when completed.  *See* Allied Section A Response at A-22;

Ambrosia Section A Response at A-19.

One month later, Commerce requested that Allied and Ambrosia each provide their FY

2020-2021 financial statements, and "{i}f these financial statements are not yet available,

provide year end unaudited financial statements or the year end accounting trial balance."  First

Supplemental Questionnaire to Allied at 3 (Aug. 23, 2021) (C.R. 86, P.R. 134); *see also* First

Supplemental Questionnaire to Ambrosia at 3-4 (Aug. 23, 2021) (C.R. 87, P.R. 136).  In its

response, Allied explained that the audit for FY 2020-2021 was still in process and provided

Commerce with the requested trial balance.  *See* Allied First Supplemental Questionnaire Resp. (SQR) at S1-3 and Exh. S1-(b) (Sept. 9, 2021) (C.R. 95, P.R. 156) (Allied First SQR).  Ambrosia informed Commerce that it had the same issues, provided evidence of the Indian Tax Authorities' delay, and the requested trial balance for FY 2020-2021.  *See* Ambrosia First SQR at S1-1 and Exh. S1-1(d), S1-6(b) (Sept. 16, 2021) (C.R. 124, P.R. 173).

In September 2021, Commerce issued a supplemental Section D questionnaire and requested that, if available, Allied and Ambrosia provide the FY 2020-2021 audited financial statements or an expected availability date.  *See* Ambrosia First Section D Supp. Questionnaire at 3 (Sept. 10, 2021) (C.R. 105, P.R. 161); Allied First Section D Supp. Questionnaire at 7 (Sept. 14, 2021) (C.R. 123, P.R. 171).  Ambrosia informed Commerce that the FY 2020-2021 audited financial statement was still in process and the Indian Ministry of Finance had extended the deadline from October 30, 2021, to January 15, 2022.  *See* Ambrosia First Section D SQR at 29 (Sept. 24, 2021) (P.R. 186).  Similarly, Allied reiterated that its audited FY 2020-2021 financial statements were not yet complete but expressed hope that they would be completed by November 7, 2021.  *See* Allied First Section D SQR at SuppD-12 and Exh. SD-21 (Sept. 28, 2021) (P.R. 191).

In response to a second supplemental section D questionnaire from Commerce, Ambrosia responded that the audited financial statements were further delayed and it expected the documents to be finalized around November 20, 2021.  *See* Ambrosia Second Section D Supp. Questionnaire at 3 (Oct. 14, 2021) (C.R. 158, P.R. 216); Ambrosia's Second Section D SQR at SD2-1 (Oct. 28, 2021) (C.R. 168, P.R. 224).  Commerce also sent a second supplemental questionnaire concerning Allied's Section A through C responses, in which it asked if the FY 2020-2021 financial statements were finalized, as well as for additional information for the FYs

2018-2019 and 2019-2020 financial statements.  *See* Allied Second Sections A-C Suppl. Questionnaire at 3 (Oct. 26, 2021) (C.R. 167, P.R. 222).  Allied similarly notified Commerce that its financial statements and tax returns were delayed but it expected the financial statements by November 25, 2021.  *See* Allied Second Sections A-C SQR at SuppABC2-1 (Nov. 5, 2021) (C.R. 194, P.R. 246).

**B.    Responses Relating To The Raw Honey Cost Of Production Reporting Methodology**

Commerce also requested additional information from Allied and Ambrosia concerning their direct involvement in honey production and their sourcing of honey from beekeepers that produced and supplied honey during the period of investigation.  *See* Allied Request for Information (RFI) (June 10, 2021) (P.R. 67); Ambrosia RFI (June 11, 2021) (P.R. 68).  In response, Allied reported that it had obtained its raw honey from traders, *i.e.*, middlemen, and Ambrosia reported that it had obtained its raw honey from middlemen and beekeepers.  *See* Allied RFI Resp. (June 24, 2021) (C.R. 41, P.R 77); Ambrosia RFI Resp. (June 24, 2021) (C.R. 39, P.R. 76); *see also* PDM at 16.

Commerce also requested comments from the parties on the raw honey cost of production (COP) reporting methodology.  *See* Request for Comments on COP Reporting Methodology (July 22, 2021) (P.R. 101).  Commerce received COP comments from Allied and AHPA.  *See* Allied Raw Honey COP Reporting Methodology Comments (July 29, 2021) (P.R. 110); AHPA Raw Honey COP Reporting Methodology Comments (July 29, 2021) (P.R. 111).

AHPA requested that Commerce sample the beekeeper suppliers and rely on the beekeepers' cost of producing the raw honey consistent with Commerce's practice.  *See* AHPA Raw Honey COP Reporting Methodology Comments.  However, Allied informed Commerce that the vast majority of the beekeepers from which its middleman traders source honey were

extremely small, remote, disparate beekeepers who also do not perform beekeeping collections operations consistently and frequently do not have contact information.  PDM at 16; *see* Allied Raw Honey COP Reporting Methodology Comments.  Allied and Ambrosia also provided information that the beekeepers and honey collectors do not maintain regular accounting records because they do not maintain production quantity or cost information and their income generated from the sale of honey is not subject to any taxes.  *See* PDM at 16; Ambrosia RFI Resp. at Exhibit 1a; Allied RFI Resp. at Exhibit 1b.  As a result, Allied argued that Commerce should rely on Allied's acquisition cost (*i.e.*, actual prices Allied paid) for the raw honey it had purchased during the period of investigation.  *See* Allied Raw Honey COP Reporting Methodology Comments; PDM at 16.  Subsequently, Commerce issued cost questionnaires to certain suppliers of Allied and Ambrosia and received responses to each supplemental and supplier cost questionnaire.  PDM at 4 n.23.

## III.    **Preliminary Determination**

On November 23, 2021, Commerce published the preliminary determination.  *See Raw Honey from India*, 86 Fed. Reg. 66,528 (Dep't of Commerce Nov. 23, 2021) (prelim. LTFV determ.) (P.R. 273), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 259).

In the preliminary determination, Commerce explained that after considering the parties' responses and because of the large number of beekeeper suppliers, both sampling and the selection of the largest beekeepers were either unattainable or ineffective options for obtaining a representative cost of production for the raw honey purchased by Allied and Ambrosia.  PDM at 16; *see* Ambrosia RFI Resp. at Exhibit 1a; Allied RFI Resp. at Exhibit 1b.  Instead, Commerce adopted Allied's proposal to rely on the respondents' acquisition costs but select and request cost information from "two beekeeper honey suppliers, and two middleman honey suppliers to Allied and one direct beekeeper supplier to the middleman, one middleman, and one middleman/

beekeeper supplier to Ambrosia, with the aim of determining whether reliance on Allied and Ambrosia's acquisition costs as a proxy for the actual cost of production of the raw honey purchased was reasonable to calculate cost of production." PDM at 16.

In doing so, Commerce focused on the largest suppliers for Allied and selected two of the top five middleman suppliers and two direct beekeepers from each of the middleman suppliers with the lowest sales prices to the selected middleman. *See id.* at 16-17. Commerce also selected Ambrosia's largest suppliers, one middleman supplier, one direct beekeeper of that middleman supplier, and one direct beekeeper supplier of Ambrosia (*i.e.*, the beekeeper with the lowest sales prices to Ambrosia). *Id.* at 17.

After examining Allied's and Ambrosia's responses, Commerce determined that the acquisition prices paid by the respondents were higher than the actual cost of production incurred by its raw honey suppliers. *See* Allied Prelim. Cost Calculation Memo. at Att. 1 (Nov. 17, 2021) (C.R. 217, P.R. 262); Ambrosia Prelim. Cost Calculation Memo. at Attachment 1 (Nov. 17, 2021) (C.R. 228, P.R. 264). Commerce determined that this information was reliable and that it was reasonable to rely on acquisition costs as a proxy for the cost of producing the honey purchased from the middlemen and beekeeper suppliers. PDM at 17.

## IV.    **In-Lieu-Of-Verification Questionnaires And Administrative Case Briefs**

On January 6, 2022, Commerce issued in-lieu-of verification (ILOV) questionnaires to Allied and Ambrosia and requested that if the finalized audited FY 2020-2021 financial statements were available to provide a copy and to demonstrate how the items reconcile with previously submitted documents. *See* Allied ILOV Questionnaire at 3 (Jan. 6, 2022) (C.R. 248, P.R. 292); Ambrosia ILOV Questionnaire at 6 (Jan. 6, 2022) (C.R. 247, P.R. 291).

