Slip Op. 23-128

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AMERICAN HONEY PRODUCERS ASSOCIATION AND SIOUX HONEY ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALLIED NATURAL PRODUCT AND AMBROSIA NATURAL PRODUCTS (INDIA) PVT. LTD., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 22-00195 |

## <u>OPINION</u>

[Denying Plaintiffs' motion for judgment on the agency record and sustaining the U.S. Department of Commerce's final determination in the less-than-fair-value investigation of raw honey from India]

Dated: September 1, 2023

Joshua Morey, Kelley Drye & Warren LLP, of Washington, DC, argued for Plaintiffs. With him on the brief were R. Alan Luberda, Melissa M. Brewer, and Matthew G. Pereira.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Reggie T. Blades, Jr., Assistant Director. Of counsel on the brief was Jared M. Cynamon, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Robert G. Gosselink</u>, Trade Pacific PLLC, of Washington, DC, argued for Defendant-Intervenors Allied Natural Product and Ambrosia Natural Products (India) Pvt. Ltd.  With him on the brief were <u>Jonathan M. Freed</u> and <u>Aqmar Rahman</u>.

Barnett, Chief Judge: This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") final affirmative

determination in the less-than-fair-value ("LTFV") investigation of raw honey from India,

for the period of investigation from April 1, 2020, through March 31, 2021.  *See Raw*

*Honey From India*, 87 Fed. Reg. 22,188 (Dep't Commerce Apr. 14, 2022) (final

affirmative determination of sales at less than fair value and final negative determination

of critical circumstances) ("*Final Determination*"), ECF No. 16-5, and accompanying

Issues and Decision Mem., A-533-903 (Dep't Commerce Apr. 7, 2022) ("I&D Mem."),

ECF No. 16-6.[1]

Plaintiffs American Honey Producers Association and Sioux Honey Association

(together, "Plaintiffs" or "American Honey") challenge two aspects of the *Final*

*Determination*, namely: (1) Commerce's decision to calculate antidumping duty margins

for respondents Allied Natural Product ("Allied") and Ambrosia Natural Products (India)

Pvt. Ltd. ("Ambrosia") rather than rely on total adverse facts available ("total AFA")[2] due

---

[1] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 16-2, a Confidential Administrative Record ("CR"), ECF No. 16-3, and a Non-Releasable Administrative Record, ECF 16-4.  Parties filed joint appendices containing record documents cited in their briefs.  *See* Public J.A. ("PJA"), ECF No. 35; Confid. J.A. ("CJA"), ECF No. 34.  Citations are to the CJA unless stated otherwise.

[2] Commerce uses total adverse facts available to determine dumping margins when the conditions for making an adverse inference have been met and "none of the reported data is reliable or usable."  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citation omitted); *see also Nat'l Nail Corp. v. United States*,

to what Plaintiffs consider to be inadequate financial statements, and (2) Commerce's decision to use acquisition costs as a proxy for the cost of production ("COP") of the subject merchandise, raw honey.  *See* Confid. Pls.' Rule 56.2 Mem. of Law in Supp. of Mot. for J. Upon the Agency R. ("Pls.' Mem."), ECF No. 20-1; Confid. Pls.' Reply Br. ("Pls.' Reply"), ECF No. 32.  Defendant United States ("the Government") and Defendant-Intervenors[3] support Commerce's determination.  Def.'s Resp. in Opp'n to Pls.' Mot. for J. Upon the Agency R. ("Def.'s Resp."), ECF No. 28; Def.-Ints.' Resp. in Opp'n to Pls.' Mot. for J. Upon the Agency R. ("Def.-Ints.' Resp."), ECF No. 31.

For the following reasons, Commerce's *Final Determination* will be sustained.

BACKGROUND

On May 18, 2021, Commerce initiated LTFV investigations concerning raw honey from Argentina, Brazil, Ukraine, Vietnam, and as relevant here, India.  *Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam*, 86 Fed. Reg. 26,897 (Dep't Commerce May 18, 2021) (initiation of LTFV investigations) ("*Initiation Notice*").  Commerce initiated the investigations following receipt of antidumping duty petitions filed on behalf of Plaintiffs, trade associations representing domestic producers of raw honey.  *Id.* at 26,897.  The petitions alleged that imports of raw honey were being

---

43 CIT _, _, 390 F. Supp. 3d 1356, 1374 (2019) (explaining that "Commerce uses 'total adverse facts available'" when it applies "adverse facts available not only to the facts pertaining to specific sales or information … not present on the record, but to the facts respecting all of respondents' production and sales information that the [agency] concludes is needed for an investigation or review") (citation omitted).