In response, Allied provided its audited FY 2020-2021 financial statements, notes, and other reconciliation documents (which had been finalized at the end of December 2021). *See*

Allied ILOV Questionnaire Resp. at ILOV-3 and Exh. SVE-11-13 and Exh. SVE-12-13 (Jan. 18,

2022) (C.R.267-78, P.R. 297).  Ambrosia likewise submitted audited financial statements for the

FY ending March 31, 2021 (which had been finalized in mid-November 2021) and provided

reconciliations of its audited financial statements to its home market and U.S. sales databases.

*See* Ambrosia ILOV Questionnaire Resp. at 14-15 and Exh. VD-10(a)-(c), and Exh. VS-15-16

(C.R. 249-66, P.R. 296).  The submitted financial statements for each company indicated that

they are audited by an independent third party, as evidenced by directors' and auditor's

signatures and stamps that are present on the income statements.  *See* IDM at 33.

Commerce timely received both administrative case and rebuttal briefs from the parties.

*See* AHPA Admin. Case Br. (Jan. 31, 2022) (C.R. 284, P.R. 307); AHPA Rebuttal Br. (Feb. 9,

2022) (C.R. 295, P.R. 329); Allied Case Br. (Jan. 31, 2022) (C.R. 283, P.R. 306); Allied Rebuttal

Br. (Feb. 9, 2022) (C.R. 293, P.R. 326); Ambrosia Rebuttal Br. (Feb. 22, 2022) (C.R. 301, P.R.

339).  On February 8, 2022, Commerce rejected Ambrosia's unsolicited and untimely new

factual information containing audited financial statements, an auditor's opinion, and certain

appendices.  *See* IDM at 2; Rejection of Ambrosia's Unsolicited New Factual Info. (Feb. 8,

2022) (P.R. 322).

## V.      __Final Determination__

On April 14, 2022, Commerce published the final determination.  *See* IDM.  In the final

determination, Commerce continued to rely on the acquisition costs reported by Allied and

Ambrosia based on the costs submitted by their middlemen and beekeepers selected for review,

and the acquisition prices paid by Allied and Ambrosia, respectively, to those suppliers.  *See*

IDM at 27; *see also* Allied Final Cost Calculation Memo. (Apr. 7, 2022) (C.R. 306, P.R. 347);

Ambrosia Final Cost Calculation Memo. (Apr. 7, 2022) (C.R. 320, P.R. 352).

Commerce explained that "{f}or the raw honey inputs consumed by Allied and Ambrosia, {it has} available on the record the acquisition costs paid by the exporter-respondents to their suppliers, and for the selected beekeepers and middlemen-suppliers, {it has} specific suppliers' actual cost of producing and collecting raw honey during the {period of investigation}." IDM at 26. Commerce acknowledged that "these suppliers' costs are not representative of the costs for total population of beekeeper suppliers" because that population "was too large to sample accurately and would have required an unmanageable number of producers to achieve a statistically valid sample." *Id.* But Commerce reasoned that its comparison of the "beekeepers' COPs to the respective acquisition costs paid by the exporter-respondents" and the resulting comparisons "does not result in missing costs, but rather the use of acquisition costs ensures the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey." *Id.* at 27. Commerce likewise determined that there were "no grounds" to resort to other data, such as National Horticultural Board of India (NHBI) data, which is part of the Ministry of Agriculture and Farmers Welfare and part of the Government of India, "because the selected middlemen and beekeeper costs are reliable." *Id.* at 22.

Additionally, Commerce rejected AHPA's argument that it should apply facts available with an adverse inference to Allied and Ambrosia based on the "cost responses provided by their middleman and beekeeper-suppliers." *Id.* at 38. Commerce explained that "even with their limited resources, the beekeepers were able to respond to Commerce's questionnaires and cooperate to the best of their abilities to meet the reporting requirements." *Id.*; *see also id.* at 39-42 (addressing issues specific to the suppliers of Allied and Ambrosia).

Turning to the financial statements, Commerce likewise determined that there was no

basis to apply facts available with an adverse inference because Allied and Ambrosia were "fully

responsive and provided in their verification questionnaire responses copies of the audited FY

2020-2021 financial statements, along with a reconciliation of those financial statements to their

trial balances." *Id.* at 32. Commerce acknowledged that its verification questionnaire "did not

explicitly specify that the accompanying audit report be provided." *Id.* And although AHPA

alleged that the FY 2020-2021 for Ambrosia were "missing certain data when compared to the

prior period audited financial statements that were submitted," Commerce explained that "there

is nothing on the record that shows that this missing information is a required part of the audited

financial statements." *Id.* at 32-33.

Moreover, Commerce determined that the FY 2020-2021 financial statements were

reliable because the "financial statements included the accompanying notes, with an auditor

seal/stamp" and Allied and Ambrosia also "provided detailed reconciliations of the audited

financial statements to the general ledger accounts, as maintained in their financial accounting

system, and a cost allocation summary worksheet which segregated the various financial

statement line items into the various reporting categories (*e.g.*, {cost of manufacturing}, general

and administrative expenses, selling, *etc.*), which reconciled with the costs reported in the

respondents' databases." *Id.* at 33.

With respect to the alleged delay in providing the FY 2020-2021 financial statements,

Commerce explained that Allied and Ambrosia did not impede the proceeding because the

Indian Ministry of Finance had extended the deadline to January 15, 2022, due to the COVID

pandemic and, thus, the "respondents were not required to finalize their audited financial

statements until late in this proceeding." *Id.* at 34. Indeed, for both Allied and Ambrosia, their

audited financial statements were finalized *after* the submission of all of their supplemental

responses. *Id.* Thus, Commerce determined that they "provided {Commerce} with a copy of

those statements at the earliest possible opportunity in response to the verification questionnaire

and, as such, did not impede the proceeding by withholding any information as alleged." *Id.*

## SUMMARY OF THE ARGUMENT

First, Commerce's reliance on the respondents' acquisition costs of raw honey purchased

from its suppliers as a basis on which to calculate their cost of production is supported by

substantial evidence and in accordance with law. In this investigation, after Commerce tested the

beekeepers' costs of production to the respective acquisition costs that Allied and Ambrosia had

paid, Commerce determined that reliance on their acquisition costs was an accurate gauge of

costs of production. Thus, Commerce determined that reliance on Allied and Ambrosia's

acquisition costs ensured the capture of all costs, expenses, and profits of the beekeepers and

middlemen involved in the production and collection of raw honey in accordance with 19 U.S.C.

§1677(28).

Second, substantial evidence supports Commerce's determination that Allied and

Ambrosia did not withhold requested information or impede the proceeding in responding to

Commerce's questionnaires. Specifically, Commerce determined that it would be inappropriate

to apply facts available with an adverse inference because the respondents provided the audited

financial statements for FY 2020-2021 in response to the ILOV questionnaires, which was the

earliest possible opportunity for them to provide the financial statements. AHPA's other

challenges to the content of the audited financial statements are meritless.

# ARGUMENT

## I.   Legal Standards

### A.   Standard Of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact intensive inquiries, such as in this case, the agency's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009). Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

To comply with the statutory requirement that Commerce's determinations be made "in accordance with law," Commerce must "follow its established practice or explain why it is reasonable for it to deviate from its practice." *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1260 (Ct. Int'l Trade 2018). Commerce's actions establish a practice "'when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to' the agency's past action." *Id.* at 1254 (quoting *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1312 (Ct. Int'l Trade 2017)).

Additionally, the Court reviews Commerce's conduct of its administrative proceedings for abuse of discretion. *See Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1350 (Fed. Cir. 2015). The Court "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345, 1354 (Ct. Int'l Trade 2008). The Court has recognized that it is within the discretion of a court or an administrative agency to relax or to modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006).

### B.   <u>Application Of Facts Available With An Adverse Inference</u>

Commerce is authorized to apply "facts otherwise available" when "necessary information is not available on the record," or when a party (1) withholds requested information, (2) fails to provide information by established deadlines or in the form or manner requested, (3) significantly impedes the review, or (4) provides information that cannot be verified. 19 U.S.C.

13

§ 1677e(a)(2); *see also Gerber Food (Yunnan) Co., Ltd. v. United States*, 387 F. Supp. 2d 1270, 1280 (Ct. Int'l Trade 2005).  If Commerce finds that a party meets any of these conditions, it may use facts otherwise available, subject to 19 U.S.C. § 1677m(d), to reach the applicable determination.  19 U.S.C. § 1677e(a).