[3] Defendant-Intervenors consist of Allied and Ambrosia (together, "Defendant-Intervenors," or, when in reference to the underlying agency proceeding, "Respondents").

sold at less than fair value, causing material injury to the domestic raw honey industry.

*Id*.

On November 17, 2021, Commerce issued an affirmative preliminary

determination.  *Raw Honey from India*, 86 Fed. Reg. 66,528 (Dep't Commerce Nov. 17,

2021) (prelim. affirmative determination of sales at less than fair value, prelim. neg.

determination of critical circumstances, postponement of final determination, and

extension of provisional measures) ("*Prelim. Determination*"), PR 273, CJA Tab 53, and

accompanying Decision Mem. ("Prelim. Mem."), PR 259, CJA Tab 48.  For the

*Preliminary Determination*, Commerce used Respondents' acquisition costs as a proxy

for COP.  Prelim. Mem. at 16.

Commerce published the *Final Determination* on April 14, 2022.  87 Fed. Reg. at

22,188.  For the *Final Determination*, Commerce relied on Respondents' financial

statements rather than total AFA and continued to rely on acquisition costs as a proxy

for COP.  *See* I&D Mem. at 19–34.

This appeal followed and the court heard oral argument on August 15, 2023.

*See* Docket Entry, ECF No. 40.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018) and 28 U.S.C. § 1581(c)

(2018).[4]  The court will uphold an agency determination that is supported by substantial

---

[4] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and
references to the U.S. Code are to the 2018 edition unless otherwise specified.

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *See Consol. Edison Co. v. NLRB*, 305 U.S. 197,

229 (1938).  While Commerce's conclusions must be supported by substantial

evidence, 19 U.S.C. § 1516a(b)(1)(B), "the possibility of drawing two different

conclusions from the evidence does not prevent [Commerce's] finding from being

supported by substantial evidence," *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620

(1966).

DISCUSSION

Commerce imposes an antidumping duty on foreign merchandise that "is being,

or is likely to be, sold in the United States at less than its fair value," and results in

material injury or threat of injury to a U.S. domestic industry.  19 U.S.C. § 1673.  The

antidumping duty imposed is "an amount equal to the amount by which the normal value

exceeds the export price (or the constructed export price) for the merchandise."  *Id*.

Here, Plaintiffs' arguments implicate Commerce's decisions to use Respondents'

financial statements and acquisition costs as a proxy for COP in its normal value

calculations.  Each issue is discussed, in turn.

**I.      Commerce's Reliance on Respondents' Financial Statements**

   **A.  Legal Background**

When "necessary information is not available on the record," or an interested

party "withholds information" requested by Commerce, "fails to provide" requested

information by the submission deadline, "significantly impedes a proceeding," or

provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i),

Commerce "shall . . . use the facts otherwise available."  19 U.S.C. § 1677e(a).  Once

Commerce determines that the use of facts otherwise available is warranted, if

Commerce also "finds that an interested party has failed to cooperate by not acting to

the best of its ability to comply with a request for information," Commerce "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available."  *Id*. § 1677e(b).  "Compliance with the 'best of its ability' standard

is determined by assessing whether a respondent has put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an investigation."

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003); *see also*

*Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1275–76 (Fed. Cir. 2012).

### B.  Factual Background

Commerce issued antidumping questionnaires to Respondents in which

Commerce requested financial statements for fiscal year ("FY") 2019–2020 and FY

2020–2021.  *See* Initial Questionnaire (June 8, 2021) ("Allied Initial Questionnaire") at

A-10, PR 63–64, CJA Tab 5; Initial Questionnaire (June 8, 2021) ("Ambrosia Initial

Questionnaire") at A-10, PR 65–66, CJA Tab 6.  Respondents each provided the FY

2019–2020 financial statements but informed Commerce that financial statements for

FY 2020–2021 were not yet available.  *See* Section A Questionnaire Resp. (July 13,

2021) at A-22, Ex. A-9(b), CR 44–47, PR 89–90, CJA Tab 12 ("Allied Section A

Questionnaire Resp."); Resp. to Section A of Original Antidumping Duty Questionnaire

(July 14, 2021) at A-19, Ex. A-9(b), CR 48–55, PR 92–98, CJA Tab 13 ("Ambrosia

Section A Questionnaire Resp.").