Commerce, however, is required "to provide a respondent with notice of deficient responses, and an opportunity to remediate, before deciding to rely on facts available." *BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1358 (Ct. Int'l Trade 2021) (citing 19 U.S.C. § 1677m(d)).  In addition, "Commerce may not decline to consider information that is necessary to the determination but does not meet all the applicable requirements when the information is timely submitted; the information can be verified; the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination." *Jindal Poly Films v. United States*, 365 F. Supp. 3d 1379, 1386 (Ct. Int'l Trade 2019); *see also* 19 U.S.C. § 1677m(e).

Further, if Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available.  19 U.S.C. § 1677e(b).  A respondent's failure to cooperate to the "best of its ability" is "determined by assessing whether {a} respondent has put forth its *maximum effort* to provide Commerce with full and complete answers to all inquiries."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added).  The standard requires that respondents "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question."  *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016).  Thus, the statutory trigger for an adverse inference "is simply a failure to cooperate to the best of respondent's ability, *regardless*

*of motivation or intent.*"  *Nippon Steel*, 337 F.3d at 1383 (emphasis added).  To then determine

whether an adverse inference is warranted, Commerce examines a "respondent's actions and

assesses the extent of respondent's abilities, efforts, and cooperation in responding to

Commerce's requests for information."  *Id.* at 1382.

## II.  Commerce's Determination To Use Allied's And Ambrosia's Acquisition Costs For The Cost Of Production, Without Applying Facts Available With An Adverse Inference, Is Supported By Substantial Evidence And In Accordance With Law

Commerce's calculation of the cost of production for Allied and Ambrosia using their

acquisition costs of raw honey from beekeepers, and to not apply facts available with an adverse

inference, is supported by substantial evidence and in accordance with law.  *See* IDM at 22-27,

38-43.  As we explain below, AHPA's arguments in opposition are meritless.

### A.  Legal Framework

To properly determine appropriate antidumping duties for a given product, Commerce

must first identify the normal value or, when the normal value cannot be determined, the

constructed value, of the merchandise in the exporting country.  19 U.S.C. § 1677b(a).

Constructed value is calculated from (1) "the cost of materials and fabrication or other

processing of any kind employed in producing the merchandise," (2) "selling, general, and

administrative expenses," and (3) "the cost of all containers and coverings … and all other

expenses incidental to placing the subject merchandise in condition packed ready for shipment

to the United States."  *Id.* § 1677b(e).  In making a normal value calculation, the statute

defines "the term 'exporter or producer' {to} include{ } both the exporter of the subject

merchandise and the producer of the same subject merchandise to the extent necessary to

accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise." *Id.* § 1677(28).

The Statement of Administrative Action (SAA) further explains that the purpose of this section "is to clarify that where different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm in calculating cost of production and constructed value." H.R. Doc. 103-316 at 835, vol. 1, 103d Cong. 2d Sess. 656 (1994), *reprinted* in 1994 U.S.C.C.A.N. 4040, 4172. The "intent of the statute is to ensure that Commerce has the authority to capture all costs and profits in situations where various companies are engaged in the production and sale of {the merchandise under consideration}." IDM at 23.

In this regard, although "the statute does not mandate that Commerce must use actual cost data, it unambiguously allows Commerce to prefer the actual production costs of unaffiliated suppliers of finished subject merchandise over acquisition costs." *SKF USA Inc v. United States*, 630 F.3d 1365, 1371 (Fed. Cir. 2011). Thus, in the final determination, Commerce determined it "has the discretion to rely on acquisition costs where such reliance does not contravene {its} responsibility to apply the antidumping law in a manner that prevents the evasion of antidumping duties." IDM at 25.

## B.    Commerce's Past Practice In The *Honey From Argentina* Investigation Informed Its Determination In This Case

As Commerce explained in the final determination, "{u}nder the current circumstances, whereby a reseller merely purchases the subject merchandise from unaffiliated parties rather than producing the subject merchandise, Commerce obtains the costs from the actual producer to ensure that resellers have not acquired merchandise at less than its COP and thereby avoided

the reach of the antidumping law." IDM at 25.  However, the circumstances presented in this case did not allow Commerce to use that approach.

For example, although Commerce selected the two largest exporters of raw honey as mandatory respondents, neither of them produce raw honey.  *See id.* at 23.  Instead, the producers are "thousands of unaffiliated middlemen and beekeepers." *Id.*  Additionally, the market is fragmented in such a way that even if Commerce had "select{ed} the largest supplier producers, {that} also fails to capture a significant or representative portion of the raw honey supplied to the exporter-respondents." *Id.* at 25.

Commerce faced similar issues in previous agricultural cases, specifically, the *Honey from Argentina* investigation.  In the investigation of *Honey from Argentina*, Commerce selected 12 independent, unaffiliated beekeepers out of a potential field of approximately 25,000 honey producers to calculate a country-wide cost.  *See Honey from Argentina,* 66 Fed. Reg. 50,611 (Dep't of Commerce Oct. 4, 2001) (final LTFV determ.), and accompanying IDM at Comment 1 (*Honey from Argentina* IDM).  Ultimately, none of the selected beekeepers responded, and because it was determined that none were affiliated with or even supplied the two exporter-respondents, Commerce relied on public studies to calculate a cost of production for the subject merchandise as facts available.  *Id.*

In the later administrative reviews covering honey from Argentina,[3] Commerce determined that the Argentine honey industry was becoming even more fragmented, such that the selection of the largest beekeeper suppliers in later reviews provided less coverage of the

---

[3] The antidumping duty order covering honey from Argentina was revoked in 2012 due to non-interest by the domestic industry.  *See Honey from Argentina*, 77 Fed. Reg. 77,029 (Dep't of Commerce Dec. 31, 2012) (revocation order).  However, there is a new antidumping duty order covering honey from Argentina.  *See Raw Honey from Argentina*, 87 Fed. Reg. 22,179 (Dep't of Commerce Apr. 14, 2022) (final LTFV determ.).

exporter-respondents' total honey purchases.  *See, e.g.*, *Honey from Argentina*, 69 Fed. Reg. 62,624 (Dep't of Commerce Jan. 6, 2004) (prelim. admin. review); *Honey from Argentina*, 71 Fed. Reg. 78,397, 78,400 (Dep't of Commerce Dec. 29, 2006) (prelim. admin. review); *Honey from Argentina*, 73 Fed. Reg. 79,802, 79,807 (Dep't of Commerce Dec. 30, 2008) (prelim. admin. review); *Honey from Argentina*, 76 Fed. Reg. 2,655, 2,659 (Dep't of Commerce Jan. 14, 2011) (prelim. admin. review).  Additionally, as Commerce explained in this case, it had determined that "these smaller beekeepers typically had limited records, or limited access to technology due to their remote locations, which meant more reliance on assumptions and estimates {rather} than actual verifiable records."  IDM at 24.  Thus, even when beekeepers responded, "Commerce was still plagued with incomplete or unreliable cost data that needed to be supplemented with public studies to calculate certain costs such as labor, land rent, and bee feed."  *Id.* at 24-25; *see, e.g.*, *Honey from Argentina*, 69 Fed. Reg. 30,283 (Dep't of Commerce May 27, 2004) (final admin. review), and accompanying IDM at Comments 1, 2, 3, 9, and 10; *Honey from Argentina*, 72 Fed. Reg. 25,245 (Dep't of Commerce May 4, 2007) (final admin. review), and accompanying IDM at Comment 4.

Armed with this understanding of the difficulties in other honey investigations and administrative reviews, "Commerce approached this new investigation with this history in mind."  IDM at 25.  Commerce explained that "it was abundantly clear" that "due to the sheer volume of beekeepers in India, a statistically valid random sample was not possible."  *Id.*  For example, during the current investigation, the beekeeper suppliers to Allied and Ambrosia "number in the thousands."  *Id.*  Consequently, Commerce recognized that it did not have the resources to rely on a statistically valid sample because that would require the collection and analysis of cost data from "scores of beekeepers."  *Id.*  Moreover, because of the generally

small nature of the beekeepers' operations and size of the respondents, the additional option

offered by the statute, *i.e.*, selecting the largest supplier producers, "also fails to capture a

significant or representative portion of the raw honey supplied to the exporter-respondents."

*Id.*

### C.    Substantial Evidence Supports Commerce's Reliance On Acquisition Costs In Calculating The Cost Of Production

As explained above, Commerce considered multiple factors before deciding on a COP

methodology including the lessons learned from the *Honey from Argentina* investigation and

administrative reviews, where the unaffiliated beekeeper respondents frequently refused to

respond to requests for information, or if responsive, they were unable to provide usable cost

data because of their small unsophisticated nature and limited records; and that Commerce's

analysis showed that even the largest producers still represented only a small percentage of total

honey supplied to the respondents. *See* IDM at 24-25.   Thus, Commerce weighed its

responsibility to apply the antidumping law in a manner that prevents the evasion of

antidumping duties with whether to continue with its precedent in obtaining the cost of

production of raw honey from unaffiliated producers and determined that that was not possible.