Commerce later renewed its request for the FY 2020–2021 financial statements,

adding that "[i]f these financial statements are not yet available, provide year end

unaudited financial statements or the year end accounting trial balance."  Suppl.

Questionnaire (Aug. 23, 2021) at 4–5, CR 87, PR 136, CJA Tab 23 ("Ambrosia Suppl.

Questionnaire"); Section A–C Suppl. Questionnaire (Aug. 19, 2021) at 4, CR 86, PR

134, CJA Tab 22 ("Allied Section A–C Suppl. Questionnaire").  Respondents

subsequently provided their respective trial balances for FY 2020–2021, explaining that

the requested financial statements were not ready because of delays related to the

global COVID-19 pandemic.  See Section ABC Suppl. Questionnaire Resp. (Sept. 9,

2021) at Exs. S1-3, S1-5, S1-4, CR 95–102, PR 156, CJA Tab 25 ("Allied Section ABC

Suppl. Questionnaire Resp."); Resp. to First Suppl. [Q]uestionnaire for Section A, B & C

of Original Antidumping Duty Questionnaire (Sept. 16, 2021) at Exs. S1-1–S1-2, S1-4,

S1-1(d), S1-6(a), CR 124–30, PR 173–76, CJA Tab 32 ("Ambrosia Section ABC First.

Questionnaire Resp."); Resp. to First Suppl. Section D Questionnaire (Sep. 24, 2021) at

Ex. S2-1, CR 135–38, PR 186, CJA Tab 34 ("Ambrosia Resp. to First Suppl. Section D

Questionnaire").  Respondents continued to inform Commerce of the delay in finalizing

the audited financial statements.  Resp. to [S]econd Suppl. Section D Questionnaire

(Oct. 28, 2021) at SD2-1, CR 168–69, PR 224, CJA Tab 42 ("Ambrosia Resp. to

Second Suppl. Section D Questionnaire"); 2nd Sections ABC Suppl. Questionnaire

Resp. (Nov. 5, 2021) at SuppABC2-1, CR 194–209, PR 246, CJA Tab 47 ("Allied 2nd

Sections ABC Suppl. Questionnaire Resp").

On January 6, 2022, Commerce issued questionnaires to Respondents in lieu of

conducting on-site verification.  In-Lieu of Verification ("ILOV") Questionnaire (Jan. 6,

2022), CR 248, PR 292, CJA Tab 55 ("Allied ILOV Questionnaire"); [ILOV]

Questionnaire (Jan. 6, 2022), CR 247, PR 291, CJA Tab 54 ("Ambrosia ILOV

Questionnaire").  Therein, Commerce requested the final audited FY 2020–2021

financial statements, if they had been finalized, and required Respondents to reconcile

the financial statements to the trial balances previously submitted.  *See* Allied ILOV

Questionnaire at 3; Ambrosia ILOV Questionnaire at 6.  In response, Allied provided

audited FY 2020–2021 financial statements finalized in December 2021, *see* [ILOV]

Questionnaire Resp. (Jan. 18, 2022) ("Allied ILOV Questionnaire Resp.") at ILOV-3–4,

Ex. SVE-11, CR 267–78, PR 297, CJA Tab 57, and Ambrosia submitted audited

financial statements finalized in mid-November 2021, *see* Ambrosia Resp. to [ILOV

Questionnaire] (Jan. 18, 2022) ("Ambrosia ILOV Questionnaire Resp.") at 15, Ex. VD-

10(a), CR 249–66, PR 296, CJA Tab 56.  The submitted financial statements did not

include an auditor's report; however, they did include markings from directors and

auditors indicating that the financial statements had been reviewed.  *See* Allied

Verification Questionnaire Resp., Ex. SVE-11; Ambrosia Verification Questionnaire

Resp., Ex. VD-10(a).  Commerce subsequently determined that Respondents had

complied with its requests and did not "impede the proceeding by withholding any

information."  I&D Mem. at 34.

### C. Parties' Contentions

Plaintiffs contend that Commerce's acceptance of the financial statements was not supported by substantial evidence because Respondents withheld those statements after they were finalized and, even then, did not provide complete statements, inclusive of the notes and auditors' reports, thus impeding Commerce's investigation.[5]  Pls.' Mem. at 12–19.  Plaintiffs further argue that the late submission of the statements denied Plaintiffs the opportunity to rebut, clarify, or correct those statements as required by Commerce's regulations.  *See id.* at 19–21.  Plaintiffs assert that Commerce's determination that Respondents acted to the best of their abilities is unsupported by the record and the alleged shortcomings should have resulted in the use of total AFA.  *See id.* at 21–32.