*Id.* at 25.   To wit, Commerce determined that it was unable to select a representative number of

beekeepers and decided instead to rely on Allied's and Ambrosia's acquisition costs. *Id.* at 26-

27.

Further, to test that the respondents' acquisition costs were reliable for purposes of

calculating COP, Commerce adopted a "pragmatic approach to collecting limited beekeeper

COP information in this investigation." *Id.* at 26.   Commerce limited its solicitation of COP

information to "two of Allied's middlemen-suppliers and two beekeeper-suppliers to those

middlemen, and to Ambrosia's one direct beekeeper-supplier, one middleman and its

beekeeper-supplier, to test whether a reliance on the exporter-respondents' acquisition costs was reasonable." *Id.* In addition to Commerce's belief that the largest honey suppliers to Allied and Ambrosia would be "more likely to have the ability to provide the data," from those suppliers, Commerce also "selected the suppliers with the lowest sales prices to Allied and Ambrosia" because they would have the "highest risk to be selling at below their COP for the raw honey and were actual suppliers to the exporter-respondents." *Id.* Therefore, Commerce reasoned that "if these beekeepers were selling above their COP for the raw honey, Commerce could reasonably determine that a reliance on acquisition costs would not result in missing costs." *Id.*

Next, Commerce compared the beekeepers' COP to the respective acquisition costs that Allied and Ambrosia paid to their suppliers, and based on these comparisons, Commerce found that there was "no reason to believe that {their} beekeepers sold raw honey below their COP." *Id.* at 27. In this case, with unaffiliated suppliers in the thousands, Commerce determined that "the 'actual cost' of producing honey continues to be illusive because of the impossibility of performing an accurate sampling of beekeeper suppliers and the impossibility of gaining coverage by obtaining information from enough of the 'largest' quantity suppliers to truly gain representative coverage." *Id.* Thus, Commerce determined that a "reliance on Allied and Ambrosia's acquisition costs does not result in missing costs," but rather "ensures the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey" in accordance with 19 U.S.C. §1677(28). *Id.*

Turning to the data the beekeepers and middlemen supplied, Commerce declined to apply facts available with an adverse inference to Allied and Ambrosia based on the "cost responses provided by their middleman and beekeeper-suppliers." *Id.* at 38. These suppliers

are "small farmers that are not required by Indian law to maintain books and records, prepare financial statements, or file tax returns," and even with their limited resources, Commerce determined that the "beekeepers were able to respond to Commerce's questionnaires and cooperate to the best of their abilities to meet the reporting requirements." *Id.* Commerce then addressed specific complaints that AHPA had with the reporting from Allied and Ambrosia's suppliers, and determined that they were without merit, as explained below. *Id.* at 39-43.

For example, although Ambrosia's middleman/beekeeper-supplier did not provide an invoice to substantiate its highest reported bee feed purchase, nor the reported monthly salary and wages, Commerce determined that the middleman/beekeeper-supplier provided the "only records that it maintains which is an expense and salary register." *Id.* at 39. The middleman/beekeeper-supplier also had to "solicit third party data to determine the cost of the beehives and bee colonies" in order to calculate reported depreciation expenses, but that was not unreasonable based on the "limited records" it maintained. *Id.* Commerce also found nothing amiss with various depreciation expenses because the equipment was included in its capital equipment worksheet. *Id.* at 40.

Although AHPA considered Ambrosia's direct beekeeper-supplier's data "questionable," Commerce determined that AHPA "provided no record evidence to support these speculative assumptions that the data are tainted or fictitious." *Id.* Indeed, as requested by Commerce, the direct beekeeper-supplier "provided screen shots from its accounting ledger supporting the reported depreciation expenses." *Id.* And although there was some confusion about whether costs were assigned to "bees themselves," record evidence "substantiates the proposition that no additional costs are needed to replace the bees." *Id.* at 41. Commerce also determined that because it had not requested that either the direct beekeeper-supplier or the

middleman/beekeeper-supplier certify their data, it was sufficient that Ambrosia had certified the responses. *Id.* (citing 19 C.F.R. § 351.303(g)(1)).

Overall, Commerce rejected AHPA's allegations that the two beekeeper-suppliers had failed to respond in full because "in support of the total expenses that were then allocated to the {period of investigation} months, both beekeepers provided copies of their expense registers along with a summary schedule showing how the monthly allocations tied to the rental and feeding expenses reported in the original cost responses." *Id.* at 41-42. They also were fully responsive in providing sufficient information to support an offset to reported costs, because they explained that, "during the extraction process, beeswax was generated and sold to unaffiliated customers and also that the sale of beeswax was reported as an offset to other variable overhead costs." *Id.* at 42. The beekeepers also explained in supplemental cost responses that "they did not incur any expenses relating to replenishing bees or bee colonies because the reproduction rate of the bees is higher than their death rate." *Id.* In sum, Commerce determined that AHPA could identify no record evidence that any "costs are missing or underreported." *Id.* at 43. To the extent that any repair costs were understated, such as nails, screws, paint, *etc.*, Commerce included an estimate of those expenses as facts available, using data AHPA had submitted "regarding the experience of U.S. industry producers." *Id.*

Thus, substantial evidence supports Commerce's determination to use Allied and Ambrosia's acquisition costs of honey to calculate their COP. *See id.* at 22-27. Also, Commerce was able to confirm that Allied and Ambrosia's beekeeper-suppliers and middlemen/beekeeper-supplier "submitted complete and usable cost responses," albeit with the

caveat that there are "complications associated with requiring small unsophisticated beekeeping operations to calculate and report COP data." *Id.* at 43.

### D.      AHPA's Arguments Do Not Undermine Commerce's Determination

AHPA makes numerous arguments that Commerce's reliance on the respondents' acquisition costs is not in accordance with law, *see* AHPA Br., but these arguments are meritless.

First, AHPA argues that Commerce has impermissibly deviated from its practice of collecting and using cost data from unaffiliated growers in agricultural cases.  *See* AHPA Br. at 35-39.  Contrary to AHPA's assertion that Commerce failed to explain why it was departing from its prior practice with agricultural products, Commerce explained at length the issues that it had faced in the prior raw honey from Argentina proceedings, which informed its decision to deviate from that practice in this case.  *See* IDM at 24-25.

When an agency changes its practice, it is obligated to provide an adequate explanation for the change, which Commerce did in this case.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983); *SKF USA, Inc. v. United States,* 263 F.3d 1369, 1382 (Fed. Cir. 2001).  As such, Commerce's past practice of using the beekeepers' cost of production does not "foreclose{} Commerce's ability" to use Allied and Ambrosia's acquisition costs as a reasonable proxy when "the situations differ in key respects." *Icdas Celik Enerji Tersane Ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1370–71 (Ct. Int'l Trade 2020).  In this case, Commerce acknowledged early in the proceeding that it had concerns with how to calculate COP and requested parties' comments on the most appropriate methodology.  *See* IDM at 22-27.  After requesting and reviewing cost information from raw honey suppliers, Commerce compared the beekeepers' COP to the respective acquisition costs paid by the two respondents, and determined that the beekeepers did not sell raw honey below

their COP.  *Id.* at 26-27.  As a result, Commerce determined that Allied's and Ambrosia's

acquisition costs include all costs, expenses, and profits of the beekeepers and middlemen

involved in the production and collection of raw honey and are a "reasonable proxy" to the

beekeepers' COP.  *Id.*  Commerce, therefore, determined that the use of the acquisition costs was

in accordance with 19 U.S.C. § 1677(28), and this determination is supported by substantial

evidence.  *Id*.