The Government contends that Respondents complied with Commerce's requests and acted to the best of their abilities.  *See* Def.'s Resp. at 30–43.  In particular, the Government notes that Respondents timely submitted audited financial statements for FY 2019–2020 and informed Commerce about delays in finalizing the FY 2020–2021 financial statements.  *Id*. at 30–31.  The Government further contends that Commerce considered and rejected the argument that the financial statements lacked key components when the agency accepted Respondents' explanation that, under

---

[5] Plaintiffs identify six deficiencies with the financial statements: (1) the lack of an independent auditor's report, (2) missing annexures and the Report on Internal Financial Controls, (3) the lack of an auditor's signature, (4) the lack of an auditor's stamp, (5) the lack of both directors' signatures on several pages of the statements, and (6) various other missing forms required under Indian law.  *See* Pls.' Mem. at 12–16.

Indian law, financial statements must include only certain items that Respondents provided.  *See id.* at 32.

Defendant-Intervenors echo the Government's position that Commerce properly relied on the financial statements and declined to apply adverse facts available.  Def.-Ints.' Resp. at 7–12.  Defendant-Intervenors contend that they timely filed their FY 2020–2021 audited financial statements consistent with the deadlines provided in Commerce's regulations.  *See id.* at 7.

### D.  Analysis

Commerce's initial questionnaire asked for Respondents' audited financial statements and specified that such request included "any footnotes and auditor's opinion."  Ambrosia Initial Questionnaire at A-10; *see also* Allied Initial Questionnaire at A-10.  Plaintiffs aver that this definition of "financial statements" as inclusive of the footnotes and auditor's opinion persisted throughout the investigation.  *See* Pls.' Mem. at 12, 21, 24; Pls.' Reply Br. at 7–8.  Commerce, on the other hand, explained that it did not explicitly request any accompanying audit report in its questionnaire in lieu of verification but instead asked Respondents to demonstrate how the values in those financial statements corresponded to the previously submitted trial balances.  *See* I&D Mem. at 32.

In light of the express language used by the agency, Commerce's determination that its "verification questionnaire requested the audited 'financial statements,' but did not explicitly specify that the accompanying audit report be provided" is supported by substantial evidence.  *Id.* at 32.  Commerce's determination is consistent with the

purpose of the questionnaires, which Commerce explained was to "collect additional or supporting documentation related to information that [Respondents] have already submitted in this investigation" and was "not a request for new information."  Ambrosia ILOV Questionnaire at 1; Allied ILOV Questionnaire at 1.

Commerce's determination that Respondents "did not impede the investigation," I&D Mem. at 32, is also supported by substantial evidence.  Commerce explained that Respondents informed Commerce of the delays in completing their FY 2020–2021 financial statements due to the pandemic, timely submitted trial balances to Commerce in lieu of the financial statements, and reconciled those trial balances to the audited financial statements.  *See id.* at 32–34.

Plaintiffs' arguments to the contrary are without merit.  Plaintiffs argue that the submitted financial statements are deficient because the statements missed "integral parts," namely the presence of an independent auditor's report.  *See* Pls.' Mem. at 25, 27–28.  As discussed above, Commerce reasonably concluded that Respondents were not required to submit an auditor's report.  Moreover, Commerce found that the statements were audited given the "directors' and auditor's signatures and stamps that are present on the income statements."  I&D Mem. at 32; *see also* Ambrosia Verification Questionnaire Resp. at Ex. VS-1, Ex. VS-2 (i), Ex. VS-2 (ii), Ex. VS-3; Allied Verification Questionnaire Resp. at Ex. SVE-1, Ex. SVE-2.  While Commerce acknowledged that the financial statements provided by Ambrosia were "missing certain data when compared to the prior period audited financial statements that were submitted," I&D

Mem. at 32–33, Commerce determined that the missing data were "not critical for

Commerce's use for this investigation,"[6] *id*. at 33.

Plaintiffs also claim that Respondents impeded the investigation by withholding

their financial statements from Commerce.  Pls.' Mem. at 12–19.  There is no dispute

that Respondents' financial statements for FY 2020–2021 were delayed as a result of

the COVID-19 pandemic.  *See* I&D Mem. at 34.  Respondents reported these delays to

Commerce along with the Indian Government's extensions of the deadlines for

completing the financial statements.  *Id.*; *see also* Ambrosia Resp. to First Suppl.