Second and relatedly, AHPA asserts that there is a gap in the record by not using the

beekeepers' data and Commerce improperly rejected the NHBI data which it should have used as

facts available to fill that gap.  *See* AHPA Br. at 38-41.  AHPA cite the *Honey from Argentina*

and *Wheat from Canada* investigations as examples when Commerce used information published

by government sources as neutral facts available because cost information from producers was

not available.  *Id.*

But those investigations are inapposite.  In *Honey from Argentina*, as explained above,

Commerce relied on the 1999 *Gestion Apicola* cost studies of beekeepers in Argentina because

the honey producers did not respond to Commerce.  *Honey from Argentina* IDM at cmt. 1.  In

*Wheat from Canada*, Commerce applied facts otherwise available to farmers who had *minimal to*

*no support* for their seeding rates and based their rates on past experience, industry standards,

machine settings, or other estimated amounts.  *See Wheat from Canada*, 58 Fed. Reg. 52,741

(Dep't of Commerce Sept. 5, 2003) (final LTFV determ.), and accompanying IDM at cmts. 11

and 12.  In this case, Commerce explained that there were "no grounds" to use the NHBI data as

a surrogate for facts available because the records from the "selected middlemen and beekeeper

costs are reliable."  IDM at 22.  To wit, Commerce received responses from *all* of Allied's and

Ambrosia's solicited suppliers; therefore, there are no gaps in the record akin to the *Honey from*

*Argentina* and *Wheat from Canada* investigations, nor was there a basis for Commerce to use the NHBI data as facts available. *Id.* at 22-27.

Third, AHPA argues that the beekeepers' data are not reliable benchmarks and are not verifiable. *See* AHPA Br. at 42-43. In particular, AHPA contends that the information is unverifiable because it comes from small farmers, there is a lack of documentation, and the supplemental questionnaires are allegedly inadequate. *See id.* at 43-45. AHPA seems to argue that, even if Commerce determined that the selected beekeepers cooperated in response to Commerce's questionnaires, which they did, if Commerce determined that it could not use the beekeepers' data *alone* for calculating COP of raw honey, then Commerce cannot use selected beekeepers' data for *any* purpose. *Id.* We are aware of no authority for that proposition.

The "general rule" pursuant to 19 U.S.C. § 1677f-1(c)(1) is that Commerce "shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise." Subsection (c)(2) provides that Commerce can limit the number of individually examined exporters or producers by either "a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection," or Commerce may examine "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined." 19 U.S.C. § 1677f-1(c)(2).

Consistent with the facts in this case and the statute, Commerce explained that the population of beekeeper and middleman suppliers was too large to sample accurately and would have required an unmanageable number of producers to achieve a statistically valid sample. *See* IDM at 25; 19 U.S.C. §1677f-1(c)(2). In other words, "due to the sheer volume of beekeepers in India, a statistically valid random sample was not possible" and even if it had selected the largest

supplier producers, that would "fail{} to capture a significant or representative portion of the raw honey supplied to the exporter-respondents."  IDM at 25.

As an initial matter, Commerce generally found that middlemen/beekeepers and beekeeper-suppliers are small farmers who are not required by Indian law to maintain books and records, prepare financial statements, or file tax returns.  *Id*. at 38; *see e.g.*, Ambrosia Supplier Cost Section D Resp. at B1-7, B2-7 and Exh. B1-3(a) (Sept. 14, 2021) (C.R. 106-07, P.R. 162); Allied Rebuttal Br. at 36.  In this case, Commerce determined that there were some gaps in the record concerning Allied's and Ambrosia's suppliers' responses; however, Commerce was able to use facts available and fill the gaps with record information, which mainly came from AHPA. IDM at 38-43.

For example, although Commerce typically requests that respondents provide supporting invoices to verify expenses, Ambrosia's middleman/beekeeper-supplier provided the only records that it maintains, which is an expense and salary register that records each transaction. *Id.* at 39.  Commerce did not find it unreasonable for the middleman/beekeeper-supplier, with its limited resources, to use its expense and salary register to support its reported bee feed costs and monthly salaries and wages, because those are the only documents it maintains in the normal course of business.  *Id.*  However, the supplier did not report a cost for salary, and as a result, Commerce calculated an imputed salary for the supplier using the information AHPA had provided and revised the middleman/beekeepers' costs accordingly.  *Id.* at 38; *see* AHPA Comments on Ambrosia's Beekeepers at Att. 2 (Sept. 28, 2021) (C.R. 147, P.R. 192).  As such, when Commerce determined that information was missing from the beekeepers' responses, it resorted to facts available to fill that gap, which is permissible pursuant to 19 U.S.C. § 1677e(a). *See* IDM at 38; *see also Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1252

(Fed. Cir. 2009) (explaining that Commerce may use as "facts available" any "information or inferences which are reasonable to use under the circumstances to make the applicable determination or substitute for the missing information.").

In addition, Commerce also applied neutral facts available to Ambrosia's supplier because the middleman/beekeeper-supplier had limited records and did not maintain details related to purchases of beehives and bee colonies.  IDM at 39.  Instead, the supplier based its acquisition cost for the purchase of beehives and bee colonies on a quotation from a third-party seller along with the knowledge of when the supplier started its operations to calculate the reported depreciation expenses.  *Id*.  Again, Commerce determined that neither the limited records maintained by the supplier nor the supplier's explanation were unreasonable.  *Id*. However, Commerce used the beehive and bee colonies cost data from the information submitted by AHPA concerning the experience of Indian industry producers, and the middleman/ beekeeper's own experience in starting up the operations and the growth percentage to revise the depreciation expenses.  *Id*. at 39-40; *see* AHPA Comments on Ambrosia's Beekeepers at Att. 2; *Ningbo Dafa Chem. Fiber Co.*, 580 F.3d at 1252.

Thus, although AHPA argues that the beekeepers' data were neither reliable nor verifiable, Commerce explained at length why that was incorrect.  *See* IDM at 38-43.  Although AHPA may have preferred that Commerce use the entirety of the NHBI data as facts available— and reject the beekeepers' data as a gauge to determine whether Allied and Ambrosia's acquisition costs were a reasonable proxy for the COP—when AHPA had quibbles with certain responses from the beekeepers, Commerce either determined that AHPA's arguments had no merit *or* used facts available (usually from AHPA's own submissions) to fill the limited gaps. *Id.*; *see Ad Hoc Shrimp Trade Action Comm. v. United States*, 675 F. Supp. 2d 1287, 1304 (Ct.

Int'l Trade 2009) ("Commerce is by statute afforded discretion in applying facts available" and "{t}his discretion is predicated on Commerce's special expertise in administering the anti-dumping law which entitles its decisions to deference from the courts.").

Finally, AHPA argues that Commerce failed to consider the NHBI data that AHPA had placed on the record that allegedly demonstrated that Allied's and Ambrosia's acquisition costs are below the average COP of raw honey in India.  *See* AHPA Br. at 45-48.  This is incorrect.

Although Commerce may not have discussed the deficiencies of AHPA's NHBI data that it had placed on the record to the extent AHPA would have preferred, "there is no statutory requirement that . . . {Commerce} explicitly discuss every piece of record evidence that is put before it in" a proceeding.  *Allegheny Ludlum Corp. v. United States*, 112 F Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000).  Rather, Commerce is required to discuss issues *material* to its determination.  *Itochu Bldg. Prods. v. United States*, 163 F. Supp. 3d 1330, 1337 (Ct. Int'l Trade 2016).  Indeed, in this case, much of AHPA's argument and evidence related to the average COP is related to its particular market situation allegation, and Commerce addressed the deficiencies of those sources and their reliability in the preliminary determination and the final determination. *See* IDM at 14-19; PDM at 5-7.

For example, although AHPA alleged that "price depression was caused by the large-scale adulteration of honey by major Indian companies, and that such price suppression indirectly lowered the price for raw honey that companies like Ambrosia and Allied could obtain when selling raw honey in bulk," Commerce determined that AHPA "failed to present sufficient evidence for this allegation."  IDM at 15.  Moreover, for the pricing information that AHPA submitted, "the lack of details regarding these price quotes precludes an evaluation of the reliability and representativeness of the data," and Commerce determined that it was AHPA who

"fail{ed} to engage" with other "record sources that contradict their argument and analysis." *Id.* at 15, 17.

Additionally, Commerce determined that record evidence did not support AHPA's allegation that Allied and Ambrosia had purchased raw honey below the beekeepers' COP. *See id*. at 39-43. Indeed, Commerce reviewed the responses from Allied and Ambrosia's suppliers, and found that there was nothing on the record to support that these suppliers' costs are missing or underreported because the period of investigation acquisition costs that Allied and Ambrosia paid are *above* the raw honey cost of production (*i.e.*, the beekeeper costs plus middleman expenses). *See id*. at 39-40 and 42-43. To the extent Commerce determined that any of the suppliers were missing certain costs, Commerce used facts available that AHPA had submitted to revise those costs. *See id.* at 39 (explaining that for Ambrosia's middleman/beekeeper-supplier, Commerce calculated an imputed salary using data AHPA had submitted "regarding the experience of the Indian industry producers"); *id.* at 39 (using AHPA "beehive and bee colonies cost data" in order "to confirm that the solicited third-party costs of beehives and bee colonies were not understated"); *id.* at 43 (using AHPA data "regarding the experience of U.S. industry producers" for the "cost for materials used to repair beehives").