Section D Questionnaire at S1-2; Allied Suppl. Section D Questionnaire Resp. at

SuppD-12 (Sept. 28, 2021), CR 142–45, PR 191, CJA Tab 35.  Plaintiffs' argument

rests on the fact that the financial statements were completed almost two months prior

to submission.  *See* Pls.' Mem. at 15–16.  Commerce rejected Plaintiffs' argument

based on the timeline discussed herein as a result of the pandemic and in

acknowledgement of the fact that the financial statements were not completed until after

the submission of all of Respondents' supplemental questionnaire responses.  *See* I&D

Mem. at 34.  While Plaintiffs would have preferred that Commerce concluded differently,

---

[6] Plaintiffs also argue that Commerce improperly relied on Ambrosia's characterization of the financial statements as meeting the requirements of the Indian Companies Act of 2013 Section 2(40), which Plaintiffs aver was not placed on the record of the investigation.  *See* Pls.' Mem. at 27–28.  Most of the agency's discussion of the Indian Companies Act is in the form of restatement of Ambrosia's assertion, without express adoption by Commerce.  *See* I&D Mem. at 32–33.  Any reliance by Commerce on the requirements of Indian law, even if erroneous, was harmless in light of the additional reasoning provided by Commerce for finding that the financial statements, as provided by Respondents in response to the ILOV questionnaires, were adequate to verify the contents of the trial balances.

Plaintiffs provide no basis for the court to disturb the agency's weighing of the facts.

*See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir.

2015) (explaining that the court may not reweigh the evidence).

Plaintiffs further assert they did not have an adequate opportunity to rebut or

comment on the financial statements because Respondents provided the statements in

response to the verification questionnaire.  *See* Pls.' Mem. at 19–21.  As Commerce

explained, the agency accepted the financial statements as part of its verification

exercise, not as new factual information, but, rather, for purposes of verifying the

accuracy of the trial balances that Respondents previously submitted.  *See* I&D Mem. at

34.  Moreover, as noted by the Government, Plaintiffs had an opportunity raise

arguments regarding those trial balances throughout the course of the proceeding and,

thus, the court finds that they were not deprived of an opportunity to comment on

Respondents' financial information.[7]  *See id.* at 28–34; Def.'s Resp. at 35-–36; 19

C.F.R. § 351.301(c)(1)(v) (listing various opportunities parties have to rebut, clarify, or

correct questionnaire responses).

---

[7] Plaintiffs also claim that "there were discrepancies among the reported cost figures" discovered at verification.  Pls.' Mem. at 18–19.  Commerce found that Respondents had reconciled these figures by providing "audited financial statements to the general ledger accounts, as maintained in their financial accounting system, and a cost allocation summary worksheet . . . which reconciled with the costs reported in the respondents' databases."  I&D Mem. at 33.  Commerce determined that none of "the examples cited demonstrate that the respondents' data are incomplete, or inaccurate, or that the responses were otherwise not in accordance with the information Commerce requested."  *Id.* at 33 & n.183.  Thus, Commerce considered Plaintiffs' concerns with the financial statements and explained how it used multiple sources to reconcile Respondents' reported data.

Finally, Plaintiffs cite *Assan Alumniyum Sanayi ve Ticaret A.S. v. United States* ("Assan"), 47 CIT __, __, 624 F. Supp. 3d 1343, 1377 (2023), to support their argument that Respondents impeded the investigation and Commerce made "[c]onclusory statements that the Respondents cooperated to the best of their ability," Pls.' Reply at 15.  Plaintiffs' reliance on *Assan* is misplaced, however, because the facts in the present case are distinct from the facts in *Assan*.  There, the court held that Commerce's finding that "Assan . . . cooperated with Commerce's requests for . . . information[] and . . . answered each request for . . . information to the best of its ability" did not accord with law because Commerce did not explain the basis for its conclusion. *Assan*, 624 F. Supp. 3d at 1377 (alterations in original).  Here, as discussed above and in Commerce's Issues and Decision Memorandum, Commerce clearly justified its conclusion that Respondents did not impede the investigation.  *See* I&D Mem. at 31–34.

In sum, Commerce responded to each of the objections raised by Plaintiffs and explained its decision to accept and rely on the financial records provided by Respondents.  The court will not reweigh this evidence.  *See Downhole Pipe & Equip., L.P.*, 776 F.3d at 1376–77.  Accordingly, Commerce's decision to rely on the Respondents' audited financial statements to conduct their antidumping analysis and to decline the use of AFA was supported by substantial evidence.