Thus, this Court should find that AHPA's "mere disagreement," *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021), with Commerce's factual findings and methodology is not a valid basis to challenge Commerce's determination. *See Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308-09 (Fed. Cir. 2020) ("Commerce's findings 'may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.'" (citation omitted)). And that Commerce's determination to use

29

Allied and Ambrosia's acquisition costs of raw honey is supported by substantial evidence and in accordance with law.

### III. Commerce Properly Determined That The Use Of Facts Available With An Adverse Inference Was Not Warranted With Respect To The Allied And Ambrosia Financial Statements

Commerce properly exercised its discretion and determined that the application of an adverse inference was not warranted concerning Allied's and Ambrosia's financial statements because the respondents responded to the best of their abilities and there was no gap in the record. *See* IDM at 31-34. To wit, Commerce found that neither respondent withheld information, failed to provide information by established deadlines that significantly impeded the proceeding, or provided information that could not be verified. *See id.* In addition, Commerce determined that the submitted financial statements were usable for margin calculations. *See id.* Thus, Commerce determined that there was no gap in the record, and there was no basis to determine that Allied or Ambrosia failed to cooperate to the best of their abilities.

Nevertheless, AHPA argues that there was a gap in the record and Commerce cannot rely on Allied's and Ambrosia's FY 2020-2021 audited financial statements because, among other arguments, the respondents did not submit complete audited financial statements and neither respondent acted to the best of their abilities. *See* AHPA Br. at 11-32. These arguments are without merit, as we explain below.

### A. Substantial Evidence Supports Commerce's Determination That Allied And Ambrosia Provided Necessary Information And Acted To The Best Of Their Ability

Commerce's determination that Allied and Ambrosia provided necessary information, that is, the FY 2020-2021 financial statements, and that they cooperated to the best of their ability is supported by substantial evidence. *See* IDM at 31-34. First, both were responsive to all of Commerce's requests for financial statements and supplemental information to confirm the

accuracy of the documentation received.  *Id.*  Each provided their audited financial statements for

FY 2019-2020 in their Section A responses and included prior documentation while notifying

Commerce that their audited FY 2020-2021 financial statements were not yet available.  *See*

Allied Section A Resp. at A-22 and Exh. A-9(a)-(b); Ambrosia Section A Resp. at A-19 and Exh.

A-9(a)-(f).  In subsequent supplemental questionnaire responses, Allied and Ambrosia provided

evidence that the Indian Tax Authorities had extended the filing deadlines and cooperated by

providing alternative information, trial balances, and other information.  IDM at 32.

Even though Allied and Ambrosia could not meet Commerce's original timeline, both

provided updates on a deadline that neither could control.  *Id.* at 34.  Indeed, based on the

extension of the tax authority's deadline to submit various reports of audit, "respondents were

not required to finalize their audited financial statements until late in this proceeding," and

Commerce determined that this was reasonable because they provided "Commerce with a copy

of those statements at the earliest possible opportunity in response to the verification

questionnaire and, as such, did not impede the proceeding by withholding any information."  *Id.*

Also, in Commerce's ensuing supplemental questionnaires and verification questionnaires,

although it had requested the financial statements for FY 2020-2021, it "did not explicitly

specify that the accompanying audit reports be provided."  *Id*. at 32; *see also* Allied Verification

Questionnaire at 4; Ambrosia Verification Questionnaire at 6.  In any event, Commerce observed

"that the submitted financial statements for each company indicate that they are audited by an

independent third party, as evidenced by directors' and auditor's signatures and stamps that are

present on the income statmeents."  IDM at 32.

Moreover, although AHPA had argued that Ambrosia's FY 2020-2021 financial

statements were "incomplete and missing all the hallmarks of audited financial statements,"

Commerce accepted Ambrosia's explanation that "under the Indian Companies Act of 2013 Section 2(40), financial statements are only required to include" certain documents such as "a balance sheet as at the end of the financial year; a profit and loss account; cash flow statement for the financial year; and any explanatory notes annexed to, or forming part of, any document referenced in the applicable sub-clauses." *Id.* at 32-33.  Thus, Commerce determined that none of the alleged missing documents were either required or were "not critical for Commerce's use for this investigation." *Id.* at 33.

Armed with financial statements, and reconciliation documents, which contained screenshots from the respondents' "accounting systems that had been annotated and cross-referenced to facilitate Commerce's understanding," Commerce was able to confirm that the trial balances that Allied and Ambrosia had provided earlier in the investigation matched. *Id.*; *see also* Allied Verification Questionnaire at Exh. SVE-13; Ambrosia Verification Questionnaire at Exh. VS-4; *Nippon Steel*, 337 F.3d at 1382.  After reviewing this additional information, Commerce determined that there were no discrepancies between the initially provided trial balances, the reconciliations, and the audited financial statements for FY 2020-2021.  IDM at 33.

Thus, substantial evidence supports Commerce's determination that Allied and Ambrosia "fully complied with {Commerce's} requests to submit their audited financial statements," and that the financial statements "are usable for this investigation for purposes of establishing the reliability of the reported sales and cost data." *Id.* at 34.  And as a result, Commerce determined that total facts available with an adverse inference was not warranted for Allied and Ambrosia. *Id.*; *Jindal Poly Films*, 365 F. Supp. 3d at 1386.

**B.   AHPA's Arguments Do Not Undermine Commerce's Determination**

Although AHPA makes numerous arguments that Commerce's determination to rely on Allied's and Ambrosia's FY 2020-2021 financial statements and not apply total facts available with an adverse inference is not supported by substantial evidence or in accordance with law, *see* AHPA Br. at 12-31, these arguments are meritless.

**1.   The Respondents Did Not Withhold Information Or Impede The Investigation**

First, AHPA argues that Commerce abused its discretion in failing to determine that the respondents withheld information or impeded the investigation because Allied and Ambrosia did not submit their FY 2020-2021 audited financial statements until responding to the ILOV questionnaires. *Id.* at 12-19.  However, AHPA's assertion is unsupported because both respondents were responsive and forthcoming about the delay with their audited financial statements.  *See* IDM at 31-34.

Unlike instances when respondents withheld information and "offered updated information only after the deadline for submitting data," *Papierfabrik*, 843 F.3d at 1379, or "withheld critical information from Commerce when {they} submitted the revised database by representing that the changes were 'minor,'" *Deacero S.A.P.I. De C.V. v. United States*, 996 F.3d 1283, 1296 (Fed. Cir. 2021), in this case, Commerce explained that there was no failure to provide requested information because the respondents were "fully responsive and provided in their verification questionnaire responses copies of the audited FY 2020-2021 financial statements, along with a reconciliation of those financial statements to their trial balances."  IDM at 32.  Indeed, the respondents were also transparent with Commerce at the very outset of the investigation that the audited FY 2020-2021 financial statements would be delayed because the Indian tax authority had "extended the due date of the submission of the income tax returns and

33

various reports of audit" to "January 15, 2022, due to the COVID pandemic." *Id.* at 34; *see* Allied Section A Resp. at A-22; Ambrosia Section A Resp. at A-19; Allied First Section D SQR at SuppD-12; Ambrosia First Section D SQR at S1-4-5; *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (affirming Commerce's application of adverse facts available because the respondent "never indicated that it was unable to provide the relevant information").

Nonetheless, both respondents expected the audited financial statements to be completed before then, and although they could not provide the audited FY 2020-2021 financial statements until they were finalized, Allied and Ambrosia produced substitute information, that is, trial balances, at Commerce's request. *Id.*; *Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1363 (Ct. Int'l Trade 2017) ("Accordingly the court is not persuaded that a respondent's submission of substitute information constitutes its 'maximum efforts' to comply where the respondent has not offered an adequate explanation for its inability to comply with Commerce's primary request for information."). And throughout the investigation, Allied and Ambrosia were responsive to Commerce's requests concerning the status of the audited financial statements, is*ee* Allied's Second A-C SQR; Ambrosia's Second Section D SQR at SD2-1, which AHPA has not challenged.

Moreover, once the documents became available, Allied and Ambrosia submitted the audited financial statements for the fiscal year ending March 31, 2021 (finalized at the end of December 2021 and mid November 2021, respectively) with their verification questionnaire responses. *See* IDM at 33; Allied Verification Questionnaire Resp. at ILOV-3 and Exh. SVE-11-13 and Exh. SVE-12-13; Ambrosia Verification Questionnaire Resp. at 14-15 and Exh. VD-10(a)-(c), and Exh. VS-15-16. After Commerce reviewed the submitted information, it

determined that the trial balances (which were first reconciled to the financial statement line items) tied exactly to the figures that Allied and Ambrosia had submitted with their section D, supplemental section D, and verification questionnaire responses.  *See* IDM at 32.