**II.     Commerce's Decision to Use Respondents' Acquisition Costs to Calculate the Cost of Production**

   **A.  Legal Background**

To determine whether subject merchandise is being sold at LTFV, Commerce

compares the export price of the subject merchandise to its normal value.[8]  *See*

*generally* 19 U.S.C. 1673, *et seq.*  Normal value is "the price [of the foreign like product]

at a time reasonably corresponding to the time of the sale used to determine the export

price."  *Id.* § 1677b(a)(1)(A).  Commerce calculates the normal value of the subject

merchandise on the basis of home market sales that are made "in the ordinary course

of trade."  *Id.* § 1677b(a)(1)(B)(i).  Commerce, therefore, may disregard sales at prices

that are less than the COP, *id.* § 1677b(b)(1), because those sales are not made in the

ordinary course of trade, *see id.* § 1677(15)(A).  The COP "equal[s] . . . the sum of . . .

the cost of materials and of fabrication or other processing of any kind employed in

producing the foreign like product, during a period which would ordinarily permit the

production of that foreign like product in the ordinary course of business."  *Id.*

§ 1677b(b)(3)(A).

The statute specifies that Commerce should normally base its calculation of COP

"on the records of the exporter or producer," if those "records are kept in accordance

with the generally accepted accounting principles," and "reasonably reflect" the cost of

---

[8] When, as here, the subject merchandise is sold or offered for sale "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price," normal value is determined on the basis of home market sales. 19 U.S.C. § 1677b(a)(1)(B).

merchandise.  *Id*. § 1677b(f)(1)(A).  However, the statute does not require Commerce to

rely upon actual cost data, but instead provides Commerce the discretion to rely upon

the actual production costs of unaffiliated suppliers of subject merchandise instead of

acquisition costs.  *See SKF USA Inc. v. United States*, 630 F.3d 1365, 1371 (Fed. Cir.

2011).

      In the context of a respondent selling raw, unprocessed agricultural products,

Commerce previously has relied on the cost of producing the raw goods as the

respondent's COP, even when the respondent is not the producer.  *See, e.g.*, *Fresh and

Chilled Atl. Salmon from Norway*, 56 Fed. Reg. 7,661, 7,672 (Dep't Commerce Feb. 25,

1991) (final determination of sales at less than fair value) (non-affiliated salmon farmers'

costs used as a proxy for COP for salmon exporter); *Greenhouse Tomatoes From

Canada*, 67 Fed. Reg. 8,781, 8,782–84 (Dep't Commerce Feb. 26, 2002) (final

determination of sales at less than fair value) (farmer's costs relied upon as exporters'

COP).  Most relevant for the present case, Commerce used this same methodology in

an earlier proceeding covering honey from Argentina.  *See, Honey From Argentina*, 76

Fed. Reg. 2,655, 2,659 (Dep't Commerce Jan. 15, 2011) (prelim. results of antidumping

duty admin. review) (independent beekeepers' cost of producing honey used as COP

for honey exporters) (unchanged for the final results).

      **B.  Relevant Factual Background**

      In the underlying proceeding, Commerce determined that, due to the large

number of beekeepers in India producing raw honey, and the fact that many of them are

small, unsophisticated operations with few or no accounting records, obtaining data

from a random sample of beekeepers that is statistically valid would not be possible. I&D Mem. at 25. Commerce also determined that because the Indian beekeeping operations were generally small in comparison to the size of Respondents, even selecting the largest suppliers to evaluate would not capture a representative sample of the raw honey being supplied to Respondents. *Id*. Commerce also took account of its experience in *Honey from Argentina*, in which it selected a dozen honey producers out of some twenty-five thousand producers and none of them responded to Commerce's inquiries. *See id*. at 24–25. Taking account of this experience and the facts of this case, Commerce determined that its resource constraints, difficulty in acquiring information from small and oftentimes unsophisticated raw honey producers, and the sheer number of producers in the Indian marketplace supported a different approach to determining COP. I&D Mem. at 25–26.

Here, Commerce determined to have Respondents report their acquisition costs and to obtain information from a subset of their suppliers to confirm that those acquisition costs were reliable. *See id.* Commerce identified the largest honey suppliers for each respondent and selected the suppliers "with the lowest sales prices to Allied and Ambrosia." *Id*. at 26. In doing so, Commerce chose to collect COP information from "two of Allied's middlemen-suppliers and two beekeeper-suppliers to those middlemen" and from "Ambrosia's one direct beekeeper-supplier, one middleman and its beekeeper-supplier." *Id.* Commerce reasoned "that these were the suppliers with the highest risk to be selling at below their COP . . . and were actual suppliers to

the exporter-respondents" and, thus, "Commerce could reasonably determine that reliance on acquisition costs would not result in missing costs."  *Id*.