Second, AHPA argues that because of Commerce's leniency and accommodations it was prevented from rebutting, clarifying, or correcting information contained in the FY 2020-2021 financial statements.  *See* AHPA Br. at 19-21.  Specifically, AHPA argues that Commerce's discretion to seek corrective information at verification has its limits and "Commerce's typical practice is to accept corrective information at verification only for 'minor corrections to information already on the record.'"  *Id*. at 20 (citations omitted).  But AHPA incorrectly characterizes the submission of the FY 2020-2021 financial statements as "corrective information."

Although verification is generally not an opportunity to submit new factual information, *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304 (2004), *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005) ("Verification is intended to test the accuracy of data already submitted, rather than to provide a respondent with an opportunity to submit a new response."), the information that Allied and Ambrosia had submitted earlier in the investigation confirmed the trial balances and reconciliation documents, which were on the record prior to the preliminary determination and the final determination.  *See* Allied First A-C SQR at Exhibit S1-4; Ambrosia First ABC SQR at Exhibit S1-6(a)-(c); Allied Verification Questionnaire Resp. at ILOV-3-6 and Exh. SVE-11-13 and Exh. SVE-12-13; Ambrosia Verification Questionnaire Resp. at 14-15 and Exh. VD-10(a)-(c), and Exh. VS-15-16.  In addition, although Commerce had asked Allied and Ambrosia for their audited FY 2020-2021 financial statements "over the course of the proceeding," "{t}he companies provided Commerce with a copy of those statements at the

earliest possible opportunity in response to the verification questionnaire."  IDM at 34; *see* Allied Verification Questionnaire Response at ILOV-3-6 and Exh. SVE-11-13 and Exh. SVE-12-13; Ambrosia Verification Questionnaire Response at 14-15 and Exh. VD-10(a)-(c), and Exh. VS-15-16.  Commerce also determined that the trial balances tied exactly to the figures that Allied and Ambrosia had submitted with their section D, supplemental section D, and verification questionnaire responses.  *See* IDM at 32.

In any event, pursuant to 19 C.F.R. § 351.301(c)(1)(v), AHPA had an opportunity to rebut, clarify or correct the information in the trial balances that were used in lieu of the financial statements and ultimately were reconciled with the audited financial statements.  *See id.*  AHPA also had the ability to rebut, clarify, and correct the information in the financial statements, and it did so in its submission of numerous rebuttal comments and its case brief.  *See generally* AHPA Admin. Case Br.; *see also* AHPA Rebuttal Case Br.; AHPA Comments on Allied's Supplemental A-C Resp. (Sept. 20, 2021) (C.R. 134, P.R. 180).

Thus, substantial evidence supports Commerce's determination that Allied and Ambrosia provided the requested necessary information and did not impede, withhold, or fail to provide information during the investigation.  *See* IDM at 31-34; 19 U.S.C. § 1677e(a); *Nippon Steel*, 337 F.3d at 1382; *Diamond Sawblades Mfrs. Coal. v. United States*, 986 F.3d 1351, 1363 (Fed. Cir. 2021) ("Commerce has not identified a withholding or misrepresentation of information that lengthened or otherwise impeded the proceeding.").

###### 2.     The Respondents Acted To The Best Of Their Ability And No Core Information Is Missing From The FY 2020-2021 Financial Statements

AHPA also argues that the respondents did not act to the best of their abilities because (1) they each failed to provide the auditor's report, (2) the financial statements are not audited by an independent third party, (3) the auditor's report is an integral part of the financial statements,

and (4) financial statements without an auditor's report are unreliable.  *See* AHPA Br. at 21-32.

However, Commerce properly determined that the use of facts available, much less with an

adverse inference, was not warranted on the basis of the respondents not including the auditors'

reports.  *See* IDM at 31-34.

First, AHPA argues that Commerce's initial questionnaire specified that the respondents

should have included the "footnotes and auditor's opinion" in providing the financial statements

because even the respondents had included that information in earlier submissions.  *See* AHPA

Br. at 21-23.  AHPA also argues that Ambrosia's untimely attempt to submit a new financial

statement with an auditor's report in February 202{2}[4] demonstrates that it was "well aware of

the requirement."  *Id.* at 22.

However, AHPA ignores that Commerce's request in the ILOV questionnaire did *not*

"explicitly specify that the accompanying audit report be provided."  IDM at 32; *see also* Allied

ILOV Questionnaire at 4; Ambrosia ILOV Questionnaire at 6.  Because Commerce had not

asked for the FY 2020-2021 audited financial statements to include auditor's reports, Commerce

determined that the "respondents did not withhold or fail to report the requested information."

IDM at 32; *see also Nippon Steel*, 337 F.3d at 1382.  Also, AHPA undercuts its argument that

Ambrosia knew that its FY 2020-2021 audited financial statements should include an auditor's

report, because when Ambrosia attempted to submit that very same auditor's report, Commerce

rejected it as untimely-filed new factual information.  *See* IDM at 2.

Relatedly, AHPA contends that even under 19 U.S.C. § 1677m(d), the request to provide

an auditor's report was clear because Commerce had asked for auditor's reports in the initial

questionnaire and Commerce did not need to repeat its instruction in the ILOV questionnaire.

---

[4]  We presume this was a typo because the filing was rejected in February 2022.  IDM at
2.

*See* AHPA Br. at 22 n.5.  However, Commerce properly exercised its discretion when it extended the deadlines for the respondents to provide their audited FY 2020-2021 financial statements and ultimately received what it requested in the ILOV questionnaires making 19 U.S.C. § 1677m(d) not applicable.  *See PAM S.p.A.*, 463 F.3d at 1348.  Importantly, "{u}nder § 1677m(e), Commerce may not disregard information necessary to a determination, even if the information does not meet all applicable requirements, if a party demonstrates that it acted to the best of its ability in providing that information and that the information was timely submitted, verifiable, sufficiently complete to serve as a reliable basis for reaching the applicable determination, and usable without undue difficulties."  *Gerber Food (Yunnan) Co. v. United States*, 491 F. Supp. 2d 1326, 1337 (Ct. Int'l Trade 2007).

Second, AHPA argues that the respondents' FY 2020-2021 audited financial statements are unreliable because they do not contain an auditor's signature.  *See* AHPA Br. at 23-25.  Specifically, it argues that Ambrosia's FY 2020-2021 financial statements are deficient because they do not contain an auditor's signature or stamp.  *See id*. at 24.

However, Commerce determined that Allied's and Ambrosia's FY 2020-2021 audited financial statements–which included the accompanying notes, with an auditor seal/stamp–was sufficient.  *See* IDM at 33.  In addition, Ambrosia's audited financial statements include signatures by the directors on every page.[5]  *See* Ambrosia ILOV Questionnaire Resp. at 1-2 and Exh. VD-10(a) and VS-2(i).  AHPA's challenge to the authenticity of the auditor's routine signature as too "squiggly" is therefore meritless, AHPA Br. at 25, because the same stamp

---

[5] AHPA does not challenge the additional audited financial statements submitted by Sunlite and AE, Ambrosia's suppliers/subsidiaries, which likewise contain signatures by the directors and auditor stamps.  *See* AHPA Br. at 23-25; Ambrosia Verification Questionnaire Resp. at Exhibit VD-10(b) and Exhibit VD-10(c).

appears on each page and underneath all the signatures.  *See* Allied ILOV Questionnaire Resp. at

Exh. SVE-11.

Third, AHPA asserts that Commerce has consistently determined in other administrative

proceedings that the auditor's report is integral and necessary to determine the reliability of

financial statements.  *See* AHPA Br. at 25.  But the cited administrative proceedings are not

relevant in this case.

For example, in *Steel Concrete Reinforcing Bars from Belarus*, Commerce explained that

there were vital issues with the financial statements of an insolvent company that would prevent

Commerce from conducting its analysis and calculations.  *See Steel Concrete Reinforcing Bars

from Belarus*, 66 Fed. Reg. 33,528 (Dep't of Commerce June 22, 2001) (final LTFV determ.),

and accompanying Issues and Decision Memorandum at Comment 2.  In *Wooden Bedroom

Furniture from China*, Commerce declined to use a third party's financial statements to calculate

surrogate financial ratios because they were missing key sections.  *See Wooden Bedroom

Furniture from the People's Republic of China*, 71 Fed. Reg. 70,739 (Dep't of Commerce Dec.