Commerce compared these beekeepers' COP to the respective acquisition costs paid by Respondents to ensure that the raw honey was not obtained below the suppliers' COP.  *See id.* at 26–27.  In each case, Commerce found that the acquisition costs paid by Respondents exceeded the COP incurred by raw honey suppliers.  *See id*. at 19–20 & n.131 (citing Prelim. Mem. at 17).  Commerce further reasoned that the reliance on acquisition costs would "ensure[] the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey" because "it can reasonably be shown that the upstream beekeeper-producers are not selling below cost" and is thus consistent with Commerce's obligations under the Tariff Act.  *Id*. at 27.

### C. Parties' Contentions

Plaintiffs contend that Commerce's reliance on acquisition costs is contrary to the agency's practice because that practice is to rely on the beekeeper and supplier costs when they are available and, in the alternative, Commerce should have relied upon Plaintiffs' data from the National Horticultural Board of India ("NHBI").  *See* Pls.' Mem.at 32–40.  Plaintiffs further claim that Commerce's reliance on acquisition costs is unsupported by substantial evidence.  *See id*. at 40–48.

The Government contends that Commerce's experience in *Honey from Argentina* was informative for this investigation.  *See* Def.'s Resp. at 16–18.  The Government argues that this experience, coupled with the reality of smaller beekeepers having

limited records, informed the agency's decision to change its practice here, which the

agency explained and justified.  *See id.* at 18–19.  The Government maintains that

Commerce adopted a "pragmatic approach to collecting limited beekeeper COP

information."[9]  *Id.* at 19 (quoting I&D Mem. at 26).  The Government further contends

that Commerce was not obligated to rely on, and was reasonable in declining, the NHBI

data.  *Id.* at 24–25, 28.

Defendant-Intervenors add that Plaintiffs failed to demonstrate that Commerce's

approach here deviated from its goal of calculating accurate dumping margins.  *See*

Def.-Ints.' Resp. at 3–6.

### D.  Analysis

Commerce's reliance on acquisition costs as a proxy for COP is in accordance

with law and supported by substantial evidence because Commerce provided adequate

reasoning for its decision and was not obligated to rely on Plaintiffs' NHBI data.

Commerce acknowledged that in prior investigations of raw agricultural goods,

including raw honey, it had sought to rely on the costs of the growers/producers when

determining COP, but explained why the agency decided to alter that practice here and,

instead, rely upon acquisition costs as a proxy for COP.  *See* I&D Mem. at 22–27.

Agencies are permitted to deviate from past practices provided that they explain the

reasoning behind the deviation.  *See, e.g.*, *Atchison, Topeka & Santa Fe Ry. Co. v.*

---

[9] As discussed above, Commerce selected suppliers with the lowest sales prices to
Respondents because those suppliers posed the highest risk of selling at below their
COP and thus Commerce could reasonably determine that reliance on the acquisition
costs would not result in any missing costs.

*Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003) ("Commerce is permitted to deviate from [its] past practice, at least where it explains the reason for its departure." (citing *Atchison*, 412 U.S. at 808)).

Here, Commerce adequately explained its decision to apply a new methodology. *See* I&D Mem. at 27.  That explanation included reference to the agency's less-than-ideal experience in *Honey from Argentina* and Commerce's comparison between Respondents' acquisition costs and the costs of production from the largest honey suppliers with the lowest sales prices to Respondents.  *See* I&D Mem. at 27; Prelim. Mem. at 16–17.  Through this analysis, Commerce concluded that Respondents' acquisition costs were above the COP of their suppliers such that the acquisition costs provided a reasonable proxy for the COP of the raw honey and that no costs were being omitted.  *Id.*  As discussed herein, Plaintiffs' arguments simply ask the court to reweigh the evidence, which the court will not do.  *See Downhole Pipe & Equip., L.P.*, 776 F.3d at 1376–77.