6, 2006) (final NSR), and accompanying IDM at 6.  Similarly, in *Certain Iron Mechanical

Transfer Drive Components from the People's Republic of China*, Commerce determined that it

could not rely on a respondent's financial statements because they were incomplete and missing

vital information for financial ratio calculation, and there was doubt whether the financial

statements were, in fact, audited.  *See Certain Iron Mechanical Transfer Drive Components from

the People's Republic of China*, 81 Fed. Reg. 75,032 (Dep't of Commerce Oct. 28, 2016) (final

LTFV determ.), and accompanying IDM at 45.  Also, in the preliminary determination for

*Certain Preserved Mushrooms from the Netherlands*, Commerce found that the respondents

repeatedly failed to provide the audit report despite its multiple, explicit requests and failed to

explain missing pages as well as a "disclaimer of opinion" on the financial statement. *See*

*Certain Preserved Mushrooms from the Netherlands*, 87 Fed. Reg. 66,265 (Dep't of Commerce

Nov. 3, 2022) (prelim. LTFV determ.), and accompanying PDM at 8.  As a result, Commerce

preliminarily determined that the respondent significantly impeded the investigation, and the

reported sales and cost data was unusable for purposes of calculating a preliminary margin.  *Id.*

However, this investigation is ongoing and Commerce has yet to issue the final determination,

and it is possible that Commerce's determination may change.  *See NTN Bearing Corp. v. United*

*States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("{Preliminary determinations are 'preliminary'

precisely because they are subject to change.").  Contrary to the above administrative reviews,

Commerce determined that Allied's and Ambrosia's FY 2020-2021 financial statements were

not missing data and did not render the whole response unreliable; rather all of the necessary

information for Commerce to make a determination was present.  *See* IDM at 31-34.

Finally, AHPA argues that because Allied and Ambrosia withheld their auditor's reports

and submitted the FY 2020-2021 financial statements late in the investigation, the record is

lacking evidence that the financial data were complete, fairly stated (in all material aspects),

compliant with Indian Generally Accepted Accounting Principles (GAAP), or credible.  *See*

AHPA Br. at 29-32.  In other words, AHPA argues that only the auditor's reports and

companies' audited financial statements can verify the accuracy of the submitted U.S. sales,

normal value sales, and cost data files.  *Id*. at 30.  That presumption is incorrect.

Commerce is guided by 19 U.S.C. § 1677b(f)(1)(A), which directs Commerce to

calculate costs only if the records are kept in accordance with the GAAP of the exporting

country.  *See USEC Inc. v. United States*, 498 F. Supp. 2d 1337, 1363 (Ct. Int'l Trade 2007)

(citing 19 U.S.C. § 1677b(f)(1)(A)).  For example, in *USEC Inc.,* the Court upheld Commerce's

determination that the differences between a supplier's information and a respondent's information were minimal enough and Commerce properly determined that the respondent's information satisfied the statute. *Id.* at 1366.

In this case, too, substantial evidence supports Commerce's determination that the actual information and figures that Allied and Ambrosia provided are correct, and there is no basis to determine that the records are unreliable. *See* IDM at 33. Allied and Ambrosia alerted Commerce at the outset that there would be a delay in providing the audited financial statements because both respondents were waiting for the Indian government to finish its review. *See* Allied Section A Resp. at A-22; Ambrosia Section A Resp. at A-19. In the interim and in accordance with Commerce's requests, both provided supplemental information in the form of trial balances and other documentation. *See* Allied First A-C SQR at S1-3 and Exh. S1-(b); Ambrosia First A-C Questionnaire Resp. at S1-1 and Exh. S1-1(d), S1-6(b). Then Allied and Ambrosia provided their audited financial statements at the earliest possible opportunity in response to the verification questionnaire. *See* IDM at 34.

In addition, "Allied and Ambrosia also provided reconciliations of their audited financial statements to their home market and U.S. sales databases" and then later "supplemented the reconcilitations with copies of screenshots from their accounting systems that had been annotated and cross-referenced to facilitate Commerce's understanding." *Id.* at 33. Further, the "cost allocation summary worksheets" submitted by both respondents "demonstrate that the total {period of investigation cost of manufacturing} derived from the trial balance (which was first reconciled to the financial statement line items) ties exactly to the figures Allied and Ambrosia submitted with their section D, supplemental section D, and verification questionnaire responses." *Id.* Thus, after reviewing the totality of information that the respondents had

41

provided, Commerce determined that there were no material deficiencies in their submissions. *Id.*

Nevertheless, citing *Tapered Roller Bearings and Parts Thereof from the People's Republic of China*, 64 Fed. Reg. 61,837, 61,842 (Dep't Commerce Nov. 15, 1999) (final admin. review), AHPA continues to assert that the audited financial statements are "core" information, and without the auditor's reports Commerce cannot determine whether the respondents' books and records are Indian GAAP compliant. *See* AHPA Br. at 29-32. But in *Tapered Roller Bearings and Parts Thereof from the People's Republic of China*, Commerce found that there were significant inconsistencies between the information Asian Bearing and National Engineering Company (NEI) provided when compared to six other companies. In particular, there was evidence to suggest that Asian Bearing's methodology was not in accordance with the Institute of Charted Accountants of India, while the NEI was labeled a "sick" company. *Id.* at 61,843.

But in this case, Allied and Ambrosia provided prior audited financial statements for FYs 2018-2019 and 2019-2020. *See* Allied Section A Response at A-22 and Exh. A-9(a)-(b); Ambrosia Section A Response at A-19 and Exh. A-9(a)-(f). Commerce was then able to compare the audited FY 2020-2021 financial statements to the prior periods of audited financial statements, and AHPA can identify no record evidence to demonstrate that the FY 2020-2021 financial statements were materially inconsistent or unreliable. *See* IDM at 32-33; Allied Section A Resp. at Exh. A-9(a)-(b); Ambrosia Section A Resp. Exh. A-9(a)-(f); Allied ILOV Questionnaire Resp. at Exh. SVE-11-13; Ambrosia Verification Questionnaire Response at Exh. VD-10(a)-(c). Also, AHPA notably does not suggest that any of the prior financial statements that Allied and AHPA provided are unreliable. *See* AHPA Br. at 29-32.

AHPA has also never suggested that the respondents did *not* inform Commerce of their delays caused by the Indian Tax Authority's extension of the filing deadline, only that the delays should somehow constitute a failure to cooperate and require imposition of facts available with an adverse inference. Yet AHPA offers no authority for the proposition that a government-caused reporting delay should somehow be imputed to respondents, especially when the respondents repeatedly informed Commerce about that delay (and provided updates) and nonetheless provided alternative information in the interim. *See* IDM at 31-34. Accordingly, substantial evidence supports Commerce's determination that it could not penalize the respondents when they acted to the best of their ability when they immediately provided the FY 2020-2021 audited financial statements as soon as they were available. IDM at 33-34; *Nippon Steel*, 337 F.3d at 1382; *Papierfabrik*, 843 F.3d at 1379

Therefore, substantial evidence supports Commerce's determination that based on its "review of the audited financial statements, supporting worksheets, and other documentation Allied and Ambrosia provided, {it did} not find that there are any discrepancies in total costs as alleged by {AHPA}, nor any discrepancies with respect to the reported sales." IDM at 33. In other words, any alleged missing information was not integral to the investigation and substantial evidence supports Commerce's determination that it was able to use their reported cost and sales data. *Id.*

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion for judgment on the agency record and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

43

PATRICA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
Jared M. Cynamon
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.
Telephone:  (202) 482-0131

/s/ Kara M Westercamp
KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 305-7571
Email: kara.m.westercamp@usdoj.gov

Dated March 17, 2023

*Attorneys for Defendant*

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing brief complies with the word-count limitation, in that it contains 12,528 words according to the word-count function of the word-processing software used to prepare the memorandum, including text, footnotes, and headings.

<u>/s/ Kara M. Westercamp</u>

**THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| AMERICAN HONEY PRODUCERS ASSOCIATION AND SIOUX HONEY ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>ALLIED NATURAL PRODUCT AND AMBROSIA NATURAL PRODUCTS (INDIA) PVT. LTD.,<br><br>Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Court No. 22-00195 |

**ORDER**

Upon consideration of plaintiffs' motion for judgment on the agency record, defendant's response thereto, plaintiffs' reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's Final Results are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____                    _____
       New York, New York                                       Chief Judge