Having adopted a reasonable methodology for testing Respondents' acquisition costs, Commerce was not obligated to rely upon Plaintiffs' NHBI data.  As the Government noted, Commerce is under no statutory requirement to "explicitly discuss every piece of record evidence that is" placed before the agency in a proceeding, *see* Def.'s Resp. at 28–29 (quoting *Allegheny Ludlum Corp. v. United States*, 24 CIT 452, 479, 112 F. Supp. 2d 1141, 1165 (2000)), and is instead only required to consider issues material to its determination, *see Allegheny Ludlum Corp.* 112 F. Supp. 2d at

1165.  Plaintiffs' mere disagreement with Commerce's findings and methodology is not

sufficient to remand Commerce's *Final Determination*.

To the extent Plaintiffs object that Commerce should have done more to verify

the costs of the beekeepers and middlemen suppliers, those objections are without

merit.  Here, it appears that Commerce considered the information it received from the

beekeepers and middlemen suppliers to be self-verifying to the extent that Commerce

recognized that these small beekeeper operations "typically had limited records, or

limited access to technology due to their remote locations."  I&D Mem. at 24.

Commerce also noted these operations are not required "to maintain books and

records, prepare financial statements, or file tax returns."  *Id*. at 38–39.  Rather than

engage in a seemingly pointless verification exercise of asking the beekeeper and

supplier operations to resubmit their limited records as part of an in-lieu-of-verification

questionnaire response, Commerce carefully reviewed the details of the information

provided by the beekeepers and suppliers to ensure completeness and filled any gaps

in that information with data provided by Plaintiffs.  *See id.* at 38–43.  Notwithstanding

the above adjustments, the costs attributed to the beekeepers and suppliers by

Commerce were *still* below the acquisition costs of Allied and Ambrosia, and Commerce

determined that no further verification was appropriate.  *See id.*  Based on the

foregoing, the court finds that the agency adequately explained the basis for its

decision, and while Commerce may not have expressly responded to Plaintiffs'

argument about verifying the beekeeper information, the court is able to discern the

agency's reasons for finding further verification unnecessary.  *See NMB Sing. Ltd. v.*

*United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the

basis for its decisions; while its explanations do not have to be perfect, the path of

Commerce's decision must be reasonably discernable to a reviewing court.").

Finally, the court acknowledges its recent decision in *Nexco S.A. v. United States*

dealing with Commerce's decision to rely upon acquisition costs as a proxy for COP in

the parallel investigation of raw honey from Argentina.  Slip Op. 23-85, 2023 Ct. Int'l

Trade LEXIS 87 (CIT June 7, 2023).[10]  There, the plaintiff was the respondent in that

investigation and argued that the acquisition costs were not a reasonable proxy for COP

because they were too high.  *See id.* at *3.  The *Nexco* court, like this court, agreed that

Commerce reasonably explained its decision to deviate from its prior practice and

consider acquisition costs as a proxy for COP.  *Id.* at *10–11.  The *Nexco* court,

however, agreed with the plaintiff that Commerce did not adequately explain how that

methodology was not "overinclusive" of costs such that it potentially overstated COP,

when the acquisition costs were two to three times higher than the beekeepers' COP.

*Id.* at *12–14.  Here, when the challenge to the methodology is from domestic party

---

[10] Note that the previous references to *Honey from Argentina* refer to an antidumping duty order issued in 2001.  *See Notice of Antidumping Duty Order; Honey From Argentina*, 66 Fed. Reg. 63,672 (Dep't Commerce Dec. 10, 2001).  That order was subsequently revoked pursuant to *Honey from Argentina*, 77 Fed. Reg. 77,029 (Dec. 31, 2012) (final results of antidumping and countervailing duty changed circumstances reviews; revocation of antidumping and countervailing duty orders).  As referenced in the Background section above, Commerce initiated a new investigation of honey from Argentina coincident with this investigation.  *Initiation Notice*, 86 Fed. Reg. at 26,897.

plaintiffs, there is no concern that the acquisition costs potentially overstate the COP of the raw honey, and Commerce has otherwise explained its decision.[11]

For these reasons, Commerce's reliance on acquisition costs as a proxy for COP is supported by substantial evidence and is otherwise in accordance with the law.

**CONCLUSION**

For the foregoing reasons, the court will sustain Commerce's *Final Determination*. Judgment will enter accordingly.


/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge


Dated: September 1, 2023
            New York, New York

---

[11] In *Nexco*, the plaintiff's concern related to acquisition costs that were potentially overinclusive such that those costs inflated the normal value and, thus, the dumping margin, to the plaintiff's detriment. By contrast, here, Plaintiffs object that the acquisition costs understate COP, thereby potentially understating the normal value and the dumping margin. As discussed above, Commerce has reasonably explained its determination that the acquisition costs capture the full cost of producing the raw honey